UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CHARLES HESS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-CV-208 JD |
| | ) | |
| BIOMET, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This case arises out of a dispute over distributorship agreements between Biomet, Inc., which sells medical devices, and six individual plaintiffs. In the early 1980s, when it was still in its infancy, Biomet hired each of the plaintiffs away from its established competitor and granted them exclusive distributorships within prescribed territories. As an incentive to move to a less-established company, which would result in a drop in pay in the near term, Biomet offered each of the plaintiffs lifetime commissions on products sold within their distributorships once they retired. Each of the plaintiffs retired between 1996 and 1999, at which time Biomet began making those payments.

In 2015, around the time Biomet was merging with Zimmer, Inc., the parties discussed proposals for Biomet to buy out the plaintiffs' rights to future commission payments. Those discussions brought to the fore a dispute over the scope of the retirement commissions. In particular, the parties disagree over whether the commissions are due only on products sold by the plaintiffs' distributorships at the time they retired—as Biomet interprets the agreements and has been paying the plaintiffs for many years—or apply more broadly to all Biomet products (and now Zimmer products too), even those that the plaintiffs did not and were not authorized to sell within their distributorships.

The six plaintiffs filed this suit in April 2016 against Biomet and the new post-merger entity, Zimmer Biomet Holdings, Inc. (which the Court need not mention further). They asserted breach of contract claims on three separate grounds. They also asserted a claim for criminal deception based on commission statements that Biomet provided over the years. The case was first assigned to Judge Lozano, who granted a motion to dismiss as to two of the three breach of contract claims. The case continued through discovery, during which time it was transferred to the undersigned. Following the close of fact discovery, the plaintiffs moved to reconsider the order dismissing two of their breach of contract claims, and asked in the alternative for leave to amend their complaint to replead those claims. Both sides also moved for summary judgment.

As explained below, the Court denies the motion to reconsider or amend—as a motion for reconsideration, it is unfounded, and as a motion for leave to amend, it is untimely. The Court also denies the motions for summary judgment as to the breach of contract claim at the core of the parties' dispute, but grants the motions in part in other respects.

## I. FACTUAL BACKGROUND

The plaintiffs in this case are six individuals who formerly worked as distributors for Zimmer, Inc., which sells medical devices. At the time the plaintiffs worked for Zimmer, Zimmer was an established company and the plaintiffs were successful salesmen. In the early 1980s, Biomet was a new company attempting to enter the medical device field in competition to Zimmer. It approached each of the six plaintiffs and asked them to join Biomet Inc. as independent distributors. At that time, Biomet was still a fledgling company and sold only a limited catalog of products, consisting of joint-replacement devices.

Because Biomet's sales did not yet compare to Zimmer's, moving to Biomet would result in a drop in compensation at least in the short term, as the distributors were paid on commission and Biomet could not afford to offer large up-front compensation. In order to induce them to

make that transition, Biomet offered each of the plaintiffs not only commissions on the sales they made as distributors, but also lifetime commissions on sales made after their retirement. Between September 1980 and June 1983, each of the six plaintiffs accepted those offers and signed contracts giving them exclusive distributorships in their respective territories. Robert McCormick covered Louisiana; Charles Hess and Ronald Papa jointly covered Oklahoma and Arkansas; Al Tornquist covered Kansas and Missouri; Marty Higgins covered two counties in Massachusetts; and Frank Shera covered most of Indiana and part of Kentucky. (The Court refers to the six plaintiffs collectively as the Distributors except when necessary to refer to them individually.)

The distributorship agreements that each of the Distributors signed were identical as relevant here. The contracts were entered between each Distributor and "Biomet Inc." [*E.g.*, 158-2]. The contracts granted each Distributor "the exclusive rights to the distribution and sale of Biomet products in [their] territory(s) and to the receipt of commissions for same[.]" *Id.* § 1. Section 2 of the contracts outlined the commission percentages that the Distributors would receive on various categories of products, and also set a floor for commissions on any items added to Biomet's product line that were not covered by those categories. *Id.* § 2(b). The contracts also set sales quotas and explained that the territories could be changed or the distributorships could be terminated under certain conditions. *Id.* §§ 3–5. They also included a non-compete provision. That provision applied only to products sold by Biomet within each Distributors' territory; it allowed the Distributors to sell other products "so long as these items are not sold or distributed or offered for sale" by Biomet within their territory. *Id.* § 6. However, if Biomet added any products or product categories to its line, the Distributors would have to cease selling any competing products. *Id.*

The claims in this case focus on Section 9 of the contracts, which established a long-term commission program. *Id.* § 9. The Distributors would be vested in that program upon working for Biomet for ten years and reaching the age of 55, and the payments would commence upon their retirements. *Id.* § 9(a). Payments under that program were calculated as percentages of the "total 'net sales'": one and one-quarter percent of the first $4 million in net sales per year, and one-half of one percent of all further net sales, with no maximum. *Id.* § 9(d). The contracts then defined the term "net sales":

> The term "net sales" shall be defined as gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet less returns and allowances and less adjustments for nonpayment of invoices as provided herein.

*Id.* § 9(e). Those payments would continue for the Distributors' lifetimes (or for a minimum of 10 years). *Id.* § 9(g). Section 9 also included a non-compete agreement for the term of the long-term commission program. In particular, it prohibited the Distributors' involvement in "any business similar to the type of business conducted by Biomet at the time of the initiation and during the term of this program, within the territory(s) then assigned to the distributor." *Id.* § 9(h).

After signing those contracts, the Distributors began working for Biomet as distributors. The medical device industry is a relationship-driven business, and those positions entailed building relationships with surgeons and often attending surgeries to provide support while the surgeons were operating. The Distributors also provided feedback from the surgeons to Biomet's research and development department in order to assist in developing new products and instruments. The Distributors' contracts did not call for them to purchase any products from Biomet; in return for their services, the contracts entitled them to commissions on sales that Biomet made within their territories. In practice, however, the Distributors did purchase certain

sample products and also maintained some inventory of products and instruments. The Distributors' business focused on selling reconstructive products, such as hip and knee implants, but they also sold some other products like pins used to fix bones after a trauma.

Biomet as an organization expanded significantly over the years. Biomet expanded its reach beyond orthopedic products, which were the focus of the Distributors' distributorships, by acquiring other companies to enter new product categories. In 1987, it acquired Electro-Biology, Inc. (EBI), which made bone growth stimulators. EBI had its own sales force, and though some of the Distributors asked for distribution rights for EBI's products, they were not given authorization to distribute EBI products and were not paid commissions on sales of EBI's products. In 1990, Biomet acquired Arrow Surgical Technologies, which it renamed Arthrotek, and which sold sports medicine products. Some of the Distributors were authorized to distribute Arthrotek products, but they were granted that authorization through separate distributorship agreements that they entered with Arthrotek. In 1992, Biomet acquired Walter Lorenz Surgical, which sold microfixation products. Biomet also acquired other companies after the Distributors' retirements, including 3i Dental (which sells dental products), DePuy Trauma (trauma products) and Lanx, Inc. (spinal products).

Each of the Distributors retired between 1995 and 1999, after their long-term commissions vested. Upon their retirements, Biomet began paying the long-term commissions to each of the Distributors on a bi-monthly basis. It paid those commissions based on the sales of orthopedic products, but did not include sales of the other business units it had acquired. (At some point, the orthopedic products were moved into a new entity, Biomet Orthopedics, Inc., and Biomet paid long-term commissions on all products sold through that business unit.) Each payment was accompanied by a commission statement, which would contain little information

beyond the amount being paid and its calculation. By 2007, those commission statements began listing each item sold upon which the Distributors were receiving commissions. They did not report any sales that were made but upon which the Distributors were not receiving commissions, though. The Distributors claim that throughout that time, they were unaware that they were not being paid long-term commissions on products sold by the other business units.

Around 2015, Biomet began undergoing a merger with Zimmer. Prior to completing the merger, Biomet made the Distributors offers to buy out their rights to future commission payments. The Distributors asserted at that time that they should be entitled to commissions not only on Biomet products, but also on any Zimmer products once the merger went through. Biomet disagreed. The Distributors also claim to have first discovered around that time that Biomet was paying them long-term commissions only on Biomet Orthopedic products, not sales from the other companies under the Biomet umbrella. The Distributors retained counsel and continued buy-out negotiations with Biomet, but those discussions fell through.

The Distributors thus filed this suit in April 2016. Counts 1 through 3 asserted claims for breach of contract, each under a different theory. In Count 1, the Distributors argue that Biomet breached the contracts by paying long-term commissions only on Biomet Orthopedic products, not products sold through the other business units. In Count 3, the Distributors argue that, following the merger, the long-term commission payments apply to all Zimmer or Zimmer Biomet products, not just to Biomet products, and that Biomet breached the contracts by failing to pay those commissions. Count 2 apparently rejects the premise of Count 3 that the contracts apply to sales of those other brands, but it claims that Biomet breached the contracts by re-branding Biomet products as Zimmer or Zimmer Biomet products in order to avoid having to pay commissions on those sales. Finally, Count 4 asserted a claim for criminal deception, on the

basis that the commission statements only reflected the sales of Biomet Orthopedic products for which Biomet was paying the long-term commissions, not the larger set of products on which the Distributors argue they were entitled to payment (as claimed in Count 1).[1]

Biomet moved to dismiss the complaint in full for failure to state a claim. At that point, the case was assigned to Judge Lozano. In an order dated February 16, 2017, Judge Lozano granted the motion to dismiss as to Counts 2 and 3, but denied the motion as to Counts 1 and 4. By that time, discovery had already commenced and the magistrate judge had entered a scheduling order. Though Judge Lozano did not state that the dismissal of Counts 2 and 3 was with prejudice, and though the scheduling order still permitted the Distributors to file an amended complaint without even seeking leave of court, they did not do so. Discovery thus continued on the remaining claims, and the deadlines for the close of fact and expert discovery were extended on multiple occasions. In the meantime, the case was reassigned to the undersigned pursuant to General Order 2017-4, under which cases in this district were transferred to judges sitting in the division in which they were filed.

Fact discovery finally closed on May 1, 2018. Shortly prior to the close of expert discovery on August 27, 2018, the Distributors filed a motion to reconsider the order dismissing Counts 2 and 3, the breach of contract claims relating to the merger with Zimmer. In the alternative, they asked for leave to amend their complaint to properly plead those claims. Shortly thereafter, both parties filed motions for summary judgment on the pending claims. The briefing on each of those motions and several related motions is now complete. The Court thus addresses the motion for reconsideration before turning to the motions for summary judgment.

---

[1] The complaint also included other counts that have been dismissed and are not relevant here.

## II.  MOTION FOR RECONSIDERATION OR LEAVE TO AMEND

The Distributors move for reconsideration of the order dismissing Counts 2 and 3. In the alternative, they request leave to amend their complaint to adequately plead those counts. In those counts, which arose from Biomet's merger with Zimmer, the Distributors sought to recover commission payments for products sold as Zimmer or Zimmer Biomet products. Judge Lozano granted Biomet's motion to dismiss those claims, holding that the Distributors had not adequately pled a breach of contract on the theories alleged in those counts.

The Court begins with the motion for reconsideration. Courts have authority to amend their interlocutory orders prior to the entry of final judgment, Fed. R. Civ. P. 54(b),[2] but motions for reconsideration are seldom appropriate. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). Motions for reconsideration are "not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269–70 (7th Cir. 1996). They should be used only in rare circumstances, such as where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension," or where there has been "a controlling or significant change in the law or facts." *Bank of Waunakee*, 906 F.2d at 1191.

There is another factor relevant to the motion for reconsideration here: the Distributors ask to reconsider an order entered by a previous judge in this case. The law of the case doctrine applies with even greater force in that circumstance. *HK Sys., Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) ("The doctrine of law of the case counsels against a judge's changing

---

[2] In its response, Biomet relies in part on Rule 60(b), but that rule only applies to final judgments, not interlocutory orders.

an earlier ruling that he made in the same case, or that his predecessor as presiding judge had made. The doctrine has greater force in the second type of case—when there is a change of judges during the litigation and the new judge is asked to revisit the rulings of his predecessor." (citations omitted)). The Seventh Circuit has "advise[d] judges that, because litigants have a right to expect consistency even if judges change, the second judge should 'abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect.'" *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (quoting *Fujisawa Pharm. Co. v. Kapoor,* 115 F.3d 1332, 1339 (7th Cir.1997)).

The Distributors point to no such new development here. The only legal argument they make in support of the viability of their dismissed claims is based on a decision that is neither "new" nor "appellate"—they rely on a decision by another district judge that not only predated Judge Lozano's order, but that Judge Lozano expressly addressed and distinguished in his order. The Distributors may disagree with Judge Lozano's reasoning, but that is not a ground for reconsideration. The Distributors also suggest that Judge Lozano was misled by the way in which their complaint characterized the contracts. Instead of attaching the contracts to the complaint or citing their relevant provisions, the complaint merely paraphrased the contracts.[3] The Distributors now concede that their characterization of a critical contractual term may have been misleading. [DE 159 p. 10 n.8]. But not only is that their own fault, it could have been easily and promptly cured through an amended complaint. It does not justify a motion for reconsideration filed nearly a year-and-a-half later, before a different judge, after discovery has closed.

---

[3] The Distributors submitted the contracts with their response to the motion to dismiss, but did not cite or rely on them in their argument in defense of these claims.

None of the new facts the Distributors cite warrant reconsideration, either. In support of their motion, the Distributors cite two pieces of "newly discovered evidence": a contract Biomet entered with a different distributor in 2007, and testimony by a Biomet representative about the Distributors' agreements. To begin with, though, newly discovered evidence on a motion to dismiss is a contradiction in terms. Motions to dismiss evaluate the sufficiency of the allegations in a complaint. New evidence that was not pled in the complaint would not change the outcome of such a motion. At least where, as here, claims were not dismissed with prejudice, new evidence would not support a motion for reconsideration, but would need to be incorporated into an amended complaint.

In addition, the new evidence the Distributors rely on is insubstantial. They first cite an agreement that Biomet Orthopedics, Inc. (not Biomet Inc., the party to their contract and the defendant in this case) entered in 2007 with Tim Weis, another distributor. Mr. Weis began as a distributor for Biomet in 1980, at which time he signed a distributorship agreement similar to the ones the Distributors here signed, including the long-term commission program. In 2007, Mr. Weis signed a revised distributorship agreement, and the long-term commission program in that revised agreement explicitly limits its scope to orthopedic products sold by Biomet Orthopedics, Inc.—the entity that currently sells the products on which Biomet argues the Distributors are entitled to commissions. The Distributors argue that because the 2007 Weis agreement explicitly spelled out that limitation, but their own agreements did not, that difference in language must mean that their own agreements are not so limited.

That conclusion does not follow. Contracts are typically construed together only if they relate to the same subject matter and were "executed at the same time." *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 22 (Ind. Ct. App. 2006). That is clearly not the case here. The

2007 Weis agreement was signed a quarter-century after the agreements at issue here. By that time, Biomet was a different and more sophisticated organization than it was in the early 1980s, and the 2007 Weis agreement is lengthier and more detailed in many respects than the original distributorship agreements. That Biomet Orthopedics, Inc. (which is not a party to this case) would draft a more detailed and precise agreement with Mr. Weis (who is not a party to this case either) at a different time and under different circumstances does not mean that the agreement must have a different meaning than the original distributorship agreements between Biomet and the Distributors. This sort of extrinsic evidence thus offers little, if any, insight into the meaning of the Distributors' agreements.

Second, the Distributors cite testimony by a Rule 30(b)(6) witness for Biomet, Ashley Portz. When asked about the meaning of the contracts, Ms. Portz testified:

> Biomet as a business evolved over time. So what Biomet looks like in the early '80s is not what it looked like in the mid-'90s and is not what it looked like into 2000 and beyond. So our -- our hindsight looking back can point to the fact that there were some details that were vague, that didn't -- today, if we had all the information that we had, it would have been great if they had put in those contracts "please only pay commission on Company 4." That just wasn't the case in terms of what we know now versus what was included in the contract. I think that would have solved everyone's problem if we had -- if we had explicitly stated the parameters with which everything would have been defined.

[DE 159-4]. The Distributors see this as a smoking-gun admission that the contracts as written do not support Biomet's interpretation.

This testimony strikes the Court, however, as entirely unremarkable. Any time two parties dispute the meaning of a contractual term, both sides likely wish the term had been drafted differently to more clearly dictate their side's interpretation. That is even more true when circumstances change over time to produce new situations that the contracts were not drafted to confront. For their part, the Distributors clearly wish the contracts had been drafted differently to better support their own interpretation—their summary judgment filings repeatedly assert that

long-term commission payments are due on all net sales within their "territories," but that's not the language the contracts use. Ms. Portz's common-sense observation that it would be better if the contracts had been drafted so as to more clearly address this situation does not mean that Biomet's interpretation of the contract is wrong.[4] And more to the point, this extrinsic evidence that was not included in the Distributor's initial complaint does not warrant reconsideration of the dismissal of that complaint. Last, the Distributors argue that Biomet is continuing to engage in conduct that violates the contracts under the theories alleged in the dismissed counts. But that provides no reason to reconsider the dismissal of those counts. Accordingly, the Court denies the Distributors' motion to reconsider.

The Court thus considers the Distributors' alternative request for leave to file an amended complaint to replead these two claims. Under Rule 15, district courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "'The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend.'" *Liebhart v. SPX Corp.*, No. 18-1918, 2019 WL 1053618, at *9 (7th Cir. Mar. 6, 2019) (quoting *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015)). The Seventh Circuit has stated that "delay by itself is normally an insufficient reason to deny a motion for leave to amend," but it can suffice when coupled with another reason, such as "prejudice to the

---

[4] Moreover, it does not appear that Ms. Portz worked for Biomet when the contracts at issue were signed or has any first-hand knowledge of the parties' intent at that time, and the Distributors moved to strike the testimony of another Biomet employee on the basis that he did not work for Biomet at the time the parties entered the contracts and thus lacked personal knowledge as to the parties' intent. [DE 187 p. 9–10]. It is thus unclear on what basis the Distributors could rely on Ms. Portz' testimony in this respect.

non-moving party." *Liebhart*, 2019 WL 1053618, at *10; *see also Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 893 (7th Cir. 2004).

The Court denies the motion for leave to amend, as the motion is untimely and prejudicial. Judge Lozano granted the motion to dismiss on February 16, 2017. At that time, the scheduling order still allowed the Distributors to file an amended complaint without even seeking leave of court until February 28, 2017, after which they could have sought leave to amend. [DE 46]. Yet they did not seek leave to file their amended complaint until July 31, 2018, over seventeen months later. [DE 157]. By that time, the extensive period of fact discovery had already closed on May 1, 2018, and expert discovery closed on the same day the Distributors' motion became ripe. The Distributors attempt to justify this delay by noting that the new evidence noted above did not come to light until April 2018 (the Portz deposition) and June 2018 (the Weis agreement). But even under their own description of their amended complaint, neither of those two pieces of extrinsic evidence were necessary to their amended complaint; their principal theory is that the language of the contracts is unambiguous, in which case this extrinsic evidence could not even be considered. Indeed, the Court does not understand why the Distributors would not have filed an amended complaint as soon as the initial complaint was dismissed, and they have offered no reason why they could not have done so. Their failure to do so for nearly a year and a half easily constitutes undue delay.

That delay is not harmless, either. Most notably, discovery has already closed, and neither side is able to address the amended claims on the basis of the discovery that has already been conducted. *See Bell v. Taylor*, 827 F.3d 699, 705 (7th Cir. 2016) (affirming the denial of leave to amend a complaint where the motion was filed at the close of discovery and would have "affect[ed] the summary judgment schedule and potentially creat[ed] a need to reopen

discovery"); *Johnson v. Cypress Hill*, 641 F.3d 867, 873 (7th Cir. 2011); *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999) (finding that the prejudice from an amended complaint that would have added a new claim "well after the close of discovery and on the eve of summary judgment proceedings" was so clear that the district court need not have even articulated its reasoning for denying leave to amend). The Distributors argue that that prejudice can be cured by reopening discovery, but that is not warranted here. The discovery period in this case was already extensive, spanning over eighteen months. That gave the Distributors ample time to refine their complaint if they wished to. Discovery was also contentious, producing many motions to compel discovery or for protective orders.

The Distributors argue that, unlike the rest of the discovery in this case, the discovery necessary to their amended claims would be cheap and quick. The Court is doubtful, but even accepting the Distributors' unlikely premise, re-opening discovery would still substantially delay the resolution of this case. The Distributors would need to propound their discovery requests for the sales data they seek, and Biomet would then need time to respond. The Distributors indicate they may also need to conduct a Rule 30(b)(6) deposition of a Biomet representative to decipher the sales data. The Distributors would then presumably need to have their damages expert review the sales data and prepare a new damages report, after which Biomet would likely seek to depose him and perhaps procure a rebuttal expert report.

Following the close of this discovery, the parties would then need time to file and brief a new round of motions for summary judgment on these additional claims, which would take several months. The Court would then have to consider and resolve those motions, having

already considered and resolved one round of summary judgment motions in this case.[5] All told, this process would entail a considerable expense of time and money and could easily delay this case by a year or more. Those consequences are not justified. This case is already nearly three years old, and the parties had ample time to conduct discovery. The Distributors could have sought leave to amend their complaint while discovery was still ongoing, and they have not given any sound reason for their failure to do so. Accordingly, the Court finds that justice does not require that the Distributors be allowed to file such an untimely amended complaint, so the Court denies the motion in that respect too.

### III. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v.*

---

[5] The Distributors filed their motion for summary judgment before their motion for reconsideration became ripe, and Biomet filed its own motion for summary judgment shortly thereafter.

*Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). In a case involving cross-motions for summary judgment, that means that each party receives the benefit of all reasonable inferences when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

## IV.  DISCUSSION

Both sides have moved for summary judgment on various issues. First, Biomet moves for summary judgment on the grounds that the Distributors' claims are barred by the statute of limitations and by laches. Both parties have moved for summary judgment on the merits of the breach of contract claim. Biomet also moved for summary judgment on the Distributors' request for future damages on the breach of contract claim, and on the merits of the Distributors' criminal deception claim. Finally, the Distributors move for summary judgment on all of Biomet's affirmative defenses. The Court address each issue in turn.

## A.     Statute of Limitations

Biomet first moves for summary judgment on the ground that the Distributors' breach of contract claim is barred by the statute of limitations. It argues that it has paid long-term commissions only on reconstructive products for the entirety of the long-term commission program, which has been in place for decades for some of the Distributors. Biomet argues that the Distributors knew or should have known that it was paying the commissions in that manner some time ago, and at least by 2007, when the commission statements began itemizing the sales on which commissions were being paid. It thus argues that their suit, filed in 2016, is barred by the statute of limitations.

The Court denies the motion for two reasons. First, the statute of limitations would not bar the Distributors' claims in their entirety, but would only limit the period for which they can

recover damages. In Indiana, the "general rule is that where an obligation is payable in installments, the statute of limitations runs as to each installment as it becomes due." *Kuhn v. Kuhn*, 402 N.E.2d 989, 991 (1980); *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993) ("[A] cause of action accrues and the statute of limitations begins to run on an installment obligation when and as each installment becomes due."). Here, the long-term commission payments came due on an ongoing basis, as they were calculated as a percentage of sales that were actually made. Until those sales were made and the commissions came due, no claim could accrue for any underpayment. Thus, the statute of limitations began running separately for each alleged underpayment.

Biomet argues that that principle does not apply here because the agreements do not qualify as "installment contracts," as that term is defined in a particular context. However, Indiana courts do not limit this rule to installment contracts. To the contrary, the Indiana Supreme Court has described this as the "general rule" that "has been applied to various obligations" payable in installments. *Kuhn*, 402 N.E.2d at 991. Since the commission payments at issue here became due over time in installments, the statute of limitations cannot bar the Distributors' claims in whole; at worst, it could preclude the Distributors from seeking underpayments that accrued prior to the applicable limitations period.

Second, Biomet's argument relies on the premise that the claim is governed by the Uniform Commercial Code, which provides a four-year statute of limitations. If not, then the breach of contract claims are subject to ten- or twenty-year statutes of limitations. Article 2 of the UCC applies to "transactions in goods." Ind. Code § 26-1-2-102. In applying that standard to transactions involving both goods and services, Indiana courts use the "predominant thrust" test, which looks to whether the predominant thrust of the contract was the sale of goods, as opposed

to the provision of services. *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 554 (Ind. Ct. App. 1993); *Pain Center of SE Ind. LLC v. Origin Healthcare Solutions LLC*, 893 F.3d 454, 460 (7th Cir. 2018). Factors relevant to that determination include: (1) the language of the contract; (2) the circumstances of the parties and the primary reason they entered into the contract; and (3) the relative costs of the goods and services. *Pain Center*, 893 F.3d at 460.

Biomet argues that the predominant purpose of the contracts was the sale of Biomet's products, so the UCC applies. Those sales are not part of the contracts between these parties, though. The subject of the contracts at issue here is the Distributors' appointment as distributors for Biomet and their entitlement to commissions on sales that Biomet makes to other parties. The sales of Biomet products come as part of separate transactions between Biomet and its customers. Biomet made that point in support of its motion to dismiss, at which time it took the opposite position and argued that the UCC did not apply: "While Plaintiffs have plead that they are entitled to commission payments that are calculated from the sale of Biomet goods *by others*, the transactions between Plaintiffs and Defendants do not involve goods." [DE 19 p. 12].[6] The Distributors accept and expound on that point in response to Biomet's present argument: "[A]s between *Plaintiffs and Biomet*, the transaction is one in which each Plaintiff provided its services to Biomet and there was no 'sale of goods' involved. In contrast, the transactions between *Biomet and Biomet's customers* indisputably are for the sale of goods and are subject to the

---

[6] The Distributors argue that Biomet is judicially estopped from taking a contrary position now, since Biomet prevailed in securing the dismissal of two counts on that basis. In response, Biomet argues that its prior argument was only commenting on the sufficiency of the Distributors' allegations, not taking an affirmative position as to whether the UCC actually applies. The Court need not resolve whether Biomet's previous argument can be sliced that thin, though, as its present argument fails even on its merits.

UCC. But it is the former, service-based agreement between Plaintiffs and Biomet not the latter sale of goods between Biomet and its customers that is at issue." [DE 198 p. 18]. The Court agrees.

Biomet notes in response that many cases state that the UCC applies to distributorship agreements. *E.g.*, *Sally Beauty Co., Inc. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1005–06 (7th Cir. 1986) (collecting cases); *Moridge Mfg. Co. v. Butler*, 451 N.E.2d 677, 678 (Ind. Ct. App. 1983). However, those cases overwhelmingly address agreements under which the manufacturer sells its products to the distributor, which then resells the products. The contracts here do not contemplate such an arrangement. As just discussed, the contracts appoint the Distributors as the exclusive distributors of Biomet products and entitle them to commissions on all sales within their territories, but the contracts do not call for the Distributors to buy any products from Biomet.

Biomet also notes that, in practice, the Distributors did purchase some sample products and also decided to keep an inventory of certain products on hand. However, the predominant thrust of the agreements was not to sell samples or inventory to the Distributors.[7] It was to retain the Distributors' services as independent sales representatives to develop relationships with the surgeons and persuade them to use Biomet products, as well as to facilitate communications between the surgeons and Biomet's research and development department. Though the goal of that arrangement was of course to increase the sales of Biomet products, those sales took place as part of separate transactions between Biomet and its customers, not the Distributors.

---

[7] Nor has Biomet offered evidence of the cost of those purchases by the Distributors or its relation to the amount of commissions they were paid for their services.

Accordingly, the UCC and its four-year statute of limitations do not govern the Distributors' claims.

For those reasons, the Court denies Biomet's motion for summary judgment as to the statute of limitations. However, Biomet remains free to raise the statute of limitations at trial to limit the length of time for which the Distributors can seek damages under the applicable limitations periods. The remaining disputes raised in the parties' briefs as to the statute of limitations can be addressed in that context.

**B.      Laches**

Biomet also moves to bar the Distributors' breach of contract claim under the doctrine of laches. "Laches is a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017); *SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005) ("Independently of any statute of limitation, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them."). In Indiana, laches requires three elements: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *SMDfund*, 831 N.E.2d at 729; *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind. Ct. App. 1996). A mere lapse in time is insufficient; unreasonable delay which causes prejudice or injury is necessary. *Shafer*, 667 N.E.2d at 231. In addition, for claims subject to a statute of limitations, laches requires a fourth element: reliance by the defendant. *Id.* ("The doctrine of laches may bar a plaintiff's claim even though the applicable statute of limitations has not yet expired if the laches are of such character as to work an equitable estoppel (which contains the

additional element of reliance by the defendant)."); *see also Town of New Chicago v. City of Lake Station*, 939 N.E.2d 638, 652–53 (Ind. Ct. App. 2010).

Laches is an affirmative defense for which the defendant bears the burden of proof. *Woods v. Harris*, 600 N.E.2d 163, 164 (Ind. Ct. App. 1992). As a party moving for summary judgment on an issue for which it also bears the burden of proof, Biomet would have to show that the evidence proves beyond dispute that each element of laches is present here. Biomet has not met that burden at least as to the element of reliance. In its opening brief, Biomet makes no attempt to establish that element. In its reply brief, Biomet argues that its reliance is shown by its continued payment of retirement commissions over the years. But Biomet did not make those payments in reliance on the Distributors' acquiescence—Biomet was required under the contracts to make those payments. And in any event, "[a]rguments raised for the first time in a reply brief are waived." *United States v. Waldrip*, 859 F.3d 446, 450 n.2. (7th Cir. 2017). Biomet has thus failed to show that it is entitled to summary judgment in its favor under the doctrine of laches, so the Court denies its motion in that respect. Again, though, Biomet remains free to raise this defense at trial.

## C.     Breach of Contract

Both sides have moved for summary judgment on the Distributors' breach of contract claim. This claim focuses on the scope of products on which the Distributors are entitled to receive long-term commissions. Biomet argues that the contracts entitle the Distributors to long-term commissions on the same set of products they were authorized to sell during their distributorships—primarily reconstructive products, meaning joint-replacement products. The Distributors contend that the long-term commissions apply more broadly to all products sold under the Biomet brand, regardless of whether they sold those products as part of their former

distributorships. They thus claim that Biomet breached the contract by failing to pay commissions on that broader set of products.

Under the contracts, the long-term commissions are calculated as percentages of "net sales." The contracts then define that term, in a provision that is the focus of both parties' arguments: "The term 'net sales' shall be defined as gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet less returns and allowances and less adjustments for nonpayment of invoices as provided herein." The central question here is: by what parameters is the "subject distributorship" defined? Biomet contends that, relative to sales made "within the subject distributorship at the time this program is initiated," the "subject distributorship" is defined both by the products sold within the distributorship and by the geographic territory of the distributorship. The Distributors disagree, contending that the "subject distributorship" is defined solely by its geographic territory. Thus, they argue that they entitled to long-term commissions on all Biomet products sold in their former territories, even products that they did not and were not authorized to sell as part of their distributorships.

The goal of contract interpretation is "to determine the intent of the parties at the time that they made the agreement." *Care Grp. Heart Hops., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018); *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Courts start with the language of the contract itself. *Sawyer*, 93 N.E.3d at 752. "If the language is unambiguous, [courts] give it its plain and ordinary meaning in view of the whole contract, without substitution or addition," *id.*, and "the parties' intent is to be determined by reviewing the language contained within the 'four corners' of" the contract. *Ryan v. TCI Architects/Eng'rs./Contractors, Inc.*, 72 N.E.3d 908, 917 (Ind. 2017). Language is ambiguous

"only if reasonable people could come to different conclusions as to its meaning." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). That determination is a question of law for a court to decide. *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). If a court decides that a contract is ambiguous, however, "the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact." *Id.* "[A]ll relevant extrinsic evidence may properly be considered in resolving the ambiguity." *Baker*, 843 N.E.2d at 535.

Though both sides argue that the contracts unambiguously support their interpretation, the Court finds that the contracts are ambiguous in this respect. The contracts do not provide any definition of the term "subject distributorship," it is not clear by what parameters the contracts define that term in this context. The contracts do set geographic limitations on the scope of the distributorships, as they grant the Distributors exclusive distributorships only within prescribed territories. They also contemplate that the territory could change over time, so it makes sense for the long-term commissions to be based on sales within the distributorships "at the time this program is initiated." Both parties agree that the "subject distributorships" are defined at least by their territories.

However, the contracts also define the distributorships by their products, which the contracts likewise contemplate could change over time. Section 1 grants the Distributors the exclusive right to distribute "Biomet products" in their territories and to receive commissions on those products. But Section 6 allows the distributors to sell non-Biomet products in their territories too, so long as Biomet does not offer competitive products in their territories. Sales of those non-Biomet products would not be described as sales "within the subject distributorship." And Section 6 also states that if Biomet adds competitive products to its line, the Distributors

"only if reasonable people could come to different conclusions as to its meaning." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). That determination is a question of law for a court to decide. *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). If a court decides that a contract is ambiguous, however, "the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact." *Id.* "[A]ll relevant extrinsic evidence may properly be considered in resolving the ambiguity." *Baker*, 843 N.E.2d at 535.

Though both sides argue that the contracts unambiguously support their interpretation, the Court finds that the contracts are ambiguous in this respect. The contracts do not provide any definition of the term "subject distributorship," it is not clear by what parameters the contracts define that term in this context. The contracts do set geographic limitations on the scope of the distributorships, as they grant the Distributors exclusive distributorships only within prescribed territories. They also contemplate that the territory could change over time, so it makes sense for the long-term commissions to be based on sales within the distributorships "at the time this program is initiated." Both parties agree that the "subject distributorships" are defined at least by their territories.

However, the contracts also define the distributorships by their products, which the contracts likewise contemplate could change over time. Section 1 grants the Distributors the exclusive right to distribute "Biomet products" in their territories and to receive commissions on those products. But Section 6 allows the distributors to sell non-Biomet products in their territories too, so long as Biomet does not offer competitive products in their territories. Sales of those non-Biomet products would not be described as sales "within the subject distributorship." And Section 6 also states that if Biomet adds competitive products to its line, the Distributors

23

have to cease selling those non-Biomet products. The distributorships thus have product-based dimensions as well. Therefore, in referring to sales within the "subject distributorship" at a given point in time, the contracts could plausibly be referring to the products sold within the distributorships as well as their territories.

The Distributors argue that any ambiguity is resolved by the use of the prepositional phrase "within the subject distributorship." As the Distributors note, the word "within" can denote a spatial or geographic relationship. *E.g.*, https://www.dictionary.com/browse/within (defining "within," in part, as "at or to some point not beyond, as in length or distance; not farther than: within a radius of a mile"); https://www.merriam-webster.com/dictionary/within ("used as a function word to indicate enclosure or containment"); https://en.oxforddictionaries.com/definition/within ("inside the range of (an area or boundary)"). They also note that interpreting this phrase to set limitations on both the territories of the distributorships and the products sold within those distributorships would attach a lot of meaning to a simple prepositional phrase, which is a fair observation. However, the word "within" can also denote a relationship relative to a content or subject matter. *E.g.*, https://www.dictionary.com/browse/within ("inside the limits fixed or required by" or "in the field, sphere, or scope of"); https://www.merriam-webster.com/dictionary/within ("in or into the scope or sphere of"); https://en.oxforddictionaries.com/definition/within ("inside the bounds set by (a concept, argument, etc.)"). Thus, this phrase could plausibly be referring to the subject matter of the distributorships as well, meaning the products sold within those distributorships.

The Distributors also offer several arguments to the effect that, since the definition of "net sales" does not explicitly include a product-based limitation or use the word "product," that limitation must not be part of the contracts, and Biomet must be trying to rewrite the contracts to

conform to its position. However, for every argument the Distributors make along those lines, the same could be said about their own interpretation. True, the long-term commission provision does not explicitly state that commissions are payable only on products that were sold by the Distributors at the time they retired. But neither does the provision state that commissions are payable on all products sold "within their territories" at the time they retired—it does not use the word "territory" at all. Instead, it states that commissions are payable on sales "within the subject distributorship[s]," a phrase that could bear either party's interpretation, as just discussed. Also, as Biomet notes, the contracts use the term "territory" over twenty times, and even use the phrase "within the territory" or something similar in multiple instances. (*See* § 6 (prohibiting the Distributors from selling competing products "within said appointed territory(s)"); § 9(h)(1) (likewise prohibiting the Distributors from competing "within the territory(s) then assigned to distributor")). If the contracts intended "net sales" to be defined by that same limitation—sales made within "the territory of" the subject distributorships—it is odd that they would not use that same language in that provision.

The Distributors next argue that their interpretation is necessary in order to harmonize the long-term commissions provision with the contracts' lifetime non-compete provision. *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990) (holding that a court "must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting"). The contracts include a non-compete provision that applies for the term of the long-term commission program, meaning for the Distributors' lives. The provision prohibits each Distributor from engaging in "any business similar to the type of business conducted by Biomet at the time of the initiation *and during the term of this program*, within the territory(s) then assigned to [D]istributor." (emphasis added). In other

words, the lifetime non-compete provision applies to products sold at the time the Distributors retired as well as any products Biomet sells at a later time. The Distributors contend that, if the non-compete provision applies to those additional products, it is necessary to construe the life-time commission provision the same way in order to harmonize those provisions. Put another way, they believe they should receive long-term commissions on any products the non-compete provision would bar them from selling.

Interpreting those two provisions to have different scopes does not create any conflict, though, and the Distributors offer no reason why the long-term commissions provision has to apply as broadly as the non-compete provision. Under either sides' interpretation of the long-term commissions provision, the Distributors have received substantial compensation for their performance under the contracts—the six Distributors have collectively been paid over $13 million in long-term commissions since their retirements, and they project that they will be paid an additional $14 million over the course of their lifetimes even under Biomet's interpretation. Interpreting the long-term commissions provision to include only those amounts does not create any conflict with the non-compete provision, it just gives the Distributors somewhat less compensation. Moreover, had the contracts intended the two provisions to have the same scope, as the Distributors contend, it would have been sensible for them to use the same language in both provisions. They did not do so, which could support a conclusion that they intended the two provisions to have different meanings.

Ultimately, the contracts themselves to not definitely resolve which of these two interpretations is correct. Accordingly, the contracts are ambiguous, and the parties may offer extrinsic evidence of the meaning of this provision. Unless that extrinsic evidence establishes the parties' intent beyond dispute, though, the contracts' meaning is a question of fact for the jury to

resolve. *Celadon*, 70 N.E.3d at 842. That is the case here, as none of the extrinsic evidence the parties offer resolves this question conclusively.

For example, Biomet points to an email by Al Plows, another former distributor, who was a point person for the retired distributors in negotiating a potential buy-out with Biomet. In an email on which all of the plaintiff Distributors were copied, Mr. Plows requested verification that Biomet would "continue to honor [its] obligation to pay override commissions on any/all *reconstructive products* sold in [their] respective territories." [DE 176-10 (emphasis added)]. This email supports Biomet's position that the parties understood the long-term commissions to apply only to reconstructive products, not to products sold by other Biomet business lines.[8] However, the Distributors at least created a dispute on that point, as they deny that Mr. Plows was speaking on their behalf or that he was representing them in his email (despite his use of the words "we" and "our").

Biomet also argues that the course of the parties' performance over time sheds light on their understanding of the contracts' meaning. In particular, it argues that it paid commissions in the same manner for decades, and that the Distributors never complained that Biomet was not paying commissions on the additional products until immediately before the Distributors filed suit. Again, however, that evidence is at least disputed, as the Distributors deny that they were aware over that time that Biomet was limiting the long-term commissions in that manner.

---

[8] The Distributors moved to strike this exhibit as irrelevant, but relevance is not a valid basis for a motion to strike at summary judgment. If the exhibit is irrelevant, then it cannot create a genuine dispute of material fact and thus need not be stricken. Indeed, moving to strike on relevance grounds is just a backdoor way of offering additional arguments on the merits. But this exhibit is plainly relevant—even if disputed—so the Court denies the motion to strike. The Court need not address the other exhibits subject to the motion to strike, either, as they would not resolve the factual disputes even if they are admissible.

The evidence the Distributors offer does not resolve this question beyond dispute, either. As with their motion for reconsideration, the Distributors cite the 2007 Weis agreement, arguing that because it explicitly limits the scope of products to which the long-term commissions apply, whereas the Distributors' contracts do not, their contracts must not be so limited. But as discussed above, that contract, entered decades later between two non-parties to this case, would not require a jury to draw such a conclusion. The Distributors attempt to draw a similar analogy with a different agreement that Mr. Shera entered with Biomet in 1999, but that argument falls short for similar reasons. The other evidence they cite likewise fails to resolve this issue beyond dispute. Thus, the Court cannot grant summary judgment for either party on the construction of Section 9(e).

That said, even if the Court adopted the Distributors' preferred interpretation of this particular provision, it is not clear that that would produce the result they seek. Under Biomet's interpretation of Section 9(e), the scope of products on which long-term commissions are due would be frozen in time as of the dates of the Distributors' retirements. By contrast, the Distributors' interpretation would sweep in any new products that Biomet began selling even after that date. The Distributors' claim, however, is not based on new products that were added to their former distributorships after their retirements. Instead, the Distributors appear to seek long-term commissions on all products sold with a Biomet trademark or by any entity owned by Biomet. That includes products sold by other entities that Biomet acquired over time, whose products the Distributors were not authorized to sell or receive commissions on even while they were still active.[9]

_____

[9] For example, in 1987, Biomet acquired Electro-Biology, Inc. (EBI), which made bone growth stimulators. EBI was a distinct entity that had its own sales force. After the acquisition, several of the Distributors asked for authority to distribute EBI products, but they were declined. Thus,

It is unclear how the Distributors ground that conclusion in the contracts. Section 1 grants the Distributors the exclusive right to distribute and receive commissions on "Biomet products" in their territories. But the contracts define "Biomet" as "Biomet, Inc."—the party to the contract. The products subject to this claim include products sold by distinct entities (albeit entities owned by Biomet) as to which the Distributors did not have distributorship agreements and did not receive commissions during their years of active service.[10] Even assuming that Section 9(e)'s reference to sales "within the subject distributorship" meant only the territory of the distributorships, the Distributors have not explained how the gross sales would include sales by distinct legal entities—entities that were not parties to these contracts and with which the Distributors did not have distributorship agreements. Given that missing link in their argument, the Court could not grant summary judgment in their favor even accepting their interpretation of the "subject distributorship" language.

For its part, though, Biomet offers little detail about the structures or relationships of the various entities or their evolution over time. For example, the products that the Distributors sold within their distributorships (and on which Biomet agrees long-term commissions are due) are now sold by Biomet Orthopedics, Inc. That entity did not exist yet when the Distributors entered their agreements with Biomet Inc., and Biomet offers no explanation for when or how that came about. Biomet also grounds its motion for summary judgment solely on its construction of Section 9(e), which the Court has found ambiguous in this respect. Thus, while this issue may

_____

they did not sell EBI products as part of their distributorships and did not receive commissions on EBI products sold in their territories. However, they argue that they are still entitled to commissions on EBI products sold in their former territories.

[10] Some of the Distributors were authorized to sell products for Arthrotek—another entity Biomet acquired—but they did so by entering separate distributor agreements with that entity. [DE 176-17 (appointing Mr. McCormick as a distributor for Arthrotek "separate and distinct from [his] Biomet distributorship")].

bear further exploration, the Court cannot grant summary judgment in Biomet's favor either. Therefore, the Court denies both sides' motions for summary judgment on the breach of contract claim.

**D.    Future Damages**

Next, Biomet moves for summary judgment on the Distributors' request for future damages on their breach of contract claim. The Distributors argue that because Biomet has disputed the scope of its obligation to pay retirement commissions, as just discussed, it has anticipatorily repudiated its contractual obligations. They thus argue that they should be able to recover not only past commissions that Biomet failed to pay, but also all commission payments that may come due in the future (including commissions on Biomet Orthopedic products, on which Biomet has paid commissions all along). Biomet disagrees, arguing that regardless of how the breach of contract claim is resolved, there is no basis for the Distributors to recover any future commission payments as damages.

The Court grants Biomet's motion, as the Distributors are not entitled to recover as damages future commission payments that have not yet come due. As discussed already relative to the statute of limitations, commissions under the long-term commissions program are based on the actual sales that occur—until those sales occur, Biomet is not obligated to pay commissions on them. The Distributors thus cannot recover in this action future commissions that have not yet come due. *Griese-Traylor Corp. v. Lemmons*, 424 N.E.2d 173, 183 (Ind. Ct. App. 1981) (holding that the trial court erred in "accelerating the installment obligations" that had not yet come due, as the contract did not include an acceleration clause).

In arguing to the contrary, the Distributors argue that Biomet has anticipatorily repudiated its obligation to pay commissions on sales of products outside of their distributorships, so they are entitled to estimate what the future commissions would be (and for

30

how long they would be paid) and recover all of those amounts now. The Distributors cite no evidence that Biomet has repudiated any future contractual obligations, though. In fact, they cite no evidence at all on this point, so their argument fails for that reason alone. [DE 198 p. 28–29]. Instead, they cite only to Biomet's brief, noting Biomet's position that the contracts do not require it to pay commissions on products that were not within the Distributors' distributorships.

Taking that position is not a repudiation of the contract, though, even if the Distributors dispute that the payments are so limited. *See Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991) ("Where two contracting parties differ as to the interpretation of a contract or as to its legal effects, an offer to perform in accordance with his own interpretation made by one of the parties is not in itself an anticipatory breach."). The whole point of the breach of contract claim is to resolve that dispute and determine whether Biomet is required to make those payments. The Distributors do not suggest that Biomet intends to defy the judgment should the breach of contract claim come out in the Distributors' favor, and Biomet represents that it will make those payments going forward if the Distributors prevail on that claim. [DE 203 p. 17 ("If a more expansive interpretation of the [long-term commission program] is adopted by the Court, [Biomet] will broaden the scope of the retirement commissions accordingly.")].

The Distributors are essentially trying to force a buy-out of all of their future commission payments. But a contractual dispute over the scope of future payments does not provide an excuse to liquidate all future obligations. Since the breach of contract claim will resolve whether Biomet has to make those payments going forward, there is no anticipatory repudiation, and the Distributors are not entitled to seek future damages. [*See* DE 47 p. 32–33 (dismissing the Distributors' declaratory judgment claim since the breach of contract claim would serve to

resolve the scope of Biomet's obligations moving forward)]. The Court therefore grants Biomet's motion for summary judgment in this respect.

## E.    Criminal Deception

Biomet next moves for summary judgment on the Distributors' claim for damages for criminal deception. Indiana law provides a civil cause of action to parties that suffer damages as a result of certain criminal offenses. Ind. Code § 34-24-3-1. A criminal conviction is not a condition precedent for such a claim, but the plaintiff must prove the elements of the offense by a preponderance of the evidence. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008). As relevant here, the offense of criminal deception occurs when a person "knowingly or intentionally makes a false or misleading statement with intent to obtain property . . . ." Ind. Code § 35-43-5-3(a)(1). The Distributors argue that Biomet committed this offense by sending them commission statements that only reflected the sales of Biomet Orthopedic products, not the larger set of products that the Distributors argue are subject to the long-term commission program.

The Court grants Biomet's motion for summary judgment, as this claim is nothing more than a breach of contract claim involving two reasonable constructions of the contract. "[T]he Indiana legislature did not intend to criminalize bona fide contract disputes." *French-Tex*, 893 N.E.2d at 1168; *accord Jamrosz v. Res. Benefits, Inc.*, 839 N.E.2d 746, 759 (Ind. Ct. App. 2005). Where the source of a party's duty "arises from a contract, 'then tort law should not interfere.'"[11]

---

[11] The Distributors argue that Judge Lozano already rejected this argument in denying the motion to dismiss this claim. However, that order expressly limited its holding to the procedural posture in which it arose, as it based its holding on the standard of review that applies to a motion to dismiss and distinguished other cases on the basis that they arose at summary judgment. [DE 47 p. 22–24]. That order thus does not govern the present analysis.

*French-Tex*, 893 N.E.2d at 1168 (quoting *Paniaguas v. Endor, Inc.*, 847 N.E.2d 967, 970 (Ind. Ct. App. 2006)).

That is the case here. The Distributors do not argue that Biomet ever misrepresented to them the scope of products on which it was paying commissions. Instead, they argue that the commission payments and accompanying statements reflected only sales of Biomet Orthopedic products, not the additional products the Distributors contend are also covered by the long-term commission provision.[12] But that is the same argument they make in support of their breach of contract claim, and the duty to pay commissions on those products arises, if at all, from those contracts. The damages the Distributors seek on this claim are also the exact same damages they seek on their breach of contract claim (before adjustments for interest): the amounts by which they contend they were underpaid. [DE 169-5]. The Distributors do not claim to have suffered any other injury in reliance on the commission statements.

Indiana courts have rejected similar claims that try to leverage disputes over contract interpretation into tort claims or criminal violations. For example, in *French-Tex*, the parties entered a lease in which the amount due included the tenant's pro rata share of all real estate taxes "imposed." 893 N.E.2d at 1159. The tenant later claimed that the landlord overcharged it by requiring it to pay amounts that had not actually been imposed, so it sued for breach of contract as well as criminal conversion. As to the breach of contract claim, the Indiana Court of

---

[12] It is difficult to see the commission statements as false or misleading to begin with. The Distributors argue that where a commission statement referred to "sales" (to which the statement applied a percentage to calculate the commissions due in that period), the Distributors believed the statement to be referring to sales of all Biomet-branded products. The statement does not say that, though; it simply refers to "sales," without further elaboration. [DE 169]. Only by assuming that the sales reported were based on the interpretation of the contracts that they now advance— but never communicated to Biomet during this period—can the Distributors portray the figures as false or misleading.

Appeals held that the contract was ambiguous, so it remanded for the parties to offer extrinsic evidence on the contract's meaning. *Id.* at 1166. However, it affirmed the entry of summary judgment against the conversion claim, holding that "the gravamen of the present action is one of contract construction." *Id.* at 1167. The contract at issue was ambiguous and the landlord acted in accordance with a reasonable interpretation of the contract, so the tenant could not support a claim that the landlord acted with criminal intent. *Id.* at 1168.

That analysis applies equally here. The Distributors distinguish *French-Tex* solely on the basis that the contracts at issue here are unambiguous and that Biomet has violated the contracts' clear commands. The Court has already rejected that argument, finding that the contracts are ambiguous. And as in *French-Tex*, Biomet acted in accordance with a reasonable interpretation of the ambiguous contracts, so the Distributors cannot establish that it committed a criminal offense. *See also NationsCredit Commercial Corp. v. Grauel Enters., Inc.*, 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998) (granting summary judgment on a criminal conversion claim because the "gravamen of the present action is contract construction" and the contract was deemed ambiguous, holding that the ambiguity "precludes a finding of the required *mens rea*"); *Fritzinger v. Angie's List, Inc.*, No. 1:12-cv-1118, 2013 WL 772864, at *3 (S.D. Ind. Feb. 28, 2013) (dismissing a criminal deception claim based on allegations that the defendant charged more than was agreed to in a contract, noting that the gravamen of the claim was a breach of contract and that the defendant suffered no injury distinct from the injury it suffered from the breach).

The Indiana Court of Appeals rejected another similar claim in *Sheaff Brock Investment Advisors, LLC v. Morton*, 7 N.E.3d 278 (Ind. Ct. App. 2014). There, an investment advisor's contract entitled him to commissions on certain amounts received by his employer. After his

employment was terminated, he sued for breach of contract and constructive fraud, alleging that his employer improperly modified those amounts and concealed having done so. On the breach of contract claim, the court affirmed summary judgment in the plaintiff's favor, holding that the employer miscalculated the amounts on which the commissions were due, in violation of the contract. *Id.* at 284–85. However, the court rejected the fraud claim. In support of that claim, the plaintiff alleged that his employer "did not provide documentation from which [he] could determine whether or not he was being paid appropriately and that [he] was forced to rely upon false and deceptive documentation provided by [his employer]." *Id.* at 288. The court held that this "was merely a repacking of his breach of contract claim." *Id.* It noted that "breaches of contract will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent," but since the plaintiff did not identify any "injury distinct from that alleged in his breach of contract claim," the court affirmed summary judgment against the fraud claim. *Id.* Those factual allegations mirror the Distributors' deception claim—that Biomet did not provide them with information showing that other products were being sold for which they were not being paid commissions—but the Distributors likewise fail to identify any injury they suffered apart from the alleged breach of contract. Their effort to repackage this breach of contract claim into a criminal offense in pursuit of additional damages thus fails.

Finally, the Distributors' brief fails to meaningfully develop factual support for this claim. In moving for summary judgment, Biomet argued in part that it never made any false or misleading statements. In response, the Distributors cited only a single commission statement sent to one of the six plaintiffs for a single two-week period. [DE 175 p. 35]. That commission statement contains minimal information beyond the amount of commissions being paid, but the Distributors argue that it was misleading because it included a column for "sales," and they argue

that Biomet was only paying commissions on sales of reconstructive products. They never cite any evidence, though, that the sales figures in this commission statement were inaccurate even under their interpretation of the contracts—that other sales were made in that Distributor's territory within the two-week period covered by that commission statement that should have been included but were not.

Surely there is other evidence the Distributors could have cited in support of this claim. Each of the Distributors received many commission statements over the years, some of which may have contained other information that might be argued to be deceptive, and the Distributors might be able to prove inaccuracies in the statements. Some of that evidence may even be in the record or cited elsewhere in the filings. But summary judgment is the "put up or shut up" moment in a lawsuit, *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008), and requires the responding party to "cit[e] to particular parts of materials in the record" to support its claim, Fed. R. Civ. P. 56(c)(1)(A). *See also Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 848 (7th Cir. 2015). That means that the arguments in a party's brief must "cite specific parts of th[e] record in support of relevant factual arguments." *Packer*, 800 F.3d at 849. Submitting materials as exhibits or referring to them in a statement of facts does not suffice without also incorporating them into a legal argument. *Id.* at 852 (refusing to consider a statement in the plaintiff's brief because the plaintiff "supplied no record citation for that statement in the relevant section of her analysis" and "made no effort to weave such evidence into a cogent argument, grounded in case law, as to why a factfinder might be able to" find in her favor). The Distributors' argument falls short of this standard. Besides a passing reference to an entire portion of their statement of facts, their argument cites only a single exhibit that, as just discussed, pertains to only one of the six

Distributors for a single period and that they failed to establish was inaccurate. [DE 198 p. 32–34].

Therefore, the Court grants the motion for summary judgment as to the Distributors' criminal deception claim.

## F.    Affirmative Defenses

Finally, the Distributors move for summary judgment on all of the affirmative defenses asserted in Biomet's answer. However, they offered only skeletal arguments in support; their brief addresses Biomet's seventeen affirmative defenses in the space of about one page, using bullet points that barely acknowledge the defenses, much less develop arguments for why summary judgment should be granted. Though the burden on a party moving for summary judgment is not heavy, this cursory discussion largely fails to meet that standard. For example, Biomet's first two affirmative defenses are that the Distributors waived their claims or should be estopped from asserting those claims. The entirety of the Distributors' discussion of those defenses is: "Defendants have failed to adduce any evidence supporting their allegation that Plaintiffs waived (or are estopped from asserting) their claims (Defenses 1 & 2)." [DE 168 p. 24]. They do not cite authority governing those defenses or explain how the evidence falls short of meeting the applicable standard. Thus, for defenses like those that depend on factual development, the Court declines to entertain the motion. *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (holding that "'skeletal' arguments may be properly treated as waived").

Other defenses, however, can be resolved by concession or as a matter of law. First, in response to the motion, Biomet agreed not to pursue several of the defenses, including numbers 4 (failure to plead fraud with particularity), 7 (negligence by the Distributors), 11 (preemption by an arbitration agreement), 15 (violation of public policy), and 16 (restraint of trade). Other

37

defenses are not actually defenses, so they can be dismissed on that basis. In affirmative defense number 5, Biomet asserts that the "claims are barred as the agreements with Legacy Distributors relate solely to orthopedic appliances, devices and supplies." But that argument about the scope of the contracts goes to the merits of the Distributors' claim and will be resolved in that context; it is not an affirmative defense. Biomet also asserts in affirmative defense number 10 that the claims fail because of the parol evidence rule. Again, however, that is a rule of contract construction that goes to the merits of the Distributors' claims, not an affirmative defense.

Next, defense number 9 asserts the defense of frustration of purpose. That defense fails as a matter of law because Indiana law does not recognize such a defense. *Justus v. Justus*, 581 N.E.2d 1265, 1275 (Ind. Ct. App. 1991). Finally, defense number 14 asserts the defense of failure of consideration. In Indiana, "[t]here is a failure of consideration when a party to a contract fails to perform those acts promised." *Alber v. Standard Heating & Air Conditioning, Inc.*, 476 N.E.2d 507, 510 (Ind. Ct. App. 1985); *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 270 F.3d 1117, 1122 n.3 (7th Cir. 2001) ("A party asserting the defense of failure of consideration is not really arguing that the contract lacks the necessary bargained for exchange. Rather, the party contends that his adversary has failed to perform her obligation under the contract."). Biomet does not make such an argument, though. Instead, it argues that there is a failure of consideration because there was no mutual consideration for a promise to pay a commission "on all Biomet products." [DE 178 p. 25]. That is plainly untrue. Regardless of which side prevails on the interpretation of the contracts, the consideration for the lifetime commissions was the Distributors' agreement to join Biomet and to act as distributors for at least ten years. The Distributors did so, so this defense fails.

In all other respects, however, the Court denies the motion for summary judgment as to the affirmative defenses. Thus, affirmative defenses 1, 2, 3, 6, 8, 12, 13, and 17 remain pending.

## V.  CONCLUSION

The Court DENIES the motion for reconsideration or for leave to amend. [DE 157]. The Court also GRANTS in part and DENIES in part the motions for summary judgment. [DE 167, 174]. The Court also DENIES the motion to strike [DE 186] and the motion for oral argument [DE 188] and GRANTS the motion to seal [DE 205].

SO ORDERED.

ENTERED:  March 20, 2019

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court
