UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHARLES HESS, et al.,           )
                                )
        Plaintiffs,             )
                                )
    v.                          )    Case No. 3:16-CV-208 JD
                                )
BIOMET, INC., et al.            )
                                )
        Defendants.             )

## OPINION AND ORDER

This case is approaching trial on the Distributors breach-of-contract claims against

Biomet.[1] Both sides have filed motions in limine, and they have also filed *Daubert* motions. In

this order, the Court resolves those motions and addresses other issues that have come to light

through the pretrial filings.

## I. DISTRIBUTORS' MOTIONS IN LIMINE

**1.    July 2015 letter negotiating buy-out**

The Distributors first move to exclude a letter their attorney sent to Zimmer–Biomet on

July 20, 2015, arguing that the letter is a settlement communication excluded by Rule 408. As

background, Biomet was going through the process of merging with Zimmer, Inc. around 2015.

As part of that process, Biomet made buy-out offers to each of the retired distributors to which it

was paying lifetime commissions, including each of the plaintiffs here. In response, the

Distributors pushed back on the amount of the buy-out and asked for better offers. Those

discussions and the pending merger also raised an additional dispute: whether the Distributors

would be entitled to lifetime commissions on sales by Zimmer or Zimmer–Biomet (the new post-

---

[1] There are two defendants, but for simplicity the Court refers primarily to Biomet when
referring to the defendants' motions and arguments.

merger entity), instead of just sales on Biomet products. After preliminary discussions between the parties failed to produce a resolution of either the buy-out offers or the Distributors' right to commissions on Zimmer or Zimmer–Biomet sales, the Distributors retained counsel.

On July 20, 2015, the Distributors' attorney sent a letter to Zimmer–Biomet addressing both of those topics. Much of the letter outlined the Distributors' history with Biomet and the reasons they should receive more favorable buy-outs. The letter also raised the Distributors' contention that they were entitled to commissions on sales by the post-merger entity. The letter asserted, for example, that Biomet had anticipatorily repudiated its obligations by taking a contrary position, and that Biomet made clear that it intended to breach its obligations to pay commissions on Zimmer–Biomet products following the merger. The letter stated that the Distributors would take any steps necessary to protect their rights unless Zimmer–Biomet either made an acceptable buy-out offer or provided written assurance that it would pay commissions on products "sold by Zimmer–Biomet in the relevant territories."

As relevant to Biomet's present arguments, however, the letter also included some references to the payment of commissions on Biomet products. It stated, for example, that since the Distributors' retirement, "Biomet has honored its obligations, and paid commissions on all products sold in the relevant territories." It likewise stated that "[u]ntil recently, the Legacy Distributors had no complaints regarding Biomet holding up its end of the bargain and honoring the Distributorship Agreements." At trial, though, the Distributors' only claim is that Biomet has been underpaying them since their retirements by paying commissions on a smaller set of Biomet products than dictated by the agreements. Biomet argues that the statements in this letter show that the Distributors' current interpretation of the agreements is a recent invention and does not reflect the parties' understanding or intent when they entered the agreements.

The Distributors move to exclude the letter under Rule 408, arguing that the letter was a settlement communication and that Biomet intends to use the letter for prohibited purposes, namely to disprove the validity of their claim or impeach by contradiction. Rule 408 states:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> . . . .
>
> (2) conduct or a statement made during compromise negotiations about the claim[.]

Fed. R. Evid. 408(a). Though Biomet attempts to argue otherwise, it plainly intends to use the letter to disprove the Distributors' claim or contradict their testimony. [DE 256 p. 5 (admitting that Biomet "will reference the letter at trial to counter the testimony offered by Plaintiffs as to the meaning of a decades-old contract provision")].

The question, then, is whether this letter falls within Rule 408's coverage. In arguing that it does not, Biomet asserts that the letter was only negotiating a contractual buy-out—a routine business negotiation, not a disputed claim—and that the claim at issue now is a new theory that was not in dispute then and was not raised until the next year when the Distributors filed suit. The Distributors disagree, arguing that there was a dispute at the time of the letter: a dispute over whether the Distributors were entitled to commissions on Zimmer or Zimmer–Biomet products. The Court agrees that the disagreement over *that* issue had likely ripened into a disputed claim by the time of the letter—the letter accuses Biomet of having anticipatorily repudiated its obligation to pay those commissions and states that Biomet made clear that it intended to breach its obligations.

Critically, however, that is not the claim going to trial in this case. For Rule 408 to apply, the claim being negotiated must be the same claim at issue in the litigation. As the Seventh Circuit recently explained, "settlement discussions concerning a specific claim are excluded from

evidence to prove liability on *that* claim, not on others. That is, when a settlement discussion concerns Claim A, and statements from that discussion are later offered to prove or disprove liability on Claim B, Rule 408(a) does not make those statements inadmissible." *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 541 (7th Cir. 2017); *see also Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005) ("The balance is especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered."). That conclusion follows from the rule's text, which states that a party may not seek to disprove the validity of "a claim" with statements made during compromise negotiations "about *the* claim." Rule 408(a) (emphasis added); *see also Muylle*, 868 F.3d at 541 ("Paragraph (a) uses the term "a disputed claim," not "disputed claims" or "any claims." Subparagraphs (1) and (2) of paragraph (a) likewise speak of "the" claim."); *Armstrong v. HRB Royalty, Inc.*, 392 F. Supp. 2d 1302, 1304 (S.D. Ala. 2005) ("[T]he definite article "the" limits "the claim" as to which evidence may not be admitted to the claim previously referenced, i.e., the claim which was the subject of a settlement offer.").

Here, to the extent the July 2015 letter discusses a disputed claim, that claim relates to whether the Distributors would be entitled to commissions on sales of Zimmer or Zimmer–Biomet products once the merger occurred. The Distributors' counsel made that point at the final pretrial conference, explaining that the dispute at the time of the letter was whether the lifetime commissions payments would extend to the products of the new Zimmer–Biomet entity. As counsel also noted, however, that claim has been dismissed and is not part of the trial in this case. The claim going to trial has nothing to do with whether Zimmer or Zimmer–Biomet-branded products became subject to the lifetime commissions provision after the merger; it

relates solely to the proper scope of commission payments on sales of legacy *Biomet* products, dating back to the Distributors' retirements.

The Distributors have never argued that a dispute existed as to that claim at the time of the letter, nor does the letter itself contemplate such a claim. [DE 175-3 p. 8 ("In the years following the Legacy Distributors' retirement, Biomet has honored its obligations, and paid commissions on all products sold in the relevant territories.")]. In fact, the Distributors have argued elsewhere that they were not even aware of that claim "until shortly before filing this lawsuit in 2016." [DE 198 p. 9].[2] If the Distributors were not even aware of this claim at the time of the July 2015 letter, they cannot argue that the letter constituted an attempt to compromise that claim. *Armstrong*, 392 F. Supp. 2d at 1305 (noting that "one can hardly dispute a claim of which he is unaware"); *see also Tendeka, Inc. v. Glover*, No. 2015 WL 2212601, at *21 (S.D. Tex. May 11, 2015) (holding that a letter attempting to settle one claim was not excluded by Rule 408 to disprove a different claim of which the parties were not even aware at the time).

Because the claim for which this evidence is being offered is not the claim being negotiated in the July 2015 letter, Rule 408 does not bar its admission. Therefore, the Court **denies** this motion.

2.     **Al Plows email**

The Distributors similarly move to exclude an email sent to Biomet's general counsel by Al Plows, another former Biomet distributor. This email was sent in May 2015, and was a precursor to the letter just discussed. In his email, which he copied to each of the Distributors, Mr. Plows responded to Biomet's buy-out offer and also asked for written confirmation "that

---

[2] *See also* DE 241 p. 11–12 (noting that Mr. Plows' prior email on the same topic was in relation to a claim that has been dismissed and is not being presented at trial)].

going forward Zimmer–Biomet will continue to honor their obligation to pay override commissions on any/all reconstructive products sold in our respective territories."

The Distributors argue that this email is excluded as a settlement communication under Rule 408, but for the same reasons just discussed, the Court finds that Rule 408 does not apply. The Distributors also argue that Mr. Plows' email is hearsay, but that argument is insubstantial. Hearsay is defined as an assertion that is offered to prove the truth of the matter asserted. Fed. R. Evid. 801(a), (c)(2). Mr. Plows' statement was a request, not an assertion of truth—he asked for confirmation that Zimmer–Biomet will pay commissions on reconstructive products sold in their territories moving forward. The relevance of this statement is not the truth of anything he asserted, but the fact that he asked for confirmation only as to "reconstructive products."[3] Because this was a request, not an assertion offered for its truth, it does not qualify as hearsay, so Biomet does not need to meet any exception to the hearsay rule. *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015).

The Distributors finally argue that this email should be excluded under Rule 403. The Distributors argue that allowing this email would require explanations of the circumstances of Mr. Plows' involvement in the negotiations and why he is not a plaintiff in this case, and could require some context about the merger. However, the details about Mr. Plows can be established quickly and without inviting confusion, and context about the merger will inevitably come up anyway—both Biomet and Zimmer Biomet are defendants in this case. And although the Distributors offer reasons that might explain away Mr. Plows' reference to "reconstructive

---

[3] The Distributors also argue that Mr. Plows did not formally represent them in this negotiation, but that would not make this email irrelevant. Mr. Plows sent the email purporting to speak on their behalf (he referred to the "Legacy Distributors" and used the words "we" and "us"); he copied each of the Distributors on the email; and they did not express disagreement with his statements. That allows an inference that they agreed with his characterization.

products," that does not negate the relevance of this exhibit, as the jury could find that Biomet's interpretation is the more plausible reading. Thus, the Court does not believe that the danger of any unfair prejudice substantially outweighs the probative value of this exhibit. Accordingly, the Court **denies** the motion to exclude this exhibit.

3.      **Distributors' violations of agreements**

The Distributors next move to exclude any evidence or argument that they violated their distributorship agreements while they were active distributors. Though Biomet responded in opposition to this motion, it clarified at the final pretrial conference that it does not intend to offer any argument that the Distributors breached their agreements. To the contrary, it intends to argue that the Distributors did not breach their agreements, and that their course of performance in compliance with those agreements informs the meaning of the agreements. On that understanding, the Court **grants** the motion as unopposed. The defendants may not argue or present evidence that the Distributors breached their agreements as active distributors, though that does not prevent them from presenting evidence of the course of performance in accordance with those agreements.

4.      **Challenge to damages calculation**

The Distributors next move to bar Biomet's damages expert, Bryan Callahan, from challenging their own expert's damages calculation. The Court addresses the admissibility of Mr. Callahan's opinions below relative to the Distributors' *Daubert* motion. That ruling suffices to frame the scope of Mr. Callahan's testimony, so no further order is warranted on that issue.[4]

---

[4] The Distributors argue elsewhere that there is no genuine dispute on the amount of damages (assuming they prevail on their interpretation of the contracts) so the issue need not be presented to the jury. The parties are free to enter a stipulation on damages if they like, but otherwise there is no basis for taking the issue away from the jury. The Distributors bear the burden of proof, and absent a stipulation, they will have to meet that burden by presenting evidence at trial. If the evidence supports only one result, they can argue that to the jury.

**5.     Shera's prior lawsuit**

The Distributors move to exclude evidence of a previous lawsuit Frank Shera brought against Biomet. That suit involved a dispute over the scope of Mr. Shera's distributorship under his distributorship agreement. Most notably, his stipulation to dismiss that suit included the following statement: "Frank L. Shera and Frank L. Shera, Inc. admit that the Distributorship Agreement does not contractually grant them the right to sell the products of Biomet's present subsidiaries or companies which Biomet may acquire in the future." The Distributors argue that this admission is not relevant because that suit involved a dispute over a different provision in the agreement, and that its use at trial would be prejudicial.

The Court disagrees. Mr. Shera's admission about the scope of the agreement is highly relevant. It is a direct admission by a plaintiff in this case about the scope of the same agreement being litigated in this case. The Distributors attempt to deflect that statement by noting that the previous suit involved a dispute over the products Mr. Shera was allowed to carry as an active distributor (addressed in Section 2) while the current suit involves a dispute over the products he is entitled to receive commissions on in his retirement (addressed in Section 9 of the same contract). But Biomet's core theory in this case is that those two provisions have the same scope—that Mr. Shera is entitled to receive retirement commissions only on products within the scope of his distributorship. *See B&R Oil Co. v. Stoler*, 77 N.E.3d 823, 827 (Ind. Ct. App. 2017) ("We review the contract as a whole[.]"). An admission that Mr. Shera was not entitled to distribute products of Biomet's subsidiaries is thus highly relevant to his claim for lifetime commissions on products sold by those subsidiaries. That the Distributors intend to offer a competing interpretation does not make this admission irrelevant.

Given the significant probative value of this evidence, the Court cannot find that the probative value is substantially outweighed by any of the concerns for prejudice raised by the Distributors. Accordingly, the Court **denies** this motion.

6. **Dollar amount already paid to distributors in the past**

The Distributors also moved to exclude evidence of the amount the Distributors were paid while they were active distributors, and to prohibit argument that the Distributors "have been fairly compensated in retirement based solely on the total amount of retirement commissions they have received." [DE 241 p. 14]. Biomet does not object to either of those requests, as narrowly framed in that manner, so the Court **grants** the motion. As Biomet notes, however, that will not preclude evidence of the amount the Distributors have been paid in retirement commissions. Nor will it preclude argument that those amounts satisfy Biomet's obligations under the agreements.

7. **Testimony by Biomet witnesses about intent**

The Distributors also move to exclude testimony by Biomet's witnesses about Biomet's intent at the time it entered the agreements. The Distributors argue that those witnesses— particularly Daniel Hann, Biomet's former general counsel—were not employed by Biomet at the time or were not part of the agreements' negotiation, so they lack firsthand knowledge and should not be permitted to relate hearsay about what Biomet's founders intended at the time. The Distributors' motion is overbroad, as the admissibility of this testimony will depend on the precise testimony, the foundation laid for it, and the purpose for which it is offered. The Court thus declines to resolve this issue through an order in limine. However, the parties' arguments raise some issues that warrant discussion at this point in order to frame the analysis that will apply at trial.

The Distributors express concern that Mr. Hann will testify about conversations he had with Biomet's founders, including Dane Miller, in which the founders talked about what they intended when they entered the distributorship agreements. Should such a statement be offered for the truth of the matter asserted by Mr. Miller, it would constitute hearsay. And as the Distributors note, the state-of-mind exception to the hearsay rule would not apply if the statement refers to what Mr. Miller intended at some earlier point. The state-of-mind exception applies only to the declarant's "then-existing state of mind," Fed. R. Evid. 803(3), so a statement about what the declarant intended at a previous time would not be covered. The statement would meet that exception, though, if Mr. Miller expressed his current state of mind about what he understood the agreements to mean at the time he made a statement to Mr. Hann. That would be a statement of his "then-existing" state of mind; the jury could then decide to what extent Mr. Miller's belief at that time supports an inference about his intent at the earlier time when the parties entered the agreement. *See* 2 McCormick on Evidence § 274 (7th ed. 2016) ("Although the statement must describe a state of mind or feeling existing at the time of the statement, the evidentiary effect of the statement is broadened by the notion of the continuity in time of states of mind.").

There is also other testimony that Mr. Hann could offer that would not be excluded as hearsay. Some statements by Mr. Miller might not be hearsay to begin with, as Biomet notes. Hearsay is an out-of-court "assertion" offered to prove "the truth of the matter asserted." Fed. R. Evid. 801(a), (c). If, for example, Mr. Miller gave Mr. Hann a direction or instruction about what action to take with regard to Biomet's performance under the agreements, that would not be an assertion offered for its truth, so it would not be hearsay. *See Ruhl v. Hardy*, 743 F.3d 1083, 1099 (7th Cir. 2014) (holding that a statement was not hearsay because it was "a direct command, not

a statement offered to prove the truth of the matter asserted"); *Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (holding that a request and an instruction were not hearsay "because they were not 'statements' making any factual assertions"). Other testimony might be based on Mr. Hann's personal knowledge. For example, as the general counsel who was involved in executing the agreements on behalf of Biomet, he would have personal knowledge of Biomet's performance under the agreements, which would be relevant to Biomet's course-of-performance argument.

That said, the Court does not agree with Biomet that Mr. Hann's testimony is insulated from the rule against hearsay because he was designated as a corporate representative for a deposition under Rule 30(b)(6). That rule allows a party to serve a notice of deposition on a corporation, identifying specific matters to be discussed. The corporation must then produce a representative who "must testify about information known or reasonably available to" the corporation on those matters. Fed. R. Civ. P. 30(b)(6). Biomet argues that because Mr. Hann was designated as a corporate representative for a Rule 30(b)(6) deposition, he can testify to its corporate knowledge without any need for personal knowledge, and thus can testify without regard to the rule against hearsay. Under Rule 32(a)(3), an "adverse party" may use at trial the deposition of a party's designee under Rule 30(b)(6). But Mr. Hann is Biomet's own representative, and Rule 32(a)(3) does not allow a party to use its own designee in this manner. *See Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) ("Federal Rule of Civil Procedure 30(b)(6) allows corporate representatives to testify to matters within the corporation's knowledge during deposition, and Rule 32(a)(3) permits an *adverse* party to use that deposition testimony during trial. However, a corporate representative may not testify to matters outside his own personal knowledge to the extent that information is hearsay

not falling within one of the authorized exceptions." (citation, quotation, and alteration omitted));

*see also* Fed. R. Civ. P. 32(a)(1)(B) (stating that a deposition may be used under this rule "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying"). Thus, notwithstanding that Biomet produced Mr. Hann in response to a Rule 30(b)(6) notice, Mr. Hann's testimony at trial will still have to comply with the rules of evidence in order to be admitted.

8.      **Statute of limitations**

The Distributors next move to exclude evidence or argument concerning Biomet's statute of limitations defense. At summary judgment, the Court made two holdings relevant to the statute of limitations. It first held that the statute of limitations accrued separately for each payment that came due, so the statute of limitations could not bar the Distributors' claims in their entirety, it could only limit the period for which they could seek damages. Second, the Court held that the applicable statute of limitations was not provided by the Uniform Commercial Code (which would have been four years). Instead, the default statute of limitations for breach of contract claims applied. The Court did not resolve, however, whether that term was 20 years (for contracts entered before September 1, 1982) or 10 years (for contracts entered after), since that would not have affected the outcome of the motion.

In their motion in limine, the Distributors first argue that five of the Distributors are subject to the 20-year statute of limitations, as they entered their original distributorship agreements before September 1982. And because none of those Distributors received commission payments more than 20 years before this suit was filed on April 4, 2016, they argue that the statute of limitations has no possible application to their claim. The sixth plaintiff, Mr. Shera, concedes that his contract is subject to a 10-year statute of limitations, but he is willing to

forego any damages that accrued more than ten years before suit, in which case there would be no work left for the statute of limitations on his claim, either.

Biomet offers little substantive response to these arguments, except to say that it wishes to argue this defense to the jury. The applicable statute of limitations is a question of law for the Court to decide, though, and a motion in limine is an appropriate vehicle for making that determination. Under Indiana law, the statute of limitations on breach of contract claims is 20 years for contracts entered before September 1, 1982, and 10 years for contracts entered after. It is undisputed that five of the Distributors (all but Mr. Shera) entered the distributorship agreements upon which their claims are based prior to September 1982, so they are subject to the 20-year term. Biomet argues in response that those Distributors signed termination agreements later, but those agreements expressly provided that the long-term commission provisions in the original distributorship agreements remained in effect. The parties even entered a stipulation to that fact. [DE 267 ("The Termination Agreements differ in name and some other respects, but all state that the Long Term Commission Program found in the Distributorship Agreements survives Plaintiffs' retirement and remains in full force and effect.")]. The breach of contract claims are premised on the surviving provision of the original distributorship agreements, which were entered before September 1, 1982 for these five Distributors, so those claims are subject to 20-year limitations period.

That being the case, Biomet hasn't shown that the statute of limitations has any role left to play at trial. As a matter of law, the five Distributors' claims are subject to 20-year limitations periods, and those Distributors represent without contradiction that they do not seek any damages that could have accrued before that period. The sixth plaintiff agrees that he is subject to a 10-year limitations period, but has agreed not to even ask for any damages that accrued before April

4, 2006. Given that concession, Biomet has effectively prevailed on its statute of limitations defense as to Mr. Shera already, so there is no use in further arguing the point to the jury. If none of the Distributors are seeking damages that accrued before the applicable limitations period, then the statute of limitations has no applicability at trial and is not relevant. Without any argument from the defendants about how the statute of limitations could nonetheless have an impact at trial, the Court **grants** this motion in limine.

9. **Equitable affirmative defenses**

The Distributors next move to exclude evidence relevant only to the defendants' equitable affirmative defenses. Both sides agree that those equitable defenses are decided by the Court, not the jury, so evidence on these issues need not be presented to the jury. The Court therefore **grants** this motion, and will not allow evidence relevant solely to the equitable affirmative defenses to be presented to the jury. Biomet argues that all of the evidence relevant to the equitable defenses will also come in as relevant to other issues at trial, so the issue may not arise, but the Distributors should make a specific objection at trial to any evidence they believe falls in this category.

10. **Mitigation of damages**

The Distributors also ask to exclude Biomet's affirmative defense that they failed to mitigate their damages. The Distributors argue that this defense should be excluded because there is insufficient evidence to support it. The Court agrees with Biomet that, framed in that manner, the motion is overbroad. A motion in limine is not the proper vehicle for evaluating the sufficiency of the evidence, so the motion is **denied** in that respect. The Distributors' motion, however, also reflects a contested issue of law that is amenable to a motion in limine, as they argue that a legal theory upon which Biomet intends to proceed for this defense is unsound. Biomet appears to argue, at least in part, that the Distributors failed to mitigate their damages

14

because they did not sue, or at least object to the underpayments, earlier. The Distributors object that this is not a cognizable mitigation-of-damages argument. The Court agrees.

First, as the Distributors argue, mitigation of damages refers to a party's duty after sustaining an injury. As the Indiana Supreme Court has noted, a party "has a duty to mitigate his or her *post-injury* damages[.]" *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006) (emphasis added) (noting also that the "principle of mitigation of damages address conduct by an *injured party* that aggravates or increases the party's injuries" (emphasis added)); *Scott-Larosa v. Lewis*, 44 N.E.3d 89, 94 (Ind. Ct. App. 2015) ("The duty to mitigate damages is a common-law duty independent of the terms of the underlying contract, and it requires the non-breaching party to make a reasonable effort to act in such a manner as to decrease the damages *caused by the breach*." (emphasis added)). Biomet's argument in this respect, however, appears to be that the Distributors failed to keep the injury from occurring in the first place. A breach occurs each time a payment comes due but is not paid, so Biomet's argument that the Distributors should have complained sooner to keep damages from accruing is really an argument that the Distributors should have kept Biomet from breaching, which is not a question of mitigation of damages.

Even then, Biomet does not claim that it would have begun paying the commissions any differently had the Distributors complained or sued at any other point—it denies even now that they are entitled to any further commissions. Instead, Biomet appears to argue that it would have been better positioned to defend itself against had the Distributors brought this suit earlier, but that is just a variation on its laches defense, not a valid theory of mitigation of damages. Relatedly, Biomet does not argue that the amounts that came due under the contracts would have been any different had the Distributors sued earlier. The commissions are based on the sales in the Distributors' former territories, and Biomet does not suggest that anything the Distributors

should have done would have affected those sales. Should the Distributors prevail on their interpretation of the contracts, the amounts that would have been due would be the same regardless of when they sued; the only difference would be whether the Distributors received those amounts as the sales occurred or when judgment is entered in this case. That again illustrates that this is not a valid mitigation of damages argument.

Accordingly, the Court will not permit Biomet to argue that the Distributors failed to mitigate their damages by failing to timely sue or complain about an underpayment of commissions. Should Biomet be unable to offer any other mitigation of damages theory, this defense can be resolved on a Rule 50 motion or at the final instruction conference.

**11.      Prior rulings**

Last, the Distributors move to preclude disclosure to the jury of the Court's prior rulings. The Court **grants** the motion as unopposed.

## II.  DEFENDANTS' MOTIONS IN LIMINE

**1.      Agreements with non-plaintiff distributors**

Biomet first moves to exclude evidence of distributorship agreements entered into by distributors other than the six plaintiffs here. Biomet argues that those agreements have little if any relevance, and that the dangers of confusing the issues and misleading the jury warrant exclusion under Rule 403. The Court agrees.

The parties focus their arguments on this topic on an agreement entered in 2007 between Timothy Weis and Biomet Orthopedics, Inc. Mr. Weis initially entered a distributorship agreement with Biomet, Inc. in the early 1980s, similar to the Distributors. In 2007, Mr. Weis agreed to terminate that initial distributorship agreement, and he signed a new agreement with Biomet Orthopedics, Inc. The 2007 agreement also included a long-term commissions program, but used different language than in the initial agreement. The Distributors argue that the 2007

agreement is relevant because it shows that Biomet must have known it owed commissions on a larger set of products than provided by the initial agreements.

As noted in part in a previous order, the Court finds the relevance of the 2007 agreement to be very limited. The 2007 agreement was entered decades after the agreements at issue here, between two non-parties to those agreements, and under different circumstances and for different reasons. Over the intervening years, all of the parties changed quite substantially and became more sophisticated than when the initial agreements were entered. That the 2007 Weis agreement used different language than the prior agreements sheds little if any light on what the parties in this case intended when they entered their agreements decades earlier. The 2007 agreement is different in nearly every respect than the original agreements; if the parties were to redraft those agreements today, neither side would use the same language as in the original agreements, even if they wanted them to have the exact same meaning. It would thus be quite difficult to attribute any differences in language to an intent to produce a different outcome on the specific issue disputed in this case.

Moreover, admitting agreements other than the ones directly at issue in this case would create substantial concerns under Rule 403. Detouring into those other agreements would create a significant risk of confusing the issues and misleading the jury. It could require a trial-within-a-trial as to what those other agreements actually mean, what the parties to those agreements intended, and under what circumstances the other agreements were entered. The jury will have enough of a task trying to make sense of the agreements at issue here, without giving it other agreements to make sense of too. Going through that process would also create unnecessary delay. In sum, the Court finds that the probative value of this evidence is significantly outweighed by the risk of prejudice under Rule 403, so the Court **grants** this motion in limine.

**2.      Future damages**

Biomet moves to bar evidence of "future damages," as the Court held at summary judgment that the Distributors are not entitled to such damages. The Distributors agree these damages are no longer at issue. The Court therefore **grants** the motion as unopposed.

**3.      Dismissed claims**

Biomet moves to bar evidence relevant solely to claims that have been dismissed. The Distributors agree (but note that some evidence relevant to those claims is also relevant to the claims that are still live). The Court thus **grants** this motion; evidence relevant solely to those claims will not be admitted, though Biomet will need to raise a specific objection at trial if it believes particular evidence falls in this category.

**4.      Zimmer or Zimmer Biomet sales**

Biomet next moves to exclude evidence of sales of Zimmer or Zimmer Biomet products. It contends that those products were encompassed in claims that were dismissed, and are not encompassed in the remaining claim, so they are not relevant. The Court denies this motion, as there does not appear to be any concrete dispute on this point. The Distributors have made clear exactly what product lines they are seeking commissions on [DE 253 p. 5], and their damages expert identifies the sales totals for which they are seeking damages. Biomet does not contend that any of those products or sales would fall within the scope of this motion. Accordingly, the Court **denies** this motion as unnecessary.

**5.      Separation of witnesses**

The Court **grants** the motion for separation of witnesses as unopposed. Fed. R. Evid. 615.

**6.      Non-disclosed documents**

Finally, Biomet moves to bar any documents not properly disclosed in discovery. It does not identify or even suggest that there are any such documents, though, so this would serve no purpose as an order in limine—there is no need to enter an order in limine stating that the Federal Rules and this Court's orders will apply at trial. The Court therefore **denies** this motion.

### III.  DEFENDANTS' *DAUBERT* MOTION

Biomet next moves to exclude the testimony of the Distributors' damages expert, Rodney Sowards. Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)      the testimony is based on sufficient facts or data;
>
> (c)      the testimony is the product of reliable principles and methods; and
>
> (d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834–35 (7th Cir. 2015). The proponent of the expert testimony bears the burden of demonstrating that the testimony meets each of those elements. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). However, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *Textron*, 807 F.3d at 834 (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432

(quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

Here, Mr. Sowards was asked to calculate the amount of damages owed to the Distributors based on the assumption that the agreements entitled them to commissions on all Biomet products sold in their former territories. Mr. Sowards' methodology in making that calculation was simple. He first compiled the net sales of all Biomet products based on Biomet's sales data. He then subtracted the net sales on which the Distributors were already paid commissions. Last, he multiplied the resulting amount by the commission rate to determine the additional amounts each Distributor should have been paid. He made that calculation for each of the Distributors, and also prepared charts breaking down the totals for each year and for each different product.

In objecting to Mr. Sowards' testimony, Biomet does not take issue with any of those steps or question the soundness of his mathematics. Instead, it focuses almost entirely on attacking his underlying assumptions. It objects, for example, that Mr. Sowards did not take it upon himself to decide whether the Distributors were entitled to receive commissions on all the products he included in his calculation, and that Mr. Sowards instead relied on counsel to tell him on which products to calculate commissions. Biomet also argues that Mr. Sowards failed to establish a causal link between a breach of the agreements and the damages included in his opinion.

Biomet's objections are misplaced. Mr. Sowards' function as a damages expert is not to interpret the agreements' meaning. His role is to answer a simple and narrow question: if the

Distributors are right about which products they are entitled to receive commissions on, how much more should they have been paid? In making that calculation, he properly relied on counsel to tell him which products the Distributors were entitled to receive commissions on, and he calculated damages based on that underlying assumption.

Biomet's objection to this approach appears to have in mind a more complex type of case where a plaintiff claims to have lost profits due to some unlawful conduct, such that the damages expert's task is to trace the effects of that particular conduct. In that situation, the expert may have to draw on his expertise to construct a "but-for world"—evaluating the condition the plaintiff would have been in but for the wrongful conduct—and to compare that to the plaintiff's actual condition. For that comparison to be relevant to a damages calculation, the expert must have a basis on which to attribute the differences to the defendant's wrongful conduct. Experts who assume away issues critical to that analysis or who fail to connect the "but-for world" to the theory of liability may fail to satisfy Rule 702.

This is not that sort of case. The theory of liability here is straightforward: a failure to pay the amounts due under the contract. The meaning of a contract is not a question for a damages expert to opine on, and Mr. Sowards appropriately relied on counsel to tell him what products to include in his calculation. Just as a damages expert may assume liability without conducting his own analysis of whether the defendant is in fact liable, so may Mr. Sowards proceed on an assumption about which products are subject to the agreement without conducting his own analysis as to whether that assumption is correct.[5] *See Smith v. Ford Motor Co.*, 215 F.3d 713,

---

[5] Mr. Sowards' testimony at trial must make clear, however, that he is relying on an assumption that has been provided to him, and that he is not offering an opinion about what the contracts mean or opining that his damages calculation is based on the correct interpretation of the contracts.

718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]"); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion."). His task from there is simply to review the sales data to determine the amount of those products' sales and how much in commissions the Distributors would have been paid on them.[6] As the Distributors argue, his task is essentially to function as a calculator. Nor is there any daylight between breach and damages such that an inquiry into causation is necessary. The alleged breach is a failure to pay amounts due under the agreements; any dollar that came due but wasn't paid was a breach, and the Distributors were damaged in that same amount.

Of course, the Distributors will need to prove through other evidence that they are in fact entitled to commissions on the products included in Mr. Sowards' calculation. Should the jury find that the Distributors' interpretation of the agreements is wrong and that they are not entitled to receive commissions on all the products included in Mr. Sowards' analysis, the jury can disregard his opinions. *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *12 (N.D. Ill. Aug. 21, 2017) ("The jury will undoubtedly be able to understand that it may not award damages, regardless of whether the evidence reveals a valid measure of damages, if [the plaintiff] does not establish its right to them by proving that its interpretation of the contract is correct."). Mr. Sowards' role as a damages expert is not to address those threshold questions, though, but simply to provide a calculation of the damages that would be due if the

---

[6] That is exactly how Biomet's damages expert went about offering his alternative damages calculation based on a smaller set of products. [DE 235 (Callahan report) at 11–12].

Distributors are right about what products they are entitled to commissions on. Mr. Sowards is qualified to make that calculation and did so reliably, so his opinion satisfies Rule 702.

Biomet's other criticisms are insubstantial. Biomet objects, for example, that Mr. Sowards grouped the product lines into two categories at counsel's instruction, before adding those two amounts to produce his damages totals. There is no reason that should affect the admissibility of his opinions, though. At worst, that intermediate step may be unnecessary, but it is not confusing or misleading and has no effect on the reliability of Ms. Sowards' calculations. In addition, as the Distributors point out, the exhibits attached to Mr. Sowards' report break down the damages by each different product line and by each year; combining those products into two groups before adding them for the final damages amount does not obscure Mr. Sowards' analysis or pose any potential to mislead the jury. Biomet also objects that Mr. Sowards did not consider the statute of limitations. That objection assumes, though, that the statute of limitations necessarily limits the Distributors' claims, which is not the case. Just the opposite: as discussed above, Biomet has not shown that the statute of limitations has any remaining potential to affect the Distributors' damages. And in any event, Mr. Sowards broke his calculation down by year, which would allow for any necessary adjustments to reflect any applicable limitations period.

For those reasons, the Court finds that Mr. Sowards' calculations satisfy Rule 702 and that they are relevant, in that they are premised on the interpretation of the agreements for which the Distributors intend to advocate at trial. The Court therefore overrules Biomet's objections to Mr. Sowards' testimony.[7]

---

[7] Biomet had also objected to Mr. Sowards' calculation of prejudgment interest, though the parties agree that prejudgment interest is a question to be decided by the Court after trial, not by the jury, so the Court need not address that objection. Mr. Sowards also gave an opinion on the value of future damages, but that is no longer at issue following summary judgment.

## IV. DISTRIBUTORS' *DAUBERT* MOTION

The Distributors also moved to exclude the testimony of Biomet's two experts: Bryan Callahan and John Nevin.

**1.      Bryan Callahan**

The Court first addresses the motion to strike opinions by Bryan Callahan, a damages expert. Mr. Callahan broke his report into four opinions. He first opined that no damages are due, and that Mr. Sowards' conclusion to the contrary is incorrect. Second, he addressed the claim for future damages. Third, he offered his own alternative calculation of damages assuming that commissions were due on three additional product categories (sports medicine, trauma, and biologics). And fourth, he responded to Mr. Sowards' deposition testimony, primarily contending that Mr. Sowards' opinion is flawed because he failed to connect liability and damages.

The second opinion is no longer at issue after summary judgment, and the Distributors do not move to exclude the third opinion, in which Mr. Callahan offers an alternative damages calculation. However, the Distributors move to exclude the first and fourth opinions. They argue that these opinions present nothing more than legal conclusions and Mr. Callahan's own interpretation of the contracts. Thus, they argue, his opinions are not helpful and are not the product of his expertise as an accountant, so they do not satisfy Rule 702. The Court agrees.

Mr. Callahan's first opinion is not a damages opinion at all. Instead, Mr. Callahan opines that Biomet's interpretation of the contract is correct, so no damages are due. He asserts, for example, that "[t]he only proper category of products for which the Plaintiffs are entitled to commissions under the Agreement is SBU04/Biomet Orthopedics." [DE 235 p. 6]. He also opines that "there exists no basis for the inclusion of product categories in the Long Term Commission Program beyond SBU04." *Id.* He bases those statements on his own interpretation

of the contractual language and on deposition testimony from Biomet's former general counsel about the meaning of the contracts. Mr. Callahan has no expertise in interpreting contracts or ascertaining parties' intent, though, nor would that be an appropriate subject for his expert testimony. Biomet attempts to distance itself from these statements in its response brief, claiming that Mr. Callahan will not provide interpretations of the contracts' meaning. Yet his opinion in this regard is that no damages are due because the contracts don't mean what the Distributors claim they do. That's an opinion about the meaning of the contracts, not a calculation of damages within the ken of an accountant.[8] This opinion thus is not helpful and is not the product of Mr. Callahan's expertise or a reliable methodology, so the Court grants the motion to exclude this opinion.[9]

The Court likewise grants the motion to exclude Mr. Callahan's fourth opinion, in which he criticizes Mr. Sowards for failing to connect liability and damages. His opinion in that regard mirrors the argument that Biomet made in moving to exclude Mr. Sowards' opinions, that he failed to consider causation. But as discussed above, there is no difference here between breach and damages: the alleged breach comes from any amounts that Biomet didn't pay, and the losses are those same amounts that the Distributors didn't receive. Put another way, *if* commissions were due on any other products, then Biomet breached the agreement by not paying those amounts, and the Distributors were injured by not receiving them. The dispute in this case focuses on that "if," but that goes to the meaning of the contracts, not the calculation of damages

---

[8] That a damages expert would opine that there are no damages is a hint that the opinion really addresses liability, not damages, particularly when the theory of liability is the failure to pay amounts due.

[9] Mr. Callahan did not conduct an analysis as to whether any damages would be due if the jury adopts his interpretation of the contracts, either; he states only that it is his "understanding the parties do not dispute" that issue. [DE 235 p. 8].

once the contracts' meaning is decided. Indeed, though Mr. Callahan asserts that Mr. Sowards failed to draw a link between breach and damages, he never articulates what he sees as the difference or what link he believes is missing. To the extent his criticism is that Mr. Sowards failed to take it upon himself to determine what the contracts mean, that criticism is misplaced; that would have been not only unnecessary but inappropriate for a damages expert to do.

Mr. Callahan's opinions thus are not helpful to the trier of fact to understand the evidence or determine a fact in issue. Nor is it apparent how Mr. Callahan drew on his expertise or reliably applyied any expert knowledge or methodology in support of these opinions. To the contrary, the opinions are confusing and pose a high risk of misleading the jury—they suggest that something more than a failure to pay the amounts due is required to award damages, and could confuse the jury into believing that these damages experts are actually offering opinions on the contracts' meaning (as both Mr. Callahan's opinions and Biomet's defense of them repeatedly cross that line).[10] *See* Fed. R. Evid. 403. The Court therefore grants the motion to strike in this respect as well. Mr. Callahan's testimony at trial will be limited to the alternative damages calculation he offers in his third opinion.

## 2. John Nevin

Biomet also offers expert testimony from Dr. John Nevin, a professor and expert in the fields of marketing, distribution channels, and supply chain management. Biomet offers his testimony in support of its interpretation of the contracts. His report discusses the nature of the medical device industry and the relationship between a manufacturer and its distributors, and

---

[10] Mr. Callahan also criticizes Mr. Sowards for grouping the products into two groups, which he sees as arbitrary. As noted above, the Court fails to see the point of that criticism, but testimony from a competing expert is not necessary to make that point anyway and would be an unnecessary distraction. Fed. R. Evid. 403, 702(a).

offers Dr. Nevin's interpretation of the contracts' meaning. The report summarizes Dr. Nevin's opinions as follows:

> Biomet made an appropriate decision to use independent distributors (independent sales representatives) to distribute and sell its orthopedic reconstructive products. The Legacy Distributors' claims for lifetime commissions based on their expansive definition of "Biomet products" is not supported by the parties' contract, the course of dealing (i.e. historical behavior) between the parties or basic economic and business logic.

> Biomet has been calculating long-term commissions for the Legacy Distributors based on a snapshot of the basket of products being sold within their distributorships at the time each distributor retired. This method appropriately compensates the Legacy Distributors based on what products they were actually selling in their territories. This rewards them for the goodwill they built up with the customers in their exclusive territories. Further, providing long-term commissions based on actual product sales to customers is consistent with the accompanying non-compete provisions in the Long-Term Commission Program.

[DE 234-1 p. 5–6].

As the parties agree, expert witnesses are generally not permitted to offer opinions on the meaning of a contract, as that is usually a question of law for the Court to decide. *RLJCS Enters., Inc. v. Prof'l Benefit Tr. Multiple Emp'r Welfare Benefit Plan*, 487 F.3d 494, 498 (7th Cir. 2007). The issue is a bit more nuanced here, though, since the Court found that one of the terms in the contracts (the provision basing lifetime commissions on "sales made within the subject distributorship at the time this program is initiated") is ambiguous. That makes the meaning of that term a question of fact for the jury to decide, and also allows the parties to present evidence, which can include expert testimony, on the meaning of that term. *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) ("Evidence of custom and usage is relevant to the interpretation of ambiguous language in a contract."); *see Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994).

While it would thus be possible for some expert testimony to be admissible to inform the meaning of the contracts, the scope of that testimony would be narrow. Dr. Nevin is an expert

regarding distribution channels. Theoretically, that expertise might allow him to discuss the relationship between various players in the distribution of implantable devices, and how certain types of contractual provisions could be used to align those parties' interests or provide certain incentives. The jury could then decide whether the parties here intended to achieve those purposes and did so through the provisions included in the contracts. Dr. Nevin's expertise would not, however, allow him to simply recite provisions of the contracts and announce how he thinks they should be read. Nor would it allow him to offer opinions about what the parties here actually intended when they entered the contracts. Resolving that question will require the jury to hear conflicting testimony and evidence and decide who to believe; expertise in marketing does not make a witness any better positioned than the jury to make that sort of credibility finding. *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 768, 775 (N.D. Ill. 2009); *Dahlin v. Evangelical Child & Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) ("[T]estimony that does little more than tell the jury what result to reach is unhelpful and thus inadmissible, and testimony regarding intent—essentially an inference from other facts—is even more likely to be unhelpful to the trier of fact." (internal quotation omitted)). An expert witness cannot be used simply to clothe a party's arguments in an air of expertise, either.[11]

In moving to strike Dr. Nevin's opinions, the Distributors argue that his opinions are overwhelmingly devoted to those latter issues and constitute legal conclusions outside his purview as an expert witness. In response, Biomet conceded that at least some of Dr. Nevin's

---

[11] *See* Fed. R. Evid. 704 committee notes ("The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rule 702 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.").

opinions fit that description, and agreed not to elicit the following opinions from Dr. Nevin's report at trial:

- In summary, a snapshot of the basket of products being sold within a distributorship at the time a distributor initiates retirement is the basis for the long term commissions. The distributors are not entitled to commissions they claim on products they did not sell or on products that did not exist until after they retired.

- The Legacy Distributors' claim for lifetime commissions based on their expansive definition of "all" Biomet product sales in their territory(s) is not supported by the contract, the historical behavior between the parties, or basic economic and business logic.

- The Distributorship Agreement never granted the Legacy Distributors the right to receive any commission on products their distributorship did not sell in their territories at the time of their retirement.

[DE 251 p. 8 ("Biomet appreciates that the specific statements above could be interpreted by a jury as a legal interpretation of the contract, and agrees not to elicit them at trial.")].

The problem, however, is that the improper opinions extend well beyond those three examples. For example, Dr. Nevin asserts that the payments Biomet has been making "appropriately compensate[] the Legacy Distributors based on what products they were actually selling in their territories." [DE 234-1 p. 6]. He also asserts that the "Biomet products actually sold by the Legacy Distributors became the basis for their Long Term Commission Program," and that "Biomet reasonably contends that the Plaintiffs were and are entitled to be paid long-term commissions on the products that were being sold in their distributorship at the time they retired." *Id.* p. 6–7. He also claims that the parties' course of dealing "provides valuable insight to the meaning of the contract between the parties." *Id.* p. 10. Those statements are no more acceptable than the ones Biomet concedes are improper, as they assert conclusions beyond his expertise and beyond the role of an expert witness. Much of the rest of his report consists of reciting the language of the contracts or testimony by Biomet's corporate representative. In neither of those respects is he drawing on his expertise and offering an opinion that would be

helpful to the jury. Dr. Nevin also offers opinions about what the parties intended when they entered the contract, such as that the "commissions were not designed to pay the Legacy Distributors for market development and sales work they did not perform." [DE 234-1 p. 13; *see also* p. 14 ("The long term commission was an incentive Biomet offered its distributors to encourage productivity and loyalty.")]. As already discussed, that sort of credibility finding from an expert witness is not helpful. *U.S. Gypsum*, 670 F. Supp. 2d at 775.

Excising these inappropriate opinions from Dr. Nevin's report would require extensive blue-penciling. As the Distributors argue, these opinions and the discussions in their support permeate nearly the entirety of the report. And even if that content could be severed, what little would remain would not require expert testimony to address. For example, in two of his opinions, Dr. Nevin talks about the need for medical device manufacturers to develop relationships with the surgeons that choose which devices to use, and he opines that it was reasonable for Biomet to do so through distributors instead of an in-house salesforce. The latter opinion is not relevant, and the former point could be established through any or all of the fact witnesses in this case—Biomet's own representatives could testify about the nature of the medical device industry, as could any of the Distributors.

At the final pretrial conference, Biomet argued that Dr. Nevin would opine that it would be irrational for a supplier to pay a distributor lifetime commissions on products they never sold. To the extent such an opinion is actually encompassed in Dr. Nevin's report, the report offers no reliable explanation or methodology in support of that opinion. The report notes, for example, that providing long-term commissions on products a distributor sold can incentivize the distributor both to develop relationships with purchasers and to preserve the purchasers' relationship with the manufacturer upon the distributor's retirement. But the report never

considers or addresses whether any additional business purpose could support broader payments (such as to incentivize distributors to leave an established competitor and take a risk in joining a start-up company). The report thus does not support an opinion that no purpose could exist for those sorts of payments. Instead, Dr. Nevin's analysis in this regard consists primarily of offering his own conclusory assertions about what Biomet actually intended, which is not helpful or the product of his expertise.[12] And to the extent he is only offering a narrower opinion—that providing long-term commissions on products a distributor sold can serve some business purposes—expert testimony is not necessary for that point in light of all the lay witnesses who can testify to the same effect, as already noted.

In addition, allowing this testimony to come in through an expert would create other problems, including the risk that the jury would attach undue weight to expert testimony on this subject or would misconstrue Dr. Nevin's testimony as offering opinions about what the parties actually intended or how the contracts should actually be interpreted. The manner in which Dr. Nevin's report repeatedly conflates those subjects illustrates those risks. And on that same note, the report would have to be thoroughly marked-up or even rewritten to confine Dr. Nevin's testimony to its appropriate scope (to the extent there is some core of expert opinion in the report that could be admitted), which would make it very difficult to delineate exactly what Dr. Nevin could testify to at trial. Given the limited utility of expert testimony in light of the lay witnesses who can testify on the relevant points, the risks of wasting time, confusing the issues, and

---

[12] [DE 234-1 p. 14–15 ("The long term commission was an incentive Biomet offered its distributors to encourage productivity and loyalty. . . . Biomet realized these Legacy Distributors developed relationships with the physicians, surgeons and hospital customers they called on in their territories. . . . [T]he purpose of these non-compete provisions was to assure Biomet that the distributors would not take their experience, customer knowledge and relationships built in their territories and share it with existing or potential competitors. . . . [T]hat is the knowledge Biomet was trying to protect through the non-compete in its Long Term Commission Program.")].

misleading the jury substantially outweigh the probative value of this testimony, so the Court would exclude it under Rule 403, to the extent any aspects of the report would otherwise satisfy Rule 702. For all of those reasons, the Court grants the motion to exclude Dr. Nevin's testimony.[13]

## V. OTHER ISSUES

A number of other issues have come to light through the parties' pretrial filings that can be addressed.

***Multiple defendants***

The Distributors filed this action against both Biomet, Inc. and Zimmer Biomet Holdings, Inc. Biomet was the party to the contracts, but the Distributors' complaint offered various theories for holding Zimmer Biomet liable for any breach as well. At the final pretrial conference, the parties discussed whether it will be necessary to distinguish between the two entities at trial, or if they will be able to reach a stipulation to avoid that complication. The Court encourages the parties to continue conferring in that regard. Otherwise, the parties would have to present evidence on additional issues, and the jury would have to be instructed and return decisions on those issues, which would add further complications with little apparent gain. Also, neither party's proposed jury instructions included instructions on any of the theories of liability

---

[13] Biomet also suggested at the final pretrial conference that the Court should hold a hearing to evaluate Dr. Nevin's opinions, but that is not warranted. Rule 26 requires an expert report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). A hearing is not an opportunity to allow an expert to offer new or different opinions, or to provide additional explanation for them, any more than a deposition would be. *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony."); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (holding that a district court is not required to hold a hearing before excluding expert testimony).

against Zimmer Biomet.[14] Thus, absent a stipulation, the parties should confer to determine which specific theories the Distributors intend to pursue against Zimmer Biomet, and should submit proposed jury instructions that inform the jury what findings it would have to make to return a verdict as to Zimmer Biomet.

### *Exhibit and deposition objections*

The parties have also submitted voluminous objections to exhibits and depositions. First, as to depositions, the parties' filings do not allow the Court to resolve the objections. The Distributors asserted hundreds of objections, yet did not even put those objections into words; most of their objections consist only of a number, apparently referring generically to a rule of evidence. If Biomet is going to be put to the trouble of responding to these objections, and the Court to ruling on them, the Distributors ought to at least verbalize their objections. The parties also noted at the final pretrial conference that many of the objections will rise or fall with issues raised in the motions in limine or *Daubert* motions, and that the parties could revisit the objections once those matters have been decided. That has now occurred. Accordingly, the Court requests that the parties confer and prepare a single spreadsheet that identifies, for any witness expected to testify by deposition: (1) the selection being objected to; (2) a concise explanation for each objection; and (3) a concise response.

As for the exhibits, the parties indicated that those objections may be affected by the other pretrial rulings, as well. Biomet's exhibit list also included catch-all categories including every exhibit used at any deposition, and all written discovery produced in this case. That is not acceptable; counsel need to consider what exhibits they anticipate using at trial and to identify

---

[14] The Distributors' only proposed instruction in that regard includes the standard for jointly committed torts, which is not relevant to liability for a breach of contract.

those exhibits. Accordingly, to allow the Court to resolve these objections in an orderly manner, the Court likewise requests that the parties confer and submit spreadsheets identifying (1) each exhibit; (2) a concise explanation for any objection; and (3) a concise response.

***Demonstrative exhibits***

Next, the parties filed a motion to set deadlines for the disclosure of demonstrative and summary exhibits. They propose exchanging those exhibits three days before trial, and they further propose that they will not exchange in advance any visual aids to be used during opening statements or closing arguments. First, exchanging demonstrative and summary exhibits only three days before trial is bound to invite problems. Instead, the parties should exchange any demonstrative or summary exhibits they intend to use at least 2 weeks before trial, and should promptly bring any objections to the Court's attention. As to visual aids for use during opening statements or closing arguments, the Court will not require those materials to be disclosed in advance in light of the parties' agreement, but the Court would encourage the parties to do so anyway so that those presentations are not interrupted should an objection arise.

***Verdict forms***

The Distributors' proposed verdict forms ask the jury to indicate which, if any, additional categories of products are covered by the lifetime commissions program. The Court agrees that an inquiry along those lines is appropriate, as the verdict will then delineate which commissions are due going forward. Biomet objected to the categories included in the Distributors' proposed verdict form, on the basis that the jury's finding about the scope of the provision could be more nuanced. However, it did not submit any proposal of its own on that topic or suggest any alternatives. Accordingly, the parties should confer and attempt to devise an appropriate inquiry

to the jury on the scope of long-term commissions due; if they are unable to agree, they should submit their revised proposals.

## VI. CONCLUSION

The parties' motions in limine are granted in part and denied in part, as discussed above. [DE 224, 241]. The Court denies the motion to strike Mr. Sowards' damages testimony, [DE 227], and grants the motion to strike expert testimony by Mr. Callahan and Dr. Nevin. [DE 233]. The Court grants in part the joint motion to set deadlines for demonstrative and summary exhibits. [DE 295]. Finally, the Court grants the parties' joint motion for a status conference, [DE 300], and will contact counsel to set a status conference.

SO ORDERED.

ENTERED:  November 13, 2019

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court