UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHARLES HESS, MARTY HIGGINS, ROBERT "GLEN" MCCORMICK, RONALD PAPA, AL TORNQUIST, and FRANK SHERA,<br><br>       Plaintiffs,<br><br>       v.<br><br>BIOMET, INC., and ZIMMER BIOMET HOLDINGS, INC.,<br><br>       Defendants. | Case No. 3:16-CV-208 JD |

## OPINION AND ORDER

This matter is before the Court on Defendant Biomet, Inc. and Zimmer Biomet Holdings, Inc's. ("Biomet") Motion for Directed Verdict, which was orally made on August 6, 2021 and the Court took under advisement. For the reasons that follow, Biomet's motion is denied.

### I. FACTUAL BACKGROUND

The six individual Plaintiffs Charles Hess, Marty Higgins, Robert "Glen" McCormick, Ronald Papa, Frank Shera, and Al Tornquist ("Distributors") formerly worked as distributors for Biomet. The Distributors sued Biomet for breach of contract, among other claims, in connection with their Distributorship Agreements, specifically regarding Section 9 of those agreements, which granted each Distributor long-term retirement commissions on products sold in their subject distributorships. In particular, the parties dispute whether the commissions are due only on products sold by the Distributors at the time they retired—as Biomet has interpreted the agreements—or apply more broadly to all Biomet products, even those that the Distributors did not and were not authorized to sell within their distributorships. Payments under that program

were calculated as percentages of the "total 'net sales'" and the Distributorship Agreements define the term "net sales":

> The term "net sales" shall be defined as gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet less returns and allowances and less adjustments for nonpayment of invoices as provided herein.

[*See, e.g.,* DE 381-1 at 6]. At the summary judgment stage, the parties agreed that the "subject distributorships" are defined at least by their territories. However, the Distributorship Agreements also define the distributorships by their products. Therefore, in referring to sales within the "subject distributorship" at a given point in time, the agreements could plausibly be referring to the products sold within the distributorships as well as their territories. Accordingly, the Court found the agreements ambiguous, and the parties offered extrinsic evidence of the meaning of the provisions "within the subject distributorship." The Court found that none of the extrinsic evidence offered at summary judgment resolved the ambiguity beyond dispute and the Court denied the parties' motions for summary judgment as to the breach of contract claim. [DE 210].

The parties tried their case to a jury from August 2 to August 9, 2021. At the end of the Distributors' case-in-chief, both parties moved for a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. The Court took these oral motions under advisement and directed the parties to file briefing on the motions. Ultimately, the jury returned its verdict, finding that Biomet breached the Distributorship Agreements, in part, with each Distributor for failing to pay commissions owed for the net sales of sports medicine and trauma products. [DE 379]. Mr. Shera was only awarded damages on trauma products. *Id.* On September 9, 2021, Biomet filed its brief in support of its motion for judgment as a matter of law in its favor. [DE 381]. The Distributors did not file a brief in support of their previously made oral motion, and

therefore, given this and the favorable jury verdict, the Court deems their motion abandoned and does not address it. The Distributors have responded in opposition to Biomet's motion [DE 383], to which Biomet replied [DE 385].

## II. STANDARD OF REVIEW

Rule 50 "allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook Cty.,* 689 F.3d 655, 659 (7th Cir. 2012) (citing Fed. R. Civ. P. 50(a)). "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Id.*; *see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016). The Court does not make credibility determinations, nor will it reweigh the evidence. *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). The Court does not ask "whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). "Overturning a jury verdict is not something that [a court does] lightly." *Id.* at 925. It should do so only if "the moving party can show that no rational jury could have brought in a verdict against it." *Hossack v. Floor Covering Assoc. of Joliet, Inc.,* 492 F.3d 853, 859 (7th Cir. 2007) (internal quotations omitted).

## III. DISCUSSION

Biomet argues it is entitled to judgment as a matter of law because "[e]ach Plaintiff has failed to submit evidence from which a reasonable jury could find Biomet was contractually

3

obligated to pay retirement commissions on products sold by its subsidiaries." [DE 381 at 1]. Biomet asserts that the Distributors were in privity with Biomet, Inc. alone by the Distributorship Agreements and no evidence supports disregarding the corporate form of Biomet and its subsidiaries. The Distributors argue that Biomet's corporate veil-pricing argument is a strawman argument, the jury's verdict was rational and supported by the evidence, and Biomet's corporate separateness is a post-hoc attempt to justify the Distributors receiving retirement commissions from Orthopedic Equipment Company ("OEC") and Biomet Orthopedics, Inc., two Biomet subsidiaries.

Biomet contends that the Distributors seek a judgment that would hold Biomet's subsidiaries accountable for the parent's liabilities. However, none of Biomet's subsidiaries are parties to this action and therefore no judgment will be entered against them. The verdict obligates Biomet for damages based on its failure to pay retirement commissions the jury found were required under the Distributorship Agreements. The verdict form asked the jury for each plaintiff, "[d]id Defendant Biomet, Inc. breach the Distributorship Agreement with Plaintiff [name]?" If the jury answered that question "yes" they were next asked which products they find Biomet, Inc to have "fail[ed] to pay commissions owed for the net sales." [DE 379 at 2–13]. While Biomet presents several cases in its briefing, they are inapplicable to the instant facts and cites no case supports its argument that entering a judgment consistent with this verdict pierces Biomet's corporate veil. By entering a judgment against Biomet, the Court simply deems Biomet liable, consistent with what the jury concluded, for its own breach of the Distributorship Agreements, to which Biomet is a named party. How Biomet plans to satisfy the judgment does not impact the legal sufficiency of the evidence before the jury, which the Court addresses in more detail below. The Distributors never pled veil-piercing, Biomet never asserted it as an

4

affirmative defense, nor did Biomet ever assert this legal argument prior to trial, only presenting it for the first time in its Rule 50 motion at the close of the Distributors' case-in-chief and again at the close of the evidence in its attempt to submit a jury instruction on the issue of Biomet being separate and distinct from its subsidiaries, which the Court denied. [DE 376, Vol. VI at 4–5].

Biomet argues that the issue of corporate veil piercing has been in controversy in this litigation, at the very least, since the Court's March 29, 2019 summary judgment order. Biomet clings to the Court's order as support for its argument that the Distributor's failed to submit evidence to the jury that warrants ignoring Biomet's corporate form. In its Order, the Court stated:

> Instead, the Distributors appear to seek long-term commissions on all products sold with a Biomet trademark or by any entity owned by Biomet. That includes products sold by other entities that Biomet acquired over time, whose products the Distributors were not authorized to sell or receive commissions on even while they were still active.[]
>
> It is unclear how the Distributors ground that conclusion in the contracts. Section 1 grants the Distributors the exclusive right to distribute and receive commissions on "Biomet products" in their territories. But the contracts define "Biomet" as "Biomet, Inc."—the party to the contract. The products subject to this claim include products sold by distinct entities (albeit entities owned by Biomet) as to which the Distributors did not have distributorship agreements and did not receive commissions during their years of active service.[] Even assuming that Section 9(e)'s reference to sales "within the subject distributorship" meant only the territory of the distributorships, the Distributors have not explained how the gross sales would include sales by distinct legal entities—entities that were not parties to these contracts and with which the Distributors did not have distributorship agreements. Given that missing link in their argument, the Court could not grant summary judgment in their favor even accepting their interpretation of the "subject distributorship" language.
>
> For its part, though, Biomet offers little detail about the structures or relationships of the various entities or their evolution over time. For example, the products that the Distributors sold within their distributorships (and on which Biomet agrees long-term commissions are due) are now sold by Biomet Orthopedics, Inc. That entity did not exist yet when the Distributors entered their agreements with Biomet

5

> Inc., and Biomet offers no explanation for when or how that came about. Biomet also grounds its motion for summary judgment solely on its construction of Section 9(e), which the Court has found ambiguous in this respect. Thus, while this issue may bear further exploration, the Court cannot grant summary judgment in Biomet's favor either. Therefore, the Court denies both sides' motions for summary judgment on the breach of contract claim.

[DE 210 at 29–30]. Biomet emphasizes the Court's statement that the Distributors had a "missing link" in their summary judgment argument that all Biomet products, even those sold by distinct entities owned by Biomet, but not parties to the contract, should be included in their retirement commissions. However, Biomet fails to read the full quoted text above. The Court notes that it could not ascertain how the Distributors "ground that conclusion in the contracts." The "missing link" is a disputed fact that required extrinsic evidence presented to the finder-of-fact at trial. A trial has now occurred, and the parties presented their extrinsic evidence to the jury and the Court finds, as discussed below, that the jury's verdict is sufficiently supported by the evidence that Biomet historically paid retirement commissions under the agreements, even if the products were sold by subsidiaries, therefore allowing a jury to conclude that the parties intended this on all products included under the Agreements. Second, the Court's summary judgment order also notes Biomet's shortcomings in establishing the parties' intent under the contract and while Biomet did not bear the burden at trial, it submitted evidence that legally supports the jury's verdict, discussed more thoroughly below.

The Court further notes, that while Biomet maintained an objection to the Distributor's request for the inclusion of a Jury Instruction leading up to trial regarding another legal issue [DE 334; DE 339; DE 351], which the Court overruled, in part [DE 355], it did not object to the Jury Instruction including the summary of the dispute and the specific question of contract interpretation submitted to the jury. Jury Instruction No. 23 stated:

> The parties dispute the meaning of the contractual provision that entitles the Plaintiffs to commission payments based on sales made "within the subject distributorship at the time" of the Plaintiffs' retirements. In particular, they dispute whether the phrase "within the subject distributorship" *refers only to the geographic territory of the distributorship, or to both the geographic territory of the distributorship and the product lines subject to the distributorship agreement.*
>
> In deciding the meaning of that provision, you should determine what the parties intended at the time they made the contracts. In doing so, you can consider all of the evidence, including the language of that provision, the language of the contracts as a whole, as well as statements or conduct by the parties reflecting their intent or their understanding of the provision's meaning.

[DE 386 at 26] (emphasis added); DE 334 at 1 ("To the extent the Court also sought any objections or supplements to the Court's Proposed Final Jury Instructions at this stage, Biomet has no objections to the Proposed Final Jury Instructions but does object to Plaintiffs' proposed supplemental inclusion of its previously tendered Proposed Final Instruction No. 5: Ambiguity Construed Against the Drafter.")]. Biomet did not object to this being the question before the jury. It did not seek a jury instruction regarding Biomet's corporate separateness from its subsidiaries until the close of evidence, despite having ample opportunity to raise the issue with the Court. When the Court asked Biomet's counsel why he was raising this modification when Biomet has had the proposed instructions for "a long, long time," given the various continuances of trial, counsel candidly responded that it was "because it occurred to [him] in the last couple of days." [DE 373, Vol. V at 219]. As the Court noted in its ruling denying Biomet's request to include the jury instruction modification, Federal Rule of Civil Procedure 51(a)(2), permits a party, at the close of evidence, to submit "requests for instructions on issues that could not reasonably have been anticipated by an earlier time that the court set for requests." [DE 376, Vol. VI at 2–3]. Under Rule 51(a)(2), Biomet's proposed modification was untimely, as Biomet's counsel asserted on the record, the jury instruction was based upon things known by Biomet for years. Biomet's failure to assert this argument, which as the Court previously ruled lends itself to

a factual interpretation of the parties' intent under the agreements, until the eve of closing arguments is one detrimental aspect to its motion. [*See* DE 376, Vol VI at 3–4 ("From the Court's perspective, whether the plaintiffs are entitled to commissions on all products sold in their territories, even though sold from Biomet's subsidiaries under their original Distributorship Agreements is a disputed fact before the jury, as indicated in the Court's order resolving the parties' motion for summary judgment under Docket Entry 210.")].

Biomet also argues that because the Distributors based its damages only on product category, the jury's verdict will require legal entities other than Biomet, Inc. to disgorge a percentage of their profits in order to pay the Distributor's commissions. Biomet criticizes the Distributors categorical product approach during trial, however, throughout this entire litigation, both parties disputed the scope of products that are meant to be included under the long-term commission payments and referred to the products categorically. Prior to trial, in its summary judgment briefing, Biomet argued that the contracts entitle the Distributors to long-term commissions on the same set of products they were authorized to sell during their distributorships—primarily reconstructive products or joint-replacement products. The evidence at trial establishes that at least one of Biomet's interpretation of the contract was based on this product category approach, specifically, in its sworn interrogatory response Biomet stated "the categories of products for which [the Distributors'] retirement commissions are calculated include: cement, extremities, foot and ankle, hips, knees, microfixation, sports medicine, surgical, and trauma products, along with some miscellaneous products." PX 52.003; PX 174. The only objection Biomet raised as to the verdict form was the inclusion of "Other Products," which ultimately the parties stipulated to removing. [DE 359]. Biomet cannot now change its position, not only on the entire scope of the parties' dispute, but also on the structure of the

8

verdict form when it did not object to it both prior to trial commencing and after the close of evidence. [DE 373, Vol. V at 228; DE 334 at 1 ("Biomet has reviewed the Court's Proposed Voir Dire, Proposed Preliminary Jury Instructions, and Proposed Verdict Forms and, in accordance with the Court's instructions, *has determined it does not have any objections or supplements to those filings* and therefore did not file a pleading noting that position.") (emphasis added)].

Regardless of Biomet's late-in-the-game arguments, ultimately, in construing the evidence strictly in favor of the Distributors and examining the evidence only to determine whether the jury's verdict could reasonably be based on that evidence, the Court finds that the verdict is reasonably based on and supported by the evidence at trial. The evidence was legally sufficient for a rational jury to conclude that when executing the Distributorship Agreements, the parties intended the retirement commissions to be calculated on products sold by Biomet, Inc., which can include those sold by its subsidiaries, and Biomet is obligated to pay the retirement commissions on those products under the Agreements. First, the Court reiterates that Biomet's sworn interrogatory responses were before the jury. In one of those responses, Biomet stated that the categories of product on which the Distributor's receive retirement commissions included the subsidiary products "sports medicine" and "trauma products." PX 52.003. The jury found Biomet breached the Distributor Agreements as to these products. This interrogatory response does not specify that the sports medicine or trauma products cannot be sold by one of Biomet's subsidiaries. This evidence alone is sufficient for a rational jury to conclude that the parties' intent was for net sales of sports medicine and trauma products to be included in the Distributor's retirement commission calculations. The Distributors all testified that they were not receiving retirement commissions on sports medicine and trauma products. [DE 365, Vol. I at 131 (Mr. Hess); DE 367, Vol. II at 110 (Mr. Hess), 137–38, 165 (Mr. Papa), 223–24, 234 (Mr.

McCormick); DE 371, Vol. IV at 161–62; DE 373, Vol. V at 29 (Mr. Higgins), 142–43 (Mr. Tornquist)]. Therefore, it was rational for the jury to find Biomet in breach of the Distributor Agreements for failing to pay retirement commissions on those products based on its own interrogatory response.

Second, Mr. Daniel Hann, Biomet's former general counsel, frequently testified at trial to his understanding of the parties' intent under the Distributorship Agreements as it relates to the long-term commission program. In doing so, Mr. Hann rejected the position that Biomet now takes on multiple occasions—that if a product was sold by a Biomet subsidiary, it cannot be included in the net sales calculation for the retirement commissions:

> Q: [I]t also doesn't matter, sir, on whether or not [the Distributors] get paid retirement commissions, whether it was, to use your terms, a product that was the result of organic growth internally or *inorganic growth as a result of an acquisition*, correct?
>
> A. If it was put in their bucket, yes.
>
> Q. So, in other words, if [the Distributors are] selling a product on the day they retired, they get a commission, *whether it was homegrown or whether it was the result of a company that Biomet acquired*, if it's in their bucket, right?
>
> A. Yes.

[DE 371, Vol. IV at 23] (emphasis added).

> Q. I think it's been suggested that unless—for one of Biomet's subsidiaries, unless these gentlemen had a separate retirement program for that subsidiary, they are not entitled to be paid retirement commissions. Is that not your position?
>
> A. That is not my position.

*Id.* at 36–37 (emphasis added).

> Q. It is not Biomet's position, is it, that they can simply take a certain product group, put it into a subsidiary and say, [w]e're *not entitled to retirement commissions because they're generated from the subsidiary as opposed to Biomet, Inc*. I mean, Biomet is not taking that position in this case, are they?

> A. No, and that's not what we've done. Again, it's what those products were at the date of retirement. That defines the boundaries.
>
> Q. I understand. So we can agree that *the mere fact that there is a subsidiary, one of these SBU entities, if the products are being sold through that subsidiary, that fact alone does not mean that we don't get retirement commissions*. Can we agree on that?
>
> A. Yes, I believe that's correct.

[DE 369, Vol. III at 185] (emphasis added). This interpretation of the Agreements, which a reasonable jury is permitted to accept, is legally sufficient to support the jury's verdict.

Further, the Distributors testified that they never intended for Biomet to be able to carve out products from their retirement commissions by creating or acquiring a subsidiary and had they thought that would be the case, they would have never agreed to the Distributorship Agreement. [DE 367, Vol. II at 107–08 (Mr. Hess), 234 (Mr. McCormick); DE 371, Vol. IV at 148, 154 (Mr. Shera)]. The evidence indicated that in the early 1980s, when Biomet recruited the Distributors from Zimmer, Biomet offered a "very thin catalog" with "very few products," none of which physicians could use. [DE 365, Vol. I at 111 (Mr. Hess); *see also* DE 367, Vol. II at 123 (Mr. Papa), 191–92 (Mr. McCormick)]. Because Biomet could not offer the Distributors many products, Biomet could not offer the Distributors money, at least in the short term. [DE 365, Vol. I at 112 ("[I]f you don't have many products . . ., you're not going to have many sales. That's why a company like Zimmer, that had a giant catalog with a lot of good products, translated into more commission." (Mr. Hess))].

What Biomet did offer, however, was the opportunity to become wealthy through retirement commissions. As Mr. Hess testified, "[Mr. Miller] said, 'You guys aren't really going to make your money being distributors.' He said, 'You're going to make your wealth through the retirement program.'" *Id.* at 116. Mr. Hess testified that Mr. Miller was clear that he was

"contemplating not only developing the company through inside product development but also through being able to pick up other companies and other products." *Id.* at 125. Mr. Tornquist testified that Mr. Miller told him "once the company grows, why, it's our intention to acquire other companies." [DE 373, Vol. V at 74]. Each Distributor testified, that at the time they executed their respective Distributorship Agreements, they intended the retirement commissions would be earned on all products sold by Biomet in their former territories. [DE 367, Vol. II at 82, 106, 110 (Mr. Hess), 127–28, 130–31, 160 (Mr. Papa), 233–34 (Mr. McCormick); DE 371, Vol. IV at 151 (Mr. Shera); DE 373, Vol. V at 32 (Mr. Higgins), 77 (Mr. Tornquist)]. This evidence provides sufficient basis for the jury to conclude that whether or not a product is sold from Biomet's subsidiary is not dispositive as to whether the Distributors are owed retirement commissions based on the parties' intent at the time of entering the contract. Considering this evidence in the light most favorable to the Distributors, it is rational and reasonable for a jury to conclude that the parties' intent was not to exclude products for the sole reason that they were sold by its subsidiaries when calculating the retirement commissions.

The jury also received evidence regarding Biomet's course of performance under the Distributor Agreements over the years, particularly regarding the commissions it *did* pay to the Distributors after they retired. In 1984, Biomet acquired OEC, one of its first acquisitions. [DE 367, Vol. II at 108]. Biomet Orthopedics, LLC is another subsidiary, which Biomet created in 1999. PX 223. Prior to this action, the Distributors were being paid retirement commissions on products sold through Biomet Orthopedics and OEC, despite neither being in existence when the agreements were executed. [DE 365, Vol. I at 12 (indicating that all contracts had been executed by 1983); PX 223 (indicating that OEC was acquired in 1984 and that Biomet Orthopedics was created in 1999); DE 369, Vol. III at 180–81]. Mr. Hann also testified to this:

12

> Q. [Y]ou agree there's no contract between the distributors and Biomet Orthopedics, LLC, correct?
>
> A. Correct.
>
> Q. Yet, we get paid on the reconstructive products notwithstanding the lack of a contract with that particular subsidiary [Biomet Orthopedics LLC], right?
>
> A. Correct.

[DE 369, Vol. III at 187].

> Q. Now, OEC, a wholly-owned subsidiary of Biomet, you know, do you not, that these plaintiffs are getting paid retirement commissions on OEC products or whatever the natural evolution of those OEC products are? That's one thing retirement commissions are being paid on, correct?
>
> A. Yes.
>
> Q. Notwithstanding that OEC is a subsidiary of Biomet, Inc., correct?
>
> A. It was, yes.

[DE 371, Vol. IV at 36].

However, Biomet argues that its payment of retirement commissions on products sold through these subsidiaries does not support the verdict. Biomet argues that there was evidence presented to the jury that Biomet Orthopedics "voluntarily ratified" the obligations under the Distributor Agreements, which is an exception to the general rule of privity. [DE 381 at 6]. Biomet never presented this theory to the jury or the Court. In considering the evidence strictly in favor of the Distributors, the evidence does not support that these subsidiaries voluntarily assumed or ratified the obligations. The evidence Biomet cites to support this argument simply does not provide the jury with the background that Biomet Orthopedics voluntarily assumed Biomet's obligations under the Distributorship agreements. Biomet submitted evidence that Biomet Orthopedics' products were "rolled into Biomet" and their products were "combined within the distributors' agreement." [DE 371, Vol. IV at 61]. However, this evidence does not

13

contradict the conclusion that other subsidiaries, such as Biomet Sports Medicine or Biomet Trauma, can and should be treated the same way under the contract. Contrary to Biomet's argument, the evidence does not establish that this was a "ratification" of the Distributorship Agreements. The evidence shows that the subsidiaries and Biomet were interchangeably listed on the Distributors retirement commission reports. Biomet's own commission statement were issued through subsidiaries (Biomet Orthopedics, Inc.) or the parent (Biomet, Inc.) depending on the time period in question. (*Compare* PX 2 at 1 (June 2001 commission statement issued by Biomet Orthopedics, Inc.), *with* PX 2 at 900 (April 2014 commission statement issued by Biomet, Inc.). This evidence could reasonably lead the jury to conclude that Biomet was obligated to pay the retirement commissions regardless of what entity was selling the product or alternatively that the obligation to pay the retirement commissions on any subsidiary products that fell within the Agreements' definition might also be paid directly by that subsidiary, despite it not being a party to the Agreements. There was sufficient evidence for a reasonable jury to conclude that Biomet was responsible for paying the retirement commissions, regardless of where the Biomet product was sold from. The jury was permitted to find that any attempt by Biomet to justify its course of performance with respect to Biomet Orthopedics and OEC was not evidence of the parties' then-existing intent but a post-hoc rationalization of Biomet's breach.

Additionally, there was legally sufficient evidence at trial for the jury to conclude that because the distributors sold sports medicine and trauma products prior to their retirement, those products, and their evolution, should be included under the retirement commissions and Biomet's failure to pay these commission is a breach of the Distributorship Agreements. The Court notes that this was Biomet's predominate interpretation of the contracts—if the Distributors sold the products during their time as an active distributor, they are entitled to retirement commissions on

14

those products sold in their territories. In 1990, before any of the Distributors retired, Biomet acquired Arrow Surgical Technologies, renamed it Arthrotek, and ultimately was rebranded as Biomet Sports Medicine, LLC in 1990, which sold sports medicine products. [DE 369, Vol. III at 181]. The evidence establishes that the Distributors sold sports medicine products during their active distributorship. [DE 365, Vol. I at 100 (Mr. Hess); DE 367, Vol. II at 63–64 (Mr. Hess), 130 (Mr. Papa), 210–14, 221–22 (Mr. McCormick); DE 371, Vol. IV at 146–47 (Mr. Shera); DE 373, Vol. V at 20, 38–39 (Mr. Higgins), 83, 142 (Mr. Tornquist)]. During their time as active distributors, the Distributors were authorized to distribute Arthrotek sports medicine products, but they were granted that authorization through separate distributorship agreements that they entered into with Arthrotek. Those Arthrotek agreements did not mention retirement commissions. However, it is reasonable for the jury to conclude, based on this evidence, that because the Distributors sold sports medicine products during their active distributorship, they were entitled to retirement commissions on sports medicine products, regardless of the separate agreement since it was silent as to retirement commissions.

Further, the Distributors testified that the intent behind the retirement commissions was to include products and product lines as they evolve. [DE 367, Vol. I at 110]. Mr. Hess testified that the anticipation that Biomet would continue to grow was the "whole essence of taking the risk." [DE 365, Vol. I at 72]. Mr. Hann also testified that whenever a product evolved that Biomet was paying a retirement commission on, the Distributors would continue to receive the commissions on the new products. [DE 369, Vol III at 210–11, 213; DE 371, Vol. IV at 19]. Mr. Hann further testified that there was no distinct test for how Biomet determines what is considered the "natural evolution" of a product. [DE 371, Vol. IV at 19–20]. It is rational for the jury to conclude that the sports medicine products that the Distributors actively sold, which have

15

evolved and grown and are now sold through the subsidiary Biomet Sports Medicine, were intended by the parties to be included in retirement commissions, just as the orthopedic products have grown, evolved, and are now sold through Biomet Orthopedics, on which they receive retirement commissions.

The same goes for trauma products. The evidence at trial indicates that the Distributors sold certain trauma products throughout their active distributorship. [DE 367, Vol. II at 109 (Mr. Hess), 130 (Mr. Papa), 210–14, 221–22 (Mr. McCormick); DE 371, Vol. 146–47 (Mr. Shera); DE 373, Vol. V at 20 (Mr. Higgin), 83, 142 (Mr. Tornquist)]. Mr. Hann testified that the distributors were selling certain trauma products when they retired, and Biomet argues they are receiving commissions on those certain trauma products. [DE 369, Vol. III at 124–26]. However, the Distributors testified to not receiving retirement commissions on trauma products. [DE 365, Vol. I at 131 (Mr. Hess); DE 367, Vol. II at 110 (Mr. Hess), 137–38, 165 (Mr. Papa), 223–24, 234 (Mr. McCormick); DE 373, Vol. V at 29 (Mr. Higgins), 142–43 (Mr. Tornquist)]. In 2012, after the Distributors retired, Biomet invested in a line of trauma products from Depuy, and these assets were put into a subsidiary called Biomet Trauma, LLC, which was created in 2010. Biomet Trauma is a subsidiary of Biomet Orthopedics. [DE 369, Vol. III at 49, 181]. It is rational for the jury to conclude that the trauma products that the Distributors actively sold, which have evolved and grown and are now sold through the subsidiary Biomet Trauma, were intended by the parties to be included in retirement commissions, just as the orthopedic products have grown, evolved, and are now sold through Biomet Orthopedics, on which they receive retirement commissions. Given that the evidence shows that the Distributors sold both the sports medicine products and trauma products available to them at the time of their active distributorship, it is rational for the jury to conclude that Biomet's evolution of those product lines are interpreted to

be under the Agreements, regardless of whether they are sold by a Biomet subsidiary and therefore, Biomet is obligated to pay retirement commissions for those products.

Lastly, in its reply, Biomet asserts that the Distributors state, "Biomet knew how to draft contracts to exclude subsidiaries," because it did so in the "1999 Biomet-Shera Settlement Agreement." [DE 385 at 7–8]. Biomet argues that the Distributors concede Mr. Shera's Settlement Agreement was an "express exclusion of subsidiaries," therefore Mr. Shera is not entitled to the jury's verdict of $775,040 for trauma products. However, the Court does not find the Distributors' response to be a concession regarding Mr. Shera's retirement commissions, which is what the jury verdict decided. The Distributors were arguing that the jury was permitted to reject Biomet's justifications and to infer that Biomet's express *exclusion* of subsidiaries in one contract (the 1999 Biomet-Shera Settlement Agreement) implies Biomet's *inclusion* of subsidiaries in another set of contracts (the Distributorship Agreements). [DE 383 at 16 n.8]. Mr. Shera testified to the language of his Settlement Agreement and explained it was his understanding that it did not have anything to do with his claim to retirement commissions. [DE 371, Vol. IV at 159]. The Distributors' counsel argued during closing argument that the six-year program that was the subject of Mr. Shera's Settlement Agreement "has nothing to do with Mr. Shera's retirement program." [DE 376, Vol. VI at 62]. Mr. Shera did not concede what he was entitled to with regard to his retirement commissions. The Court finds Biomet's argument regarding the jury's verdict for Mr. Shera without merit. The jury was permitted to conclude the Settlement Agreement did not impact his retirement commissions and therefore the jury's verdict was sufficiently supported by the evidence.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for a judgment as a matter of law is DENIED. [DE 381]. If the Defendants intend to move on their remaining equitable affirmative defenses, they must do so 14 days after the issuance of this Order. Plaintiffs' response is due 14 days after Defendants' motion is filed and any reply must be filed 7 days after the response is filed. With regard to Plaintiffs' Motion for Prejudgment Interest [DE 384], the parties must comply with the standard motion practice briefing schedule in Local Rule 7-1(d). To the extent the parties believe those motions require oral argument, they may request oral argument and explain why oral argument is necessary, consistent with Local Rule 7-5. With that, the Court DENIES AS MOOT Plaintiffs' Motion to Set Briefing Schedule. [DE 387].

SO ORDERED.

ENTERED: November 22, 2021

/s/ JON E. DEGUILIO
Chief Judge
United States District Court