UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHARLES HESS, et al.,

     Plaintiffs,

     v.                                      Case No. 3:16-CV-208 JD

BIOMET, INC., et al.,

     Defendants.

## <u>OPINION AND ORDER</u>

On August 9, 2021, after a six-day jury trial, a verdict was entered in favor of Plaintiffs Charles Hess, Marty Higgins, Robert "Glen" McCormick, Ronald Papa, Al Tornquist, and Frank Shera (collectively, the "Plaintiffs"). (DE 379.) On November 23, 2021, the Court denied the motion for judgment as a matter of law brought by Defendants Biomet, Inc., and Zimmer Biomet Holdings, Inc (collectively, the "Defendants"). (DE 389.) The Court now considers Plaintiffs' motion for an award of prejudgment interest (DE 384) and Defendants' motion to grant judgment in its favor on the basis of several affirmative defenses (DE 391).

### A.    Factual Background

In the early 1980s, Plaintiffs were distributors of medical devices for Zimmer, Inc. Biomet was attempting to enter the medical device field and approached each of the six plaintiffs about joining Biomet as independent distributors. At the time, though, Biomet's sales were smaller than Zimmer's, which meant that moving to Biomet would result in the Plaintiffs losing compensation in the short term, since distributors were paid on commission and Biomet could not offer large up-front compensation. In order to entice them, Biomet offered each plaintiff lifetime commissions on sales made after their retirement, in addition to the sales they made as

distributors. Between 1980 and 1983, each of the six plaintiffs accepted these offers and signed distributorship agreements.

Section 9 of the distributorship agreements established a long-term commission program for each of the Plaintiffs. (DE 158-2 § 9.) After the long-term program vested, upon retirement, the Plaintiffs would be entitled to payments which were percentages of the total "net sales:" one and one-quarters percent of the first $4 million in net sales per year, and one-half of one percent of all further net sales, with no maximum. These payments would continue for the Plaintiffs' lifetimes (or for a minimum of ten years). (*Id.*) The contracts proceeded to define the term net sales:

> The term "net sales" shall be defined as gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet less returns and allowances and less adjustments for nonpayment of invoices as provided herein.

(*Id.*) Each of the Plaintiffs retired between 1995 and 1999. Biomet then began paying long-term commissions to the Plaintiffs on a bi-monthly basis. These commissions were based on the sales of orthopedic products, but not other business units Biomet had acquired. The commission statements contained sparse information beyond the amount being paid until 2007, when the commission statements began listing each item sold upon which the Plaintiffs were receiving commissions. However, these statements did not list the items sold upon which the Plaintiffs were *not* receiving commissions.

Around 2015, Biomet began undergoing a merger with Zimmer. The Plaintiffs asserted that they should be entitled to commissions not only on Biomet products, but also on any Zimmer products once the merger went through. The Plaintiffs claimed that it was around then that they also discovered that Biomet had been paying them long-term commissions only on

2

Biomet Orthopedic products, not from the sales of other products by companies under the Biomet umbrella.

On April 4, 2016, Plaintiffs filed a complaint. (DE 1.) As relevant here, Plaintiffs brought a claim for breach of contract alleging that Biomet "failed to pay [Plaintiffs] a commission on all Biomet products sold in their respective territories as required by the terms of the retirement-income program." (DE 1 ¶ 96.) In their answer, Defendants asserted seventeen affirmative defense. (DE 50.)

At the summary judgment stage, parties disputed whether "subject distributorship" within the aforementioned distributorship agreement included all Biomet products sold in their respective territories, even those that the Plaintiffs did not and were not authorized to sell — as interpreted by Plaintiffs — or only on the products sold by the Plaintiffs at the time they retired. (DE 210 at 1.) The Court denied summary judgment on the breach of contract claim, concluding that the agreement was ambiguous and that none of the extrinsic evidence submitted resolved the ambiguity. (*Id*. at 30.) The Court also determined that a number of Defendants' affirmative defenses were either resolved by concession or as a matter of law. Following summary judgment, only eight of the seventeen affirmative defenses remained. (*Id.* at 39.) The parties later agreed that the affirmative defenses of waiver, estoppel, unjust enrichment, acquiescence, and laches were to be tried by the Court, not the jury. (DE 301 at 14; DE 267 at 3 n.3.) The other remaining affirmative defenses were either excluded by the Court in an order addressing the parties' motions in limine, (DE 301 at 7, 12–14), or allowed to be presented at trial. (*Id.* at 14–16.)

A six-day jury trial commenced. At the end of Plaintiffs' case-in-chief, Defendants moved for a motion for judgment of matter of law under Federal Rule of Civil Procedure 50, which the Court took under advisement. Ultimately, the jury returned a verdict in favor of a

finding that Defendants breached the Distributorship Agreements, in part, by failing to pay commissions owed for the net sales of sports medicine and trauma products. (DE 379.) Plaintiff Shera was only awarded damages on trauma products. This verdict was in line with the Defendants' predominate interpretation of the contracts — that Plaintiffs were only entitled to retirement commissions on the products sold in their territories at the time they retired.

After the verdict was returned, the Defendants renewed their motion for judgment as a matter of law. (DE 381.) On November 23, 2021, the Court denied this motion and advised the Defendants that if they intended "to move on their remaining equitable affirmative defenses," they had 14 days to do so. (DE 389 at 18.) In line with this order, the Defendants then filed a motion seeking judgment in their favor on the remaining affirmative defenses, which include waiver, estoppel, laches, unjust enrichment, and acquiescence.[1] (DE 391.) Plaintiffs filed a response (DE 393) and Defendants filed a reply (DE 397). Plaintiffs then filed a motion seeking leave to file a surreply, along with the surreply, arguing that Defendants raised new, previously unaddressed arguments in their reply. (DE 399.)

Plaintiffs have also filed a motion for an award of prejudgment interest. (DE 384.) In their response, Defendants argue that this motion is premature given the pending affirmative defenses. (DE 388.) The Court agrees. Therefore, the Court will first consider Defendants' affirmative defenses prior to considering Plaintiffs' motion for an award of prejudgment interest.

**B.    Discussion**

   ***(1) Affirmative Defenses***

---

[1] The Court refers to the brief accompanying Defendants' motion seeking judgment in their favor on the remaining affirmative defenses, (DE 392), as their "opening brief."

The Defendants argue that five affirmative defenses justify entering judgment in their favor: (1) Plaintiffs' claims have been waived; (2) Plaintiffs are estopped from asserting the claims; (3) Plaintiffs' claims are untimely and wholly or partially limited due to laches and other equitable doctrines limiting the allegations of stale claims; (4) Plaintiffs' claims are barred because they have been unjustly enriched; and (5) Plaintiffs' claims are barred by the doctrine of acquiescence. (DE 392 at 3.)

As an initial matter, the Court notes that neither acquiescence nor unjust enrichment are separate affirmative defenses. "[A]cquiescence . . . is [not] an independent equitable remedy, [but rather] is an alternate first element of equitable estoppel." *O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 786 F. Supp. 1442, 1447 n.4 (S.D. Ind. 1992). Acquiescence is also considered as an element in the laches affirmative defense. *SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005).[2] Accordingly, the Court will consider acquiescence when it considers estoppel and laches. *See also* Ind. R. Trial P. 8(C) (listing out various affirmative defenses, including estoppel, laches, and waiver, but not acquiescence).

Unjust enrichment is also not an independent affirmative defense, but rather is "more appropriately asserted as a claim, as opposed to a defense[.]" *City of Mishawaka v. Kvale*, 810 N.E.2d 1129, 1135 n.5 (Ind. Ct. App. 2004); *see Warrior Ins. Grp., Inc. v. Insureon.com, Inc.*, No. 00 C 3619, 2000 WL 1898867, at *1 (N.D. Ill. Dec. 29, 2000) ("[U]njust enrichment is not an affirmative defense."). The Defendants fail to cite a single case which supports that unjust enrichment can be used as an affirmative defense. In fact, in their opening brief, Defendants fail to include *any* discussion of case law to support their unjust enrichment argument. (DE 392 at

---

[2] Acquiescence is also an alternative way to prove waiver. However, "[w]aiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." *Bobeck Real Estate Co., Inc. v. Frontier N. Inc.*, 120 F. Supp. 3d 845, 854 (N.D. Ind. 2015).

20–21.) In their reply brief, the Defendants do cite to two cases which they claim support their argument: *New Welton Homes v. Eckman*, 830 N.E.2d 32 (Ind. 2005) and *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243 (Ind. Ct. App. 2010).[3] (DE 397 at 12.) However, these cases are inapplicable and appear to be unrelated to unjust enrichment. *New Welton Homes* held that a discovery rule typically applied in tort law for statute of limitations purposes could not be applied in contract law because allowing such a rule to "[supersede] the contractual limitations" would burden the parties with unbargained-for obligations. 830 N.E.2d 32. *Belle City Amusements* held that damages awarded in a breach of contract case by the trial judgment were not reasonably certain given that the damages awarded extended beyond the end-date of the contract. 936 N.E.2d 243. Neither case even mentions unjust enrichment, let alone discusses it in any depth. Since the Defendants have been unable to cite a single case which supports their unjust enrichment argument, the Court deems it waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . .").

Unlike acquiescence and unjust enrichment, waiver, estoppel, and laches are independent affirmative defenses. For these affirmative defenses, the burden of proof rests with the

---

[3] Defendants specifically cite these cases for the proposition that "windfalls should be avoided, even in the context of breach of contract . . . ." (DE 397 at 12.) *Belle City Amusements* indicates that, when awarding damages, gross profits should not be awarded, but rather that net profits should be awarded, since otherwise the party would receive a "windfall in the form of that portion of lost gross income representing expenses of operations saved by defendant's breach." 936 N.E.2d at 251. *New Welton Homes* describes how allowing the "discovery rule" to supersede a contractual limitation would cause a "windfall" by burdening parties with unanticipated obligations. 830 N.E.2d at 35. While these cases mention "windfalls," one when discussing awarding damages and the other when discussing whether a discovery rule should supersede a contractual limitation, neither remotely concerns unjust enrichment. Additionally, the Court sees no reason why awarding damages for this breach of contract would constitute a "windfall." Biomet used the long-term commission program as a way to entice the Plaintiffs to leave Zimmer and agree to distribute with Biomet. Now Biomet owes those long-term commissions. Rather than being a windfall, this is the result of their initial bargain.

Defendants. *Paint Shuttle, Inc. v. Cont'l Cas. Co.*, 733 N.E.2d 513, 524 (Ind. Ct. App. 2000)

("An affirmative defense is a defense upon which the proponent bears the burden of proof . . .

."); *BKCAP, LLC v. Captec Franchise Tr. 2000-1*, No. 3:07-CV-00637, 2010 WL 3219303, at *8

(N.D. Ind. Aug. 12, 2010) ("Waiver is an affirmative defense and the burden of proof rests with

the party asserting it."); *Barnhill v. Liberty Mut. Fire Ins. Co.*, 129 F. Supp. 2d 1192, 1201 (N.D.

Ind. 2001) ("One who alleges and relies upon an estoppel has the burden of establishing all facts

necessary to constitute it."); *Clay v. State*, 508 N.E.2d 800, 803 (Ind. 1987) ("Laches is an

affirmative defense and the party raising such a defense has the burden of proof by a

preponderance of the evidence."). The Court proceeds to consider each of these affirmative

defenses in turn.

(a) Waiver

Defendants first argue that the Plaintiffs "affirmatively and impliedly waived the right to

dispute their Long-Term Commissions." (DE 392 at 3.) As an initial matter, the Court addresses

a point of confusion by the Defendants regarding the law of waiver. Defendants assert that the

doctrine of waiver applies "where a statement was made in a party's presence which he did not

deny, if the circumstances would have, as here, called for a denial." (DE 392 at 4.) Defendants

only support for this proposition is a case issued by the Indiana Supreme Court in 1871, entitled

*Pierce v. Goldsberry*, 35 Ind. 317, 321 (Ind. 1871). Cases from the 1800s may have relevance in

the proper context. Indeed, in certain circumstances, they may be dispositive of the legal issue

being addressed. However, in the instant case, it is unclear why Defendants believe *Pierce* lends

any support to the proposition they assert. The issue in *Pierce* was whether evidence had been

improperly excluded at trial. The defendant in *Pierce* attempted to testify that the plaintiff had

remained silent and adopted certain prior statements, but the trial court excluded this testimony.

The court in *Pierce* held that the exclusion of this evidence at trial was improper, as the plaintiff had "heard and understood what was said by [the defendant]" and that the situation "called upon and required [the plaintiff] to speak." *Id.* at 322. While *Pierce* concluded that another party's silence may, under certain circumstances, be admitted at trial to show an opposing party's admission, it does not address, in any manner, whether silence amounts to waiver of a legal right.

In fact, Indiana law is clear that mere silence does not typically suffice to demonstrate waiver of a legal right. A waiver is the voluntary and intentional relinquishment of a known right. *Smylie v. State*, 823 N.E.2d 679, 688 n.13 (Ind. 2005) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) ("Waiver indicates an intentional relinquishment or abandonment of a known right."). A valid waiver involves both the "knowledge of the existence of the right and the intention to relinquish it." *In re Est. of Highfill*, 839 N.E.2d 218, 222 (Ind. Ct. App. 2005) (citation and quotation marks omitted). The waiver "must be made by the person whose rights or remedies are to be affected." *Matter of S.L.*, 599 N.E.2d 227, 229 (Ind. Ct. App. 1992) (citation omitted). Waiver may be shown by either express or implied consent. *City of Crown Point v. Misty Woods Properties, LLC*, 864 N.E.2d 1069, 1079 (Ind. Ct. App. 2007). However, waiver requires an affirmative act and mere silence, acquiescence, or inactivity will not constitute waiver unless there is a duty to speak or act. *See Old Plank Trail Cmty. Bank, N.A v. Mattcon Gen. Contractors, Inc.*, 137 N.E.3d 308, 311 (Ind. Ct. App. 2019).

Therefore, there were two ways that Defendants could seek to prove waiver. First, they could show that there was: (1) knowledge of the existence of the right and (2) an affirmative act showing an intention to relinquish the right. Or, in the alternative, Defendants could show that there was: (1) knowledge of the existence of the right; and (2) silence or inactivity when there was a duty to speak or act. Since knowledge of the existence of the right is necessary for either

method of demonstrating waiver, the Court initially examines whether Defendants have shown that Plaintiffs had knowledge that they were entitled to commissions beyond what they were receiving.

The Court finds that the Defendants have failed to show that Plaintiffs had actual or constructive knowledge that they were entitled to commissions beyond what they were receiving. Defendants first argue that the biweekly commission statements provided to each of the Plaintiffs after their retirements provided sufficient information to give Plaintiffs either actual or constructive knowledge. Defendants assert that "[b]eginning at least as early as 2007, the commission statements had a column with Item Description, and the Plaintiffs knew what the listed products were or could have asked if they were uncertain." (DE 392 at 5.)

There were two sets of commission statements: those issued prior to 2007, and those issued from 2007 and beyond. The Court initially considers the statements issued prior to 2007. These commission statements included no information except the "Total Commissions" paid. Without any further information about what products they were being paid for (and what products they were not being paid for), these commission statements support an inference that Plaintiffs lacked knowledge that they weren't being paid commissions they were entitled to, at least until 2007. Furthermore, multiple Plaintiffs provided testimony indicating that these statements provided no information that would have allowed them to determine that Defendants were underpaying them. (Hess Testimony, DE 367 at 18:8–21:19; Papa Testimony, *Id.* at 131:22–132:21; McCormick Testimony, *Id.* at 225:4–225:21; Higgins Testimony, DE 373 at 27:25–28:21; Tornquist Testimony, *Id.* at 90:3–91:1.) Dan Hann, Defendants' sole witness, also admitted that based on the commission sheets issued prior to 2007, a reader would not be able to

9

determine which products Plaintiffs were receiving retirement commission for. (Hann Testimony, DE 371 at 39:14–41:18.)

Defendants make various assertions which imply that Plaintiffs, in their testimony, admitted that they knew of underpayments prior to 2007. For example, Defendants assert that "Plaintiff Higgins admitted that he knew in 1999 what he was not being paid on, and that he did nothing about it." (DE 392 at 8.) Defendants point to testimony where Higgins admitted that, in 1999, he "realized [he wasn't] being paid on EBI, on biologics, [and] on Lorenz . . . ." (Higgins Testimony, DE 373 at 33:12–34:8.) Similarly, Defendants assert that Plaintiff "Tornquist waived his right to raise this dispute" on his commission payments because he "admitted that he did not carry dental, spine, Walter Lorenz, EBI, or biologics," "had written confirmation he would not be paid on 'all products,'" and "knew as early as 1987 that his retirement commissions would not include other categories, like EBI products." (DE 392 at 8.)

However, these admissions do not demonstrate that either Higgins or Tornquist knew that they were not being paid commissions which they were legally entitled to. EBI was a subsidiary of Biomet who sold bone growth stimulators and spinal stimulation products. (DE 367 at 67:17–68:6.) Walter Lorenz was a company purchased by Biomet which sold Microfacial products. (DE 368 at 86:13–88:11.) The jury found that Biomet was *not* liable for failing to pay commissions on Biologics, Microfixation, Spine, Dental, or Electrical Stimulation Products. (DE 379.) This verdict was in line with the Defendants' primary interpretation of the contracts, that if the Plaintiffs did not sell the products during their time as an active distributor, then they were not entitled to retirement commissions on those products. Higgins and Tornquist's admissions that they knew their retirement commissions excluded EBI (i.e., electrical stimulation products), Lorenz (i.e., Microfixation products), and Biologics products simply show that they knew they

were not receiving commissions which they were not legally entitled to, since they did not sell those products at the time of their retirement. Crucially, it does not show that Higgins or Tornquist knew Biomet was failing to provide commissions they were legally entitled to, which is what is required for the Defendants to prove waiver. *See In re Est. of Highfill*, 839 N.E.2d at 222 (explaining that a valid waiver requires "knowledge of the existence of the right and the intention to relinquish it").

After 2007, the commission statements began to include an "Item Description," which described the products on which retirement commissions were being paid. However, these commission statements did not include any information regarding the products on which the Plaintiffs were *not* being paid commissions. Multiple Plaintiffs testified that the commission statements, even after 2007, would not have allowed them to identify what products they were not receiving commissions on. (Papa Testimony, DE 367 at 132:17–132:21; Higgins Testimony, DE 373 at 30:2–6; Tornquist Testimony, *Id.* at 90:23–91:1.)

Defendants argue that because Plaintiffs could have reached out to Biomet for further information on the commissions, Plaintiffs knew of their rights and waived them.[4] For example, Defendants point to Plaintiff Papa testifying that "if he 'thought [he was] being shortchanged at any point in time, there was no question as to who to call.'" (DE 392 at 6.) Another example that Defendant gives is that Plaintiff Hess could have "[s]imply call[ed] up Biomet, or for that matter, ask[ed] [his] brother-in-law" to help him identify the products listed. (*Id.* at 5.) The Court believes that these hypotheticals are entirely consistent with Plaintiffs' testimony that they did

---

[4] The Court notes that even if Plaintiffs knew of their rights and could have reached out that this is not, on its own, sufficient to demonstrate waiver. Indiana law is clear that there must be knowledge of a right and intentional relinquishment of this right. This intentional relinquishment may be either through an affirmative act or silence *and* a duty to speak up or act. However, silence alone is not sufficient. *Old Plank Trail Cmty. Bank, N.A*, 137 N.E.3d at 311. As discussed later in this opinion, Defendants never argue that Plaintiffs had a duty to speak.

not know they were being shortchanged. After all, if a Plaintiff did not know they were being

shortchanged, why would they inquire further? An individual who believed he was being paid

everything he was owed would have no reason to conduct any further investigation.

Similarly, Defendants argue that Plaintiffs "could have learned exactly what was being

sold in their distributorships" since they had "close relationships with their successors." (*Id.* at

4.) However, the mere fact that Plaintiffs may have had close relationships with the successors is

insufficient to show knowledge. If there was evidence that the Plaintiffs had, in fact, reached out

to these successors and received information showing that they were not receiving commissions

they were entitled to, then this would be evidence tending to show knowledge. But that they

*could have* hypothetically reached out, but did not, and *could have* hypothetically gained

information, but did not, is entirely consistent with the Plaintiffs being unaware that any wrong

had been done to them. Nor does the fact that the Plaintiffs could have reached out, but did not,

show that a reasonably diligent person would have reached out. *See Intel Corp. Inv. Pol'y Comm.*

*v. Sulyma*, 140 S. Ct. 768, 772 (2020) ("[T]he law will sometimes impute knowledge — often

called "constructive" knowledge — to a person who fails to learn something that a reasonably

diligent person would have learned.").

Defendants do include some other arguments outside of these hypotheticals about what

Plaintiffs could have done. However, these arguments are equally unpersuasive. Defendants

argue that Plaintiff McCormick could have accessed the data of the products in his former

territory "because he worked for his successor after he retired from Biomet." (DE 392 at 7.)

Defendants also assert that a letter sent from Mr. McCormick's wife in which she advised

Biomet that it reduced Mr. McCormick's commission rate too soon, from the 1.25% owed on the

first $4 million dollars in sales to .5% after, supports a finding of "knowing waiver." (*Id.*) Even

though Ms. McCormick noted in her letter that Biomet had "lowered our percent rate too soon in February '02 which was only a total sales of 2.8 million for territory so far since September of '01," (DE 367 at 249:11–14), the Court finds that this letter is insufficient to demonstrate Mr. McCormick's knowledge that he was not being paid commissions on products he was legally entitled to. First, at issue is whether Mr. McCormick had knowledge, not whether his wife did, and Mr. McCormick specifically testified that he did not look at the commission reports, even though his wife did. (DE 367 at 253:9–16.) Additionally, Mr. McCormick's wife, in her letter, was primarily addressing whether the percentage commission was correct, utilizing the *overall* value of Mr. McCormick's successor's territories, not whether the individual products included to calculate the total value were correct. (*Id.* at 249:12–24.) Given that this letter was (1) from his wife and (2) primarily addressed overall sales in successor territories, not the underlying products, the Court does not believe this is sufficient to demonstrate that Mr. McCormick knew he was not receiving commissions on certain product lines he was entitled to receive.

Defendants also raise a few arguments specific to their communications with Plaintiff Shera. First, Defendants argue that Shera entered a settlement agreement with Biomet that waived any right to sell products of Biomet's subsidiaries or future acquired companies. However, the Court specifically rejected this argument in its order addressing Defendants' Rule 50 motion. (DE 389 at 17). At trial, Shera testified that he understood that the agreement only pertained to his *active* distributorship and had nothing to do with his retirement. (DE 371 at 159:16–18.) An agreement excluding subsidiaries in his *active* distributorship is unrelated to his knowledge of underpayments occurring during his retirement.

Defendants also point to a letter sent to Shera by Biomet, which explains that Shera would not be entitled to commissions on products, such as those produced by Arthrotek, which

were not "merged into and became part of the Biomet product line" and which were "[d]istinct from the Biomet product line." (DE 392 at 10–11.) Defendants assert that this letter shows that "Shera [] waived the ability to claim he was entitled under his Distributorship Agreement to sales made by Arthrotek, which is sports medicine." (*Id.* at 11.) However, the jury did not find Biomet liable for failing to pay Shera commissions on sports-medicine sales. (DE 379 at 10.) Accordingly, the argument is moot: waiving Shera's right to payment for sports medicine would not matter, since the jury already found he was not entitled to damages on sports medicine products. The Court also notes that the damages which the jury did award to Shera for trauma products were precisely those that the letter indicates should have been awarded to Shera, since trauma products eventually merged into the Biomet product line. (DE 389 at 16 ("[I]t is rational for the jury to conclude that the trauma products that the Distributors actively sold, which have evolved and grown and are now sold through the subsidiary Biomet Trauma, were intended by the parties to be included in retirement commissions, just as the orthopedic products have grown, evolved, and are now sold through Biomet Orthopedics, on which they receive retirement commissions.").)

As the Court explains above, the Defendants' argument largely boils down to the fact that Plaintiffs *could have* inquired further and *could have* gained information that would have made them aware that they were not being paid what they were legally entitled to. However, this is not sufficient to show actual or constructive knowledge. Accordingly, the Court finds that Defendants have not met their burden to show that Plaintiffs had actual or constructive knowledge that they were entitled to commissions beyond what they were receiving.

Even if Defendants had demonstrated that Plaintiffs knew they were entitled to more commissions than they were being paid, Defendants cannot demonstrate that there was an

affirmative act showing Plaintiffs' intention to relinquish that right. *See BKCAP, LLC v. Captec Franchise Tr. 2000-1*, No. 3:07-CV-00637, 2010 WL 3219303, at *8 (N.D. Ind. Aug. 12, 2010) ("[T]o constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it.").

Defendants first argue that an email sent from another retired distributor, Al Plows, is an affirmative act showing the Plaintiffs' intention to relinquish their rights. The contents of the email cited by Defendants read as follows:

> We request written confirmation from Zimmer, that going forward Zimmer-Biomet will continue to honor their obligation to pay override commission on any/all reconstructive products sold in our respective territories. . . . The confirmation will clearly state that commission will be paid on all reconstructive products sold in Biomet, Zimmer-Medical Holdings or Zimmer-Biomet packaging . . . .

(DE 392 at 11–12) (quoting Tr. Ex. IY). The Court finds that there are two reasons that this letter from Plows fails to constitute an affirmative act showing Plaintiffs' intention to relinquish their right to the commissions they were not receiving: (1) Defendants have not demonstrated that Plows had the authority to waive Plaintiffs' legal rights; (2) the content of Plows email does not show an intention to waive Plaintiffs' legal rights.

The first issue is whether Plows had the authority to bind the Plaintiffs. A waiver "must be made by the person whose rights or remedies are to be affected." *Matter of S.L.*, 599 N.E.2d at 229. If Plows were an unrelated third party, then he clearly would be unable to bind the Plaintiffs. Under Indiana law, though, "an agent acts for his principals in the same manner as though the principals themselves had acted." *Silverstein v. Cent. Furniture Co.*, 162 N.E.2d 690, 701 (Ind. App. 1959) (citation omitted). Defendants argue that Plows was either acting with actual agency or with apparent agency on behalf of the Plaintiffs when he sent this email and that this constituted a proper waiver.

The Defendants have failed to meet their burden to show that Plows was in an actual agency relationship with the Plaintiffs. *See Kifer v. State*, 137 N.E.3d 990, 992 (Ind. Ct. App. 2019) ("One who asserts that there was an agency relationship has the burden of proving its existence."). Actual agency requires that three elements be shown: "(1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent." *Demming v. Underwood*, 943 N.E.2d 878, 883 (Ind. Ct. App. 2011). The Court finds that the Defendants have failed to prove the element of control. To establish control, Defendants had to show "that the agent be subject to the control of the principal with respect to the details of the work." *Id.* at 885. Defendants assert that Plows was "appointed [by the Plaintiffs] to send the email and [that the Plaintiffs] agreed with the contents of the message." (DE 392 at 12.) Defendants cite to the Plows email quoted above for support, but this email does not demonstrate that Plows was subject to the control of Plaintiffs when he crafted this email, or in any manner. Defendants also assert that the "Plaintiffs all individually agreed that Plows was sending that communication on their behalf, and affirmed that his statements were correct" and cite testimony from Plaintiffs in support of that proposition. (DE 392 at 12.) However, this too fails to demonstrate that Plaintiffs exercised any control over Plows or the content of his message. Accordingly, Defendants have failed to demonstrate that Plows was acting with actual agency.

Defendants also have failed to demonstrate that Plows was acting with apparent authority. Apparent authority "is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 148 (Ind. 1999) (citation and quotation marks omitted). "The manifestation must be made by the principal to a third party and reasonably cause the third party to believe that an

16

individual is an agent of the principal and to act upon that belief." *Id.* The manifestation "need not be in the form of direct communications, but rather the placing of the agent in a position to perform acts or make representations which appear reasonable to a third person is a sufficient manifestation to endow the agent with apparent authority." *Quality Foods, Inc. v. Holloway Assocs. Pro. Engineers & Land Surveyors, Inc.*, 852 N.E.2d 27, 32 (Ind. Ct. App. 2006) (citations and quotation marks omitted).

Defendants argue that there was apparent authority because Plaintiffs were all copied "on [Plow's] email, and none emailed in response to disagree or object to his message." (DE 392 at 12.) The Court does not believe that the Plaintiffs' silence would make it reasonable for a third person to believe that Plows had the authority to waive the Plaintiffs' legal entitlement to commissions. Here, the content of the message sent by Plows sought confirmation from Biomet that they would continue to honor their obligations. The message did not explicitly waive, or even imply they were waiving, any legal right of the Plaintiffs or seek to alter any legal arrangements on the part of the Plaintiffs. Based on this singular email, which primarily sought a confirmation from Biomet, it would be unreasonable to assume from the Plaintiffs' silence that Plows was an agent with the authority to waive their legal entitlements to commissions. Therefore, Plows also lacked apparent authority.

Even if Plows had actual or apparent authority, Defendants' argument fails for a more fundamental reason: Plows' email never voluntarily waives any legal right. Waiver may be express or implied, but where it is implied, Indiana Courts have held that "there must be a clear, unequivocal, and decisive act of the party showing the purpose to waive[.]" *Russell v. Trustees of Purdue Univ.*, 178 N.E. 180, 185 (Ind. 1931); *see BKCAP, LLC v. Captec Franchise Tr. 2000-1*, No. 3:07-CV-00637, 2010 WL 3219303, at *8 (N.D. Ind. Aug. 12, 2010). This email, which

seeks a written confirmation of Biomet's obligations, does not demonstrate any intention by the Plaintiffs to waive their legal right to certain commissions. Therefore, even if Plows had authority to waive their legal rights, Defendants' argument would still fail.

Defendants next direct the Court to a letter that Plaintiffs' counsel sent in July of 2015 which stated that "[i]n the years following the Legacy Distributors' retirement, Biomet ha[d] honored its obligations, and paid commission *on all products* sold in the relevant territory." (DE 392 at 13 (emphasis added).) As Plaintiffs explain in their response, rather than constituting a waiver, this letter predates the Plaintiffs' discovery of the extent of Biomet's breach. (DE 393 at 16.) The letter indicates Plaintiffs' mistaken belief that Defendants owed them commissions on "all Biomet products sold in the relevant territories" and had been paying these commissions (DE 175-3 at 9.) Therefore, the Court finds that the July 2015 letter also does not display the intent of the Plaintiffs to waive any legal rights.

Defendants only raised the above two pieces of evidence in support of their argument. Accordingly, the Court finds that Defendants have failed to show that Plaintiffs intentionally waived their legal rights with an affirmative act.

The Court next addresses whether Defendants have demonstrated that Plaintiffs remained silent when they had a duty to speak up. Defendants raise this argument for the first time in their reply brief. Plaintiffs have submitted a motion to file a surreply in order to respond to this new argument. (DE 399.) The Court grants this motion, as it responds to a new argument raised by the Defendants that Plaintiffs did not have a chance to consider. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, 564 F. Supp. 3d 683, 719 (N.D. Ind. 2021) ("The court will only allow a litigant to file a surreply when it responds to a new argument, describes some development in the law, or rests on other unique considerations.").

In their surreply, Plaintiffs argue that Defendants waived their "duty to speak" argument by not raising it in their opening brief. "[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (citations omitted); *see Smith v. Metro. Prop. & Cas. Ins. Co.*, No. 3:20-CV-053-JD-MGG, 2020 WL 5946599, at *6 (N.D. Ind. Oct. 7, 2020) ("Because [the defendant] sprung this argument on [the plaintiff] for the first time on reply, the Court treats it as waived."). The Court agrees with the Plaintiffs: by not arguing there was a duty to speak in their opening brief, or even mentioning duty, Defendants have now waived their ability to do so.

In their response to the surreply, Defendants argue that their reply brief "explained that its position had always been that '[w]here plaintiff has actual knowledge ***or even the means of knowledge***, he has a duty to speak up.'" (DE 401 at 2.) Defendants then include a bullet point list of seven quotes pulled from their opening brief they say demonstrate the general "theme" of duty to speak present in their opening brief. (*Id.*) Rather than help their case, this list illustrates the confused, often incorrect, opening brief that the Defendants provided to the Court.

Five of the bullet points are quotations from the Defendants' argument concerning laches, which is a legal doctrine separate from the doctrine of waiver, and would not provide any notice to the Plaintiffs that the Defendants were arguing there was a duty to speak. (*Id.* ¶ 4(c)–(g).) The doctrine of laches concerns protecting Defendants from an "unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017) (citation omitted); *see also* 1 D. Dobbs, Law of Remedies § 2.3(5), p. 89 (2d ed. 1993) (Dobbs) ("The equitable doctrine of laches bars the plaintiff whose unreasonable delay in prosecuting a claim or protecting a right has worked a prejudice to the

defendant.").   Each of these five bullets address delay in the assertion of rights by commencing

suit, not a duty to speak. (DE 401 ¶ 4(c)–(g).)

Defendants' conflation of distinct legal doctrines is not an isolated incident. For example,

in their reply, Defendants assert that "Indiana law is ***resoundingly*** and ***abundantly*** clear that

inaction and silence can equitably bar a claim, and silence and inaction are the ***hallmarks*** of the

defenses of laches, waiver, and estoppel." (DE 397 at 5 (emphasis added).) Despite the

confidence that Defendants have in that assertion, Indiana law actually indicates that silence

alone is ***never*** sufficient to demonstrate waiver, and is not even required to demonstrate waiver.

*Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) ("However, waiver is an

affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless

there was a duty to speak or act."); *Armbruster v. Tran*, 179 N.E.3d 1046 (Ind. Ct. App. 2021)

(same); *Ryan v. Janovsky*, 999 N.E.2d 895, 901 (Ind. Ct. App. 2013) (same); *2444 Acquisitions,*

*LLC v. Fish*, 84 N.E.3d 1211, 1217 (Ind. Ct. App. 2017) (same); *Forty-One Assocs., LLC v.*

*Bluefield Assocs., L.P.*, 809 N.E.2d 422, 428 (Ind. Ct. App. 2004) (same).

Another one of Defendants' bullet points is to a proposition asserted in their opening

brief, which reads: "[a]cquiescence and waiver both apply where a statement was made in a

party's presence which he did not deny, if the circumstances would have, as here, called for a

denial. *Pierce v. Goldsberry*, 35 Ind. 317, 321 (1871)." (DE 401 ¶ 4(a).) *Pierce* is one of the few

cases that Defendants rely on when describing Indiana's law of waiver in their opening brief.

However, the Court does not believe that this quotation from *Pierce* provides any notice to the

Plaintiffs that Defendants were arguing there was a duty for Plaintiffs to speak. Rather, the

citation to *Pierce* leaves the reader befuddled, asking themselves why Defendants would

repeatedly cite a case which has absolutely nothing to do with the doctrine of waiver. Defendants

20

cite this case in their opening brief (DE 392 at 4), in their reply brief (DE 397 at 2), and in their response to Plaintiffs surreply (DE 401 ¶ 4(a)). As explained above, though, *Pierce* is a case addressing when the silence of an opposing party is admissible evidence to show adoption of a statement. It does not concern waiver of a legal right, does not discuss a duty to speak up, and therefore would not put Plaintiffs on notice of a need to discuss duty to speak in their response.[5]

Defendants final bullet point cites a portion of their opening brief which asserts that "Plaintiffs' willful ignorance and silence until 2016 was an inexcusable failure to speak up." (DE 401 ¶ 4(b).) Defendants claim that this is "synonymous with asserting that Plaintiffs had a duty to speak up" and provided Plaintiffs with sufficient notice. (DE 401 ¶ 5.) However, this line is not synonymous with providing an argument that Plaintiffs had a duty to speak up. First, the line is not an argument, it is a conclusory statement. Additionally, rather than discussing a duty to speak, the line is instead indicative of Defendants' incorrect understanding of the doctrine of waiver. Throughout their opening brief, Defendants imply that mere silence in this circumstance is sufficient to prove waiver and that no duty to speak is required. For example, Defendants write concerning Plaintiff Tornquist:

> As of 1996, Tornquist had written confirmation that he would not be paid on 'all products,' yet did not dispute his commission payments until 2016. Accordingly, he has waived his right to raise this dispute now.

---

[5] Defendants consistently misread cases and assert that they stand for propositions that they don't support. For example, Defendants cite in their reply brief to *Hamlin v. Steward* for the proposition that "waiver can be shown by omissions of a party to a contract where there was a duty to speak." 622 N.E. 2d 535 (Ind. Ct. App. 1993); (DE 397 at 2.). Even though *Hamlin* touches on waiver and states that it might be implied from omissions by a party to a contract, *Hamlin* never discusses a duty to speak. *Id.* at 538. Another example is Defendants citing in their reply brief to *Hellyer Communications, Inc. v. WRC Properties, Inc.*, to support the proposition that there is a "duty to speak [when] Plaintiffs [have] access to all the information." 969 F. Supp. 1150, 1559 (S.D. Ind. 1997); (DE 397 at 2.). But *Hellyer* does not support this proposition. The Plaintiff in *Hellyer* had a duty to speak up and notify the landlord of problems with the premises *because that was in his contract. Hellyer Communications, Inc.*, 969 F. Supp. at 1559 ("Hellyer had a duty to inspect [the] premises . . . and to notify WRC of any problems [pursuant to] Initial Lease Section 2.03.").

(DE 392 at 9.) Or, when summarizing their argument concerning waiver, Defendants write the following:

> Plaintiffs could have easily identified that they were not being paid on certain product categories, and had actual knowledge that their Long-Term Commissions would exclude certain products categories . . . Plaintiffs now want to take advantage of this willful blindness, and their silence since the 1990s. Plaintiff Hess best explained why the Plaintiffs took no actions: "the checks kept going up." In other words, the Plaintiffs knew or could have known exactly what they were or were not being paid on, but because their income kept increasing, they simply did not care. ***This constitutes waiver and acquiescence.***

(*Id.* at 11.) Defendants' theory appears to have been that silence under these circumstances was sufficient to constitute waiver. But Defendants never articulate *why* silence under these circumstances constitutes a waiver. Is it because they believe there was a duty to speak up? If so, why was there a duty to speak under these circumstances? The entirety of that argument is missing in their opening brief.

Given that Defendants failed to argue duty to speak in their opening brief, it is waived. There are a few reasons why this finding of waiver is particularly justified in this circumstance. First, Defendants had an extended period of time to refine their arguments concerning waiver. Defendants raised this affirmative defense in their answer in March of 2017. (DE 50 at 36.) It is reasonable to expect in the five years since, that Defendants would have sufficient time to do the necessary legal research and develop this argument fully. *See Booking v. General Star Management Co.*, 254 F.3d 414, 418 (2d Cir. 2001) (finding that waiver was warranted because "by the time an appellate brief is drafted, a case has been percolating in the federal courts for long enough for the appellant's counsel to have selected the arguments that he will rely upon, [so] it is therefore reasonable to expect that he will include all of these arguments in his opening brief"). Furthermore, the Court believes that considering such arguments where they are not raised in the opening brief would only encourage briefing which omits large chunks of the

applicable law and risks the Court providing an ill-advised opinion. *See Herbert v. National Academy of Sciences*, 974 F.2d 192, 195–197 (D.C. Cir. 1992) ("To consider an argument discussed for the first time in reply . . . would risk the possibility 'of an improvident or ill-advised opinion,' given our dependence as an Article III court on the adversarial process for sharpening the issues for decision."). Additionally, it is manifestly unfair to the Plaintiffs for Defendants not to have raised this argument in their opening brief since this gave them no opportunity to address the Defendants' argument in their response. *LeSEA, Inc. v. LeSEA Broad. Corp.*, 379 F. Supp. 3d 732, 737 (N.D. Ind. 2019) ("Arguments raised for the first time in a reply are fundamentally unfair because the other side has no opportunity to respond, and they are properly disregarded by a court as waived.").

Accordingly, because Defendants have failed to show knowledge of a legal right and an intention to relinquish that legal right (either through an affirmative act or silence alongside a duty to speak), the Court finds that Defendants have not met their burden of proof to demonstrate waiver.

### (b) Laches

Defendants next argue that the doctrine of laches bars Plaintiffs' claims, asserting that "if Plaintiffs' claims are not barred by laches, it is difficult to conceive of when the defense of laches could ever apply." (DE 392 at 13.) The Court disagrees.

Laches is an equitable doctrine. *SMDfund, Inc. v. Fort Wayne–Allen County Airport Auth.*, 831 N.E.2d 725, 728 (Ind. 2005). The doctrine recognizes that "[i]ndependently of any statute of limitation, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them." *Id.* at 729 (citations and quotation marks omitted). Laches is comprised of three elements: (1) inexcusable delay in asserting a

known right; (2) an implied waiver arising from knowing acquiescence in existing conditions;
and (3) a change in circumstances causing prejudice to the adverse party. *Shafer v. Lambie*, 667
N.E.2d 226, 231 (Ind. Ct. App. 1996). "The mere passage of time is insufficient to establish
laches. . . ." *Pickett v. Pickett*, 470 N.E.2d 751, 754 (Ind. Ct. App. 1984). Rather, the delay must
be an unreasonable delay and prejudice the opposing party. *Id.* However, because laches is a
limitation upon equitable relief, and breach of contract is a legal claim, laches alone does not
"operate to bar the claim when the applicable limitations period has not run." *Town of New
Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 652 (Ind. Ct.
App. 2010). Mere laches, "short of the statutory period of limitations and not connected with
such facts as may amount to an estoppel, is not a bar to an action at law on the contract." *Id.*

 The Court previously explained why the statute of limitations has not run on Plaintiffs'
claims in its order addressing the parties' motions for summary judgment (DE 210) and its order
addressing the parties' motions in limine prior to trial (DE 301). The payments to Plaintiffs by
Biomet were made in installments, and under Indiana law, the statute of limitations began
running *separately* for each alleged underpayment. At the summary judgment stage, the Court
explained that Plaintiffs' claims could not be barred "in whole" and "at worst, [the statute of
limitations] could preclude the Distributors from seeking underpayments that accrued prior to the
applicable limitations period." (DE 210 at 17.) When addressing the parties' motions in limine,
the Court explained that based on the time they entered their original distributorship agreements
(prior to September 1, 1982) five of the plaintiffs had 20-year statute of limitations, and none of
their damages could have accrued outside that period. (DE 301 at 12–13.) One plaintiff, Shera,
conceded that his contract was subject to a 10-year statute of limitations since he entered the
original distributorship agreement after September 1, 1982, and consented to foregoing any

damages accruing more than ten years before suit. (*Id.*) Therefore, the statute of limitations has not run on any of the Plaintiffs' claims and the limitation on Shera's damages was resolved prior to trial.[6]

In this situation, where the statute of limitations has not run, laches "may bar a plaintiff's claim even though the applicable statute of limitations has not yet expired if the laches are of such character as to work an equitable estoppel (which contains the additional element of reliance by the defendant)." *Hellyer Commc'ns, Inc. v. WRC Properties, Inc.*, 969 F. Supp. 1150, 1157 (S.D. Ind. 1997) (citations omitted); *see also Siddall v. City of Michigan City*, 485 N.E.2d 912, 916 (Ind. Ct. App. 1985) ("The doctrine of laches may bar the party's right to assert a claim before the running of the applicable statute of limitations if the laches are of such character as to work an equitable estoppel which contains the additional element of reliance by the defendant."); *Habig v. Bruning*, 613 N.E.2d 61, 65 (Ind. Ct. App. 1993).

Therefore, in order to prove their laches defense, it had to be of such a nature as to work an equitable estoppel and Defendants had to prove four elements: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; (3) a change in circumstances causing prejudice to the adverse party; and (4) reliance by the defendant. The Court finds that Defendants have failed to meet their burden on the initial three elements.

The Court first finds that Defendants have failed to show an inexcusable delay by Plaintiffs in asserting a known right. Defendants largely repeat the same argument they raised

---

[6] Defendants make the argument that "***at a minimum***, the Distributorship Agreement is akin to an installment contract, and Plaintiffs should not be entitled to recover damages which allegedly accrued outside of the statute of limitations period." (DE 392 at 16.) The Court agrees that Plaintiffs should not receive damages from outside the statute of limitations period. As explained above, though, Plaintiffs *were not* awarded any damages outside the statutory period.

when discussing knowledge in the context of waiver: that because Plaintiffs *could have* determined they were not being paid what they were owed by Biomet, they had actual or constructive knowledge of these underpayments. (DE 392 at 14.) However, when it comes to laches, this argument is even more unconvincing. A party asserting that a waiver has occurred may do so by showing actual or constructive knowledge of a legal right and intention to relinquish that right. *See O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 786 F. Supp. 1442, 1447 (S.D. Ind. 1992) (examining Plaintiff's actual or constructive knowledge when discussing waiver); *see also* 27 Williston on Contracts § 70:43 (4th ed.) (Waiver requires either "actual or constructive knowledge of the existence of such right . . . ."). However, when proving laches, Indiana law is clear that "the doctrine of laches cannot be predicated upon constructive knowledge." *Perry v. State*, 512 N.E.2d 841, 844 (Ind. 1987); *see also Angel v. Powelson*, 977 N.E.2d 434, 446 (Ind. Ct. App. 2012) ("We acknowledge that our Court has stated that knowledge of a right, for the purposes of laches, cannot be based merely on constructive knowledge.").

Even if constructive knowledge were a permissible way to prove laches, Defendants' argument would still fail. Similar to their argument when discussing waiver, Defendants' again focus on what Plaintiffs hypothetically *could have* done. But this does not address what Plaintiffs, in fact, knew or what they should have reasonably done. Furthermore, as previously explained, the commission statements prior to 2007 failed to include descriptions of what items they were being paid, meaning there was *nothing* in those commission statements which would have put them on notice that they were not being paid for products they should have been receiving commissions on. Additionally, the commission statements after 2007 failed to include descriptions of what they were not being paid on.

Instead, it appears that Plaintiffs first discovered that they were being paid less than they were entitled in 2015. (Hess Testimony, DE 367 at 43:5–8, 48:11–19.) Shortly prior to the Zimmer Biomet merger, that Plaintiffs were approached by Biomet with a buyout offer and secured counsel to assist in those discussions. (*Id.* at 31:10–32:7.) Counsel, once procured, discovered that they were being paid less than owed and, on April 4, 2016, this case was filed. (*Id.* at 48:16–20; DE 1.) Given that there was less than a year between that discovery and the filing of the suit, the Court finds that this was not an unreasonable delay. Indiana courts have refused to find unreasonable delay with comparable time periods. *Compare Bryant v. State*, 405 N.E.2d 583, 585 (Ind. App. 1980) (finding that eighteen months did not constitute unreasonable delay in instituting a proceeding), *with Wienke v. Lynch* 407 N.E.2d 280 (Ind. App. 1980) (finding that a delay of nearly five years was unreasonable).

For similar reasons, the Court finds that Defendants have also failed to demonstrate an implied waiver from knowing acquiescence in existing conditions. Because Defendants have not shown that Plaintiffs knew about the underpayments prior to 2015, they have also failed to show that, by failing to act on those rights, Plaintiffs intended to relinquish them. *Metro. Dev. Comm'n of Marion Cnty. v. Schroeder*, 727 N.E.2d 742, 749 (Ind. Ct. App. 2000) ("[W]aiver is the intentional relinquishment of a known right.") Accordingly, an implied waiver may not be found.

Even assuming Defendants had shown the first two elements, they have failed to meet their burden to demonstrate prejudice as a result of the delay. "The party seeking the application of laches to bar a claim must have been prejudiced by a change in condition due to the delay." *Shriner v. Sheehan*, 773 N.E.2d 833, 846 (Ind. Ct. App. 2002) (citation omitted). One type of prejudice that will support a laches defense comes from loss of evidence or the unavailability of important witnesses. *See Stiefel v. Farmers' State Bank*, 168 N.E. 30, 33 (Ind. App. 1929) ("If a

party voluntarily delays asserting a known right, and, by reason of such delay, evidence of the matter in controversy has been lost, or so obscured that the court is practically precluded from ascertaining the truth of the matter . . . a court of equity . . . will hold that the delay in asserting the right will bar a recovery on the ground of laches."). Defendants argue that, as a result of the alleged delay, witnesses and evidence were unavailable making it "'exceedingly difficult' for them to defend themselves against Plaintiffs' claims." (DE 392 at 16.) Specifically, Defendants argue that the delay precluded Dane Miller, who passed away in 2015, and Jerry Ferguson, who had severe health issues, from testifying. (*Id.*) Miller and Ferguson were the founders of Biomet and helped negotiate the distributorship agreements. Defendants also argue that there were no emails in the 1980s, that because of the delay no letters existed, and that documents had been deleted since the distributorship agreement was executed in the course of ordinary business. (*Id.*)

First, it is entirely speculative whether Miller or Ferguson's testimony would have materially altered the Defendants' position in this case. *Shriner*, 773 N.E.2d at 846 ("The prejudice element requires that [the defendants] materially altered their position due to [plaintiff's] delay . . . ."); *Est. of Gerke v. Est. of Gerke*, 580 N.E.2d 972, 977 (Ind. Ct. App. 1991) ("[T]he prejudice element requires that [defendant] materially altered its position due to [the] delay."). Hann was the Defendants' sole witness and provided testimony regarding the interpretation of the contract that arguably *helped* the Plaintiffs, testifying that in addition to the actual products that the Plaintiffs were selling on the day they retired, if there was a "natural evolution" of those products, then the Plaintiffs were entitled to retirement commissions on those. (DE 371 at 19:9–15.) Hann also testified that the Plaintiffs were selling trauma products on the day their distributorships terminated. (DE 369 at 125:5–8.) Hann had a close relationship with Miller in his role as general counsel and Miller, on a "number of occasions," would discuss

his intentions and interpretations regarding the Long-Term Commission Program. (*Id.* at 53:3–9.) Given the close relationship Hann had with Miller, who was one of the principal architects of the deal, and that Hann's testimony regarding the interpretation of the contract arguably helped Plaintiffs, the Court does not believe it is likely that the introduction of Miller or Ferguson's testimony would have materially altered Defendants' position.

Plaintiffs also point out that Defendants had an array of other Biomet executives who served contemporaneously with Miller and Ferguson who they chose not to call as witnesses. Plaintiffs direct the Court to two specific examples. First, the parties deposed Gary England, who began at Biomet in 1981 and remained there until 2007. (DE 393-2). England provided deposition testimony that he assumed that plaintiffs were receiving in retirement commissions on products they sold while they were active distributors. (*Id.* at 10.) The parties also deposed Gregory Hartman, who joined Biomet in 1984 and who also recalled having conversations with Miller. (DE 261-4.) Hartman testified that his understanding of the distributorship agreement was that after the distributors retired, they would continue to receive commissions based on the Biomet products "they sold in their territory at the time they were salesman" and also new products developed after the retirement "depend[ing] on the type of product." (DE 261-4 at 41:3–42:7.) Mr. Hartman's understanding of the retirement provision was also based on discussions with Miller. Defendants did not call these witnesses at trial, even though both men had close relationships with Miller and recalled how the retirement commissions were supposed to work. That there were other available witnesses who worked with Miller beyond Hann, who were also familiar with the retirement provisions, further demonstrates that Defendants were not prejudiced by any delay. Defendants had multiple witnesses who could testify regarding the meaning of the clause in issue. They made the strategic choice not to call them.

29

Defendants next argue that they were prejudiced at trial due to a lack of documentation remaining from the period the distributorship agreement was entered. Defendants assert that relevant documents have been destroyed in the ordinary course of business, that letters no longer exist, and that "[t]here were no emails in the 1980s when these agreements were first executed."[7] (DE 392 at 16.) Defendants claim that this loss of documentation caused the defense to be "unable to 'really articulate and tell [its] story and defend [itself].'" (*Id.* at 16–17 (quoting Hann testimony, DE 369 at 75:2–11.)) There are two reasons why this explanation is deficient to meet Defendants' burden.

First, it is entirely speculative whether any relevant contemporaneous documents ever existed. In order to make out a claim of prejudice, there must actually be evidence "submitted . . . in support of its claims of prejudice." *Nature Conservancy v. Wilder Corp. of Delaware*, 656 F.3d 646, 652 (7th Cir. 2011). Hann did testify that certain documentation that "normally [would] be available in a case like this" had it been filed within a couple of years of the events was not available. (DE 369 at 74:11–20.) However, that documents *normally* would be available in such lawsuits is not evidence that relevant documents outside the distributorship agreement *actually* existed. In fact, Hann later testified that he was not aware of a single draft of the distributorship contract that was exchanged between Biomet and the Plaintiffs, (*Id.* at 80:5–9, and that he also had never seen any letters between the parties in connection with negotiation of distributorship agreements (*Id.* at 149:6–20). Defendants have failed to point to any evidence supporting that relevant documents, no longer available, ever existed. Therefore, they have failed to prove prejudice.

---

[7] Hann admitted in his testimony that there was no email in use back in 1980. (DE 369 at 78:19–21.) Therefore, the fact that there are no emails now is not a result of any delay, but rather because of the fact that these emails never existed in the first place.

In their response, Defendants argue that this case is similar to *Smith v. Caterpillar, Inc.*, 338 F.3d 730 (7th Cir. 2003), where the Seventh Circuit affirmed a district court's finding that laches barred the plaintiff's claim. However, rather than supporting Defendants' argument, *Smith* actually illustrates why Defendants' prejudice argument fails. In *Smith*, the district court granted summary judgment after the Defendants filed "affidavits of relevant witnesses verifying . . . information concerning the missing or destroyed personnel records." *Smith*, 338 F.3d at 733. The Seventh Circuit affirmed, finding the Defendant had demonstrated prejudice by pointing to certain critical documents, such as "performance reviews," "attendance records," and "materials from training seminars," which had been inadvertently lost or intentionally destroyed as part of routine record maintenance. *Id.* at 735. This conclusion was only reached because Caterpillar had "submitted evidence" that "key documents necessary to its defense had been destroyed as part of routine record maintenance." *Nature Conservancy*, 656 F.3d at 652 (distinguishing *Caterpillar* and affirming a denial of a laches defense). In the instant case, though, Defendants have not directed the Court to any evidence supporting that key documents actually existed.

This leads to the second reason that Defendants' documentation argument fails: the defendants do not provide a sufficiently specific explanation about *how* the destruction of these documents prejudiced them. Conclusory statements which merely assert a party has suffered evidentiary prejudice from the loss of documentary evidence is insufficient to demonstrate prejudice. *See PSN Illinois, Inc. v. Ivoclar Vivadent, Inc.*, 398 F. Supp. 2d 902, 911 (N.D. Ill. 2005) (citing *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992)). Defendants argue that because contemporaneous documents no longer exist, they are "unable to 'really articulate and tell [its] story and defend [itself].'" (DE 392 at 17 (quoting Hann testimony, DE 369 at 75:2–11.)) In *Smith*, the Defendant specifically identified critical documents, like performance

reviews, attendance reviews, and materials from training seminars, which were key to their

defense. Rather than identifying specific documents and explaining prejudice, Defendants here

merely assert that the general category of "contemporaneous documents" would have helped to

"tell [its] story and defend [itself]." These type of vague and conclusory arguments are

insufficient to make a showing of prejudice. *See, e.g.*, *Integrated Cards, L.L.C. v. McKillip*

*Indus., Inc.*, No. 06 C 2071, 2008 WL 3286981, at *5 (N.D. Ill. Aug. 8, 2008) ("Conclusory

statements that there are missing witnesses, that witnesses' memories have lessened, and that

there is missing documentary evidence, is not sufficient [to show prejudice for a laches

defense]."); *Melendres v. Arpaio*, 154 F. Supp. 3d 845, 854 (D. Ariz. 2016) (holding that laches

could not bar a claim where the party "speculates that perhaps documents once existed [and] are

now lost, but [the party] does not identify what documents are missing or how their loss has

[caused] prejudice"); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d 1176, 1183

(D. Or. 2008) (holding that laches could not bar a claim where the Defendant failed to identify

the specific evidence and failed to explain how this evidence prejudiced them).

The Court does not examine reliance, as the above clearly demonstrates that Defendants

have failed to meet three essential elements of laches.

### (c)  Equitable Estoppel

Next, the Defendants argue that Plaintiffs' claims should be equitably estopped.[8] "The

party claiming equitable estoppel must show its (1) lack of knowledge and of the means of

knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and

---

[8] There is some debate between the parties about whether equitable estoppel in this context is to be considered separately from the laches affirmative defense. Defendants analyze equitable estoppel separately from laches; Plaintiffs do not. Since it is clear that Defendants have not demonstrated an equitable estoppel, even if analyzed separately, the Court analyzes it separately.

(3) action based thereon of such a character as to change his position prejudicially." *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006). "Equitable estoppel may arise from silence or acquiescence as well as from positive conduct." *City of New Albany v. Cotner*, 919 N.E.2d 125, 133–34 (Ind. Ct. App. 2009). However, Indiana law is clear that "silence will not form the basis of an estoppel unless the silent party has a duty to speak." *Id.* at 134; *Mechling v. State*, 16 N.E.3d 1015, 1017 (Ind. Ct. App. 2014); *Town of New Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010); *Kruse v. Nat'l Bank of Indianapolis*, 815 N.E.2d 137, 149 (Ind. Ct. App. 2004).

The Court has previously discussed the failure of the Defendants to discuss duty to speak in their opening brief. *See supra* pp. 18–23. "[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (citations omitted). Accordingly, because Defendants have waived their argument concerning Plaintiffs' duty to speak, they have failed to establish equitable estoppel.

Furthermore, even had Defendants shown a duty to speak, if the person sought to be estopped does not have actual or constructive knowledge of the facts, then they may not be estopped. *See Liberty Nat. Bank & Tr. Co. v. Payton*, 602 N.E.2d 530, 534 (Ind. Ct. App. 1992) ("Equitable estoppel is established when there is a false representation or concealment of material facts with actual or constructive knowledge; to one without knowledge or reasonable means of knowledge of the true facts with the intent that he rely upon it; and, the second party relied his to detriment."); *Alber v. Standard Heating & Air Conditioning, Inc.*, 476 N.E.2d 507, 510 (Ind. Ct. App. 1985) (reciting rule that concealment of "material fact [must be made] with actual or constructive knowledge"). As discussed earlier, Defendants failed to show that

Plaintiffs had actual or constructive knowledge that they were owed more commissions than they had been receiving. *See supra* pp. 8–14.

Defendants have therefore failed to prove their affirmative defense of equitable estoppel. Accordingly, because Defendants have failed to prove any of their affirmative defenses, their motion for judgment in their favor is denied.

### (2) Motion for Prejudgment Interest

The Court next addresses Plaintiffs' motion for an award of prejudgment interest. (DE 384.) The purpose of awarding prejudgment interest is to compensate a plaintiff for the delay in receiving money it should have received earlier. See *Frey v. Hotel Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) ("Courts award prejudgment interest because 'compensation deferred is compensation reduced by the time value of money,' and only prejudgment interest can make the plaintiff whole."). Under Indiana law, "an award of prejudgment interest in a contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind. Ct. App. 2002). The ascertainable standard references the amount of damages, *not* liability for those damages, as "[t]he trier of fact need always exercise its judgment to determine the liability for damages; but, prejudgment interest is proper where the trier of fact need not exercise its judgment to assess the amount of damages." *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1087 (Ind. Ct. App. 1991); *see also Five Star Roofing Sys., Inc. v. Armored Guard Window & Door Grp., Inc.*, No. 21A-PL-1964, 2022 WL 2070520, at *12 (Ind. Ct. App. June 9, 2022) ("[T]he ascertainable standard is in reference to the amount of damages as distinguished from the liability for those damages."); *Meridian Mut. Ins. Co. v. Majestic Block & Supply, Inc.*, 1 N.E.3d 173, 182 (Ind. Ct. App. 2013) (same). When the *amount* of damages are

the subject of a good faith dispute, an award of prejudgment interest is improper. *Woodward v. Heritage Const. Co.*, 887 N.E.2d 994, 1002 (Ind. Ct. App. 2008). If prejudgment interest is awarded, an interest rate of 8% applies if there is no contract providing for a different interest rate. *Song v. Iatarola*, 76 N.E.3d 926, 939 (Ind. Ct. App. 2017) ("The current interest rate is 8% when there is no contract by the parties specifying a different interest rate."); Ind. Code § 24-4.6-1-101.

Defendants have conveniently forgotten the difference between determining liability for damages and determining the amount of damages. They argue that because there was an "ambiguity [in the Distributorship Agreement] to be resolved by the jury" that the scope of the damages as to each Plaintiff was "inherently uncertain." (DE 388 at 3.) Defendants point to two ostensibly "analogous" cases: (1) *Haggarty v. Haggarty*, 2021 WL 3627268, Cause No. 20A-DC-1877 (Ind. Ct. App. Aug. 17, 2021) and (2) *Kummerer v. Marshall*, 971 N.E.2d 198 (Ind. Ct. App. 2012). However, in both of those cases, the judge acted as the trier of fact and exercised discretion not only in finding liability, but also in determining the amount of damages. In *Haggerty*, for instance, because the contract at issue only indicated that the Plaintiff would be owed "ordinary living expenses," prejudgment interest was not allowed because the trial court had to "exercise its discretion to determine the *amount* that should have been deposited each month to cover ordinary living expenses." *Haggarty*, 176 N.E.3d at 250 (emphasis added). Meaning, prejudgment interest was disallowed because the trial court had to exercise discretion determining the amount of damages, not liability. Similarly, in *Kummerer*, because the amount of the attorney fee at issue depended on a reasonableness determination, this "necessarily involved the court's judgment *in order to assess the damages*" and prejudgment interest was not allowed. *Kummerer*, 971 N.E.2d at 202 (noting that "[t]he award of prejudgment interest is

considered proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages"). Defendants' argument mistakes exercising discretion in determining liability, which does not bar an award prejudgment interest, with exercising discretion to determine the amount of damages, which does bar awarding prejudgment interest. Other courts in this district have described this type of argument, which confuses exercising discretion in finding a defendant liable with exercising discretion when determining the amount of damages, as "seriously contort[ing] the applicable legal standard for awarding prejudgment interest." *BKCAP, LLC v. Captec Franchise Tr. 2000-1*, No. 3:07-CV-637, 2011 WL 4916573, at *3 (N.D. Ind. Oct. 14, 2011).

Here, once liability was found, damages could be calculated using a simple mathematical formula. Plaintiffs were entitled to a certain percentage under the distributorship agreement, which was either 1.25% or .5% of "net sales" depending on annual income. The jury found that Defendants breached the contracts by failing to pay on trauma and sports-medicine products, except for Shera, who Defendants only failed to pay on trauma products. Plaintiffs had a damages expert, Mr. Soward, apply a contractual formula to compute a damages award. Soward calculated the damages for each plaintiff by using the retirement commission rate above (either 1.25% or .5% of "net sales"). (DE 373 at 152:21–153:4.) If a plaintiff was in a partnership and split their fees, then this would be split in half. (*Id.* at 153:9–11.) Defendants did not introduce any expert to rebut these calculations and, in their closing, stated "*we don't challenge the human calculator's math*[.]" (DE 376 at 92:8–10 (emphasis added).) The jury then awarded damages on the trauma and sports medicine products in an amount equal to the damages provided by

Sowards' simple, mathematical calculations.[9] Because damages could be ascertained by the jury in a simple mathematical computation, without an exercise of discretion, it is mandatory to award prejudgment interest. *Hayes v. Chapman*, 894 N.E.2d 1047, 1055 (Ind. Ct. App. 2008) ("Once it appears that the damages may be ascertained with reasonable precision, an award of prejudgment interest is mandatory."). Here, Plaintiffs have included an affidavit from Sowards, which provides the prejudgment interest owed to each Plaintiff through October 20, 2021. (DE 384-1.) Sowards calculated the prejudgment interest by using a daily "rate of 0.0219% (8% divided by 365 days) multiplied the number of days between the accrual date (established utilizing a mid-period convention) and October 20, 2021." (DE 384-1 ¶ 6.)

Defendants dispute the accrual date and argue that, even if the Court awards prejudgment interest, it should limit the award to interest accruing on or after July 6, 2018. Under Indiana law, prejudgment interest is "computed from the time the principal amount was demanded or due." *Song v. Iatarola*, 76 N.E.3d 926, 939 (Ind. Ct. App. 2017); *see also* Ind. Code § 24-4.6-1-103(b). Defendants argue that because Plaintiffs first demanded specific payment for trauma and sports products on July 6, 2018, no prejudgment interest can be awarded prior to that day and that "[p]rior to that date, damages were completely theoretical[.]" (DE 388 at 6.) This argument fails to address that Biomet was obligated to pay retirement commissions under the contract in installments. As the Court noted in its summary judgment opinion, each "commission[] payment at issue here became *due* over time in installments." (DE 210 at 17 (emphasis added).) Therefore,

---

[9] Defendants argue that the jury relied on its judgment in awarding only damages on the trauma product category to Shera. However, Defendants were only *liable* to Shera on the trauma product category. Therefore, by awarding damages equal to Sowards' calculation for trauma products alone, the jury simply accepted Sowards' simple mathematical computations.

because the principal was due on the schedule of installments, prejudgment interest was to be computed from the date each installment was due to Plaintiffs.

Finally, Defendants argue that awarding damages would be "extraordinarily inequitable under these circumstances." (DE 388 at 4.) This argument fails for two reasons. First, Defendants fail to point to any case that allows for an equitable defense to be used in this context. "Once it appears that damages can be ascertained with reasonable precision, an award of prejudgment interest is *mandatory*." *Dana Companies, LLC v. Chaffee Rentals*, 1 N.E.3d 738, 751 (Ind. Ct. App. 2013) (citation omitted) (emphasis added). Without citing any law that an equitable defense is allowed in this context, the argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ."). Second, Defendants again argue that they should not be punished for Plaintiffs' silence for multiple decades and should not be awarded prejudgment interest for this time period when they were unaware that Plaintiffs would eventually make these claims. (DE 388 at 4.) The Court has already explained why Defendants' laches and equitable estoppel arguments have failed. *See supra* pp. 23–34. The explanation from the Court in those sections equally applies here.

Accordingly, the Court finds Defendants owe prejudgment interest to Plaintiffs in line with Soward's computations through October 20, 2021, as provided for in Exhibit A. (DE 384-1.) Additionally, Defendants are required to pay prejudgment interest on sales of products accruing after October 20, 2021, and on the sales of those products for which data was unavailable, but on which Defendants were liable. The Court will therefore allow the Plaintiffs' expert, Sowards, to supplement his calculations to include all interest accruing through the entry of final judgment.

### (3) Rule 11 Sanctions

The Court wishes to address a separate issue, which it raises on its own accord. Throughout their briefing, defense counsel have repeatedly conflated areas of the law, incorrectly described case law, and put forth underdeveloped arguments. The Court believes that the arguments defense counsel puts forth are sanctionable.

Under Federal Rule of Civil Procedure 11(b), a lawyer, by presenting the Court with a written paper, certifies that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" If a court determines that Rule 11(b) has been violated, that court may impose an appropriate sanction on any attorney or law firm that violated the rule and is responsible for the violation. Fed. R. Civ. P. 11(c)(1). A court is allowed to "impose sanctions *sua sponte*[.]" *Johnson v. Cherry*, 422 F.3d 540, 551 (7th Cir. 2005). However, in imposing these sanctions, the court "must give the offending party notice of its intent to do so and the opportunity to be heard." *Id.* This notice must describe the "specific conduct for which [the parties are] potentially subject to sanctions." *Id.* at 551–552. The court may impose Rule 11 sanctions on a party for "making arguments . . . that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). "[F]or Rule 11 purposes[,] a frivolous argument is simply one that is baseless or made without a reasonable and competent inquiry." *Berwick Grain Co., Inc. v. Ill. Dept. of Agric.*, 217 F.3d 502, 504 (7th Cir. 2000) (internal citation and quotation marks omitted)."While a court must not sanction a party for a reasonable misconstruction of case law, a party is not entitled to deliberately ignore or misstate case law that is unfavorable to its

position." *Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 280 (7th Cir.1989) (citations omitted).

The Court finds that there were multiple arguments advanced by defense counsel that were legally unreasonable, indicating a failure to do even basic legal research before filing papers with this court. *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 958 (7th Cir. 2020) (citation omitted) ("The very point of Rule 11 is to lend incentive for litigants 'to stop, think and investigate more carefully before serving and filing papers.'"). First, the defense counsel repeatedly relies on *Pierce v. Goldsberry*, 35 Ind. 317, 321 (Ind. 1871)— they do so in their opening brief, their reply, and in their response to Plaintiffs' surreply. In their opening brief, for instance, counsel asserts that *Pierce* stands for the proposition that waiver and acquiescence "may both apply where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here, called for a denial." (DE 392 at 4.) As previously detailed, *Pierce* is a case concerning whether evidence of an opposing party's silence is admissible as evidence at trial. *Pierce* has nothing to do with waiver of legal rights.[10] Instead, Indiana law is clear that waiver requires an "affirmative act and mere silence, acquiescence, or inactivity will not constitute waiver unless there is *a duty to speak or act.*" *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) (emphasis added). Relying on this misstated caselaw, defense counsel fail to argue that Plaintiffs had a duty to speak, even though Indiana law is clear that both waiver

---

[10] *Pierce* includes the word "acquiescence" in its opinion, but the use in *Pierce* refers to an adoptive admission dependent on showing that the party-opponent heard, understood, and acquiesced to the statement being made, thereby making such silence admissible at trial. *See Pierce*, 35 Ind. at 321 ("[A]cquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party.") How this supports their argument, defense counsel fails to explain. The acquiescence addressed in *Pierce* can be contrasted with a distinct doctrine of acquiescence, which "is an intentional assurance to the defendant, express or implied, that the plaintiff will not assert his rights*." Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc*., 936 F.2d 889 (6th Cir. 1991). *Pierce*, on its face, has nothing to do with this latter doctrine, and the Court has previously explained that in Indiana "acquiescence is [not] an independent equitable remedy . . . ." *O.K. Sand & Gravel, Inc. v. Martin Marietta Corp*., 786 F. Supp. 1442, 1447 (S.D. Ind. 1992).

and equitable estoppel, if based on a plaintiff's silence, must also show that a plaintiff had a duty to speak. Defense counsel's failure to argue that there was a duty to speak in their opening brief waived that issue and undermined multiple of their affirmative defenses from the outset. Counsel's repeated reliance on *Pierce* for a proposition it does not support indicates to the Court that they have deliberately misconstrued or ignored Indiana's case law regarding waiver of a legal right.

After waiving their argument concerning duty to speak by failing to raise it in their opening brief, defense counsel raise it for the first time in their reply. However, defense counsel continues to deliberately misstate case law. For example, in their reply, when arguing that laches, waiver, and equitable estoppel applies to bar Plaintiffs' claims, counsel quotes from *SMDfund, Inc. v. Wayne-Allen County Airport Authority*, 831 N.E.2d 725, 729 (Ind. 2005), writing:"[i]f they were unaware, they are nonetheless charged with notice of these activities." (DE 397 at 7.) Defense counsel has failed to indicate that they have substantially *altered* this quote from the original, which reads: "If they were unaware, they are nonetheless charged with notice of these activities *by virtue of their public nature*." *SMDfund, Inc.*, 831 N.E. 2d at 729 (emphasis added). Rather than correctly represent the quotation, which is unfavorable to its position, defense counsel hides it by not indicating to the Court that they have altered the quotation.

Another example of defense counsel misstating case law is in their discussion of *Hellyer Commc'ns, Inc. v. WRC Properties, Inc.*, 969 F. Supp. 1150, 1159 (S.D. Ind. 1997), which they assert supports the rule that there is a duty to speak when "Plaintiffs [have] access to all of the information."(DE 397 at 2.) Counsel again includes a misleading quotation, writing that "Hellyer had a duty to inspect the premises to ensure that they conformed with the Lease and to notify [Landlord] with any problems." (DE 397 at 2.) What defense counsel omits, however, is that the

court in *Hellyer* was clearly writing that Hellyer had a duty to notify the landlord pursuant to the *terms of the lease.* In fact, the entire passage which defense counsel pulls that quote from clearly discusses whether the lease required Hellyer to notify his landlord:

> Hellyer had a duty to inspect its premises to ensure that they conformed with the Lease and to notify WRC of any problems. *Initial Lease Section 2.03.* Hellyer maintains that *Section 2.03* only pertained to the *Initial Lease* and the tenant improvements made to the leased space, but was not generally in effect as a term of the Lease. This argument fails in the face of the *Integration Clause* . . . .

*Hellyer Commc'ns, Inc.*, 969 F. Supp. at 1159 (emphasis added). Given the clarity of this passage, it provides no support for the proposition Defense counsel puts forth: that "Indiana law supports that there was a duty to speak, because the Plaintiffs had access to all of the information." (DE 397 at 2.)

Defense counsel also raise a frivolous argument in their response to Plaintiffs' motion for an award of prejudgment interest. (DE 388.) Indiana law is clear that the ascertainable standard references the amount of damages, *not* liability, as "[t]he trier of fact need always exercise its judgment to determine the liability for damages; but prejudgment interest is proper where the trier of fact need not exercise its judgment to assess the amount of damages." *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1087 (Ind. Ct. App. 1991). Defense counsel first misrepresents Indiana case law by making the argument that because the jury was asked to interpret the meaning of "net sales within the subject distributorship," prejudgment interest could not be awarded, since the interpretation of "net sales" defined the scope of damages. (DE 388 at 2.) However, in interpreting that phrase, the jury determined Defendants' *liability* for damages to Plaintiffs. It did not need to exercise discretion in determining the *amount* of damages. The amount of damages was apparent from the calculations of Soward, which Defendants did not object to, impeach, or rebut.

Defense counsel go on to make another baseless argument, writing that because the "jury further exercised its judgment and discretion by not uniformly awarding damages across Plaintiffs and limited its award to Mr. Shera to only the trauma product category . . . it necessarily relied on its judgment in awarding damages." (DE 388 at 5.) Again, counsel confuses the basic distinction between a finding of liability for damages and calculating the amount of damages. The jury found that Defendants were liable to Shera *only* for trauma products. (DE 379) Therefore, the jury awarded damages only for trauma products. The amount they gave was exactly that which Soward calculated for the category of trauma products, so no discretion in calculating the amount of damages was used by the jury. Given the basic distinction between determining *liability* for damages and the *amount* of damages, these arguments put forth by counsel are unreasonable.

For the above reasons, the Court believes that sanctioning defense counsel under Rule 11 is proper. "[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Each of the arguments above were unreasonable, wasting the time of the Court, burdening the opposing party, and diverting resources from more pressing matters. Before determining what is an appropriate sanction, however, the Court is required to provide the Defendants an opportunity to respond. *Johnson*, 422 F.3d at 549 (remanding where the district court failed to give notice of the specific conduct for which it was contemplating sanctions and to afford the defendant an opportunity to show cause why sanctions were not in order). Therefore, the Court orders the defense counsel to show cause, within two weeks of the entry of this order, as to why sanctions should not be imposed.

**C.    Conclusion**

For the foregoing reasons, the Court DENIES Defendants' motion to grant judgment in its favor. (DE 391.) The Court DENIES Defendants' motion for a hearing or oral argument. (DE 398.)  The Court GRANTS Plaintiffs' motion for leave to file a surreply. (DE 399.) The Court also GRANTS Plaintiffs' motion for an award of Prejudgment interest.[11] (DE 384.) Prior to entering final judgment, however, Plaintiffs will present updated computations from Mr. Soward including sales accruing after October 20, 2021, and interest on sales from data unavailable as of trial. Defense counsel are ORDERED to show cause within two weeks of entry of this order as to why sanctions should not be imposed.


SO ORDERED.

ENTERED: June 28, 2022

> _/s/ JON E. DEGUILIO_
> Chief Judge
> United States District Court

---

[11] Plaintiffs are owed the following amount in prejudgment interest up to October 20, 2021:

| | |
|---|---|
| Hess: | $216,830 |
| Papa: | $216,830 |
| Higgins: | $35,304 |
| McCormick: | $196,313 |
| Shera: | $404,634 |
| Tornquist: | $394,422 |