UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHARLES HESS, et al.,

    Plaintiffs,

    v.                         Case No. 3:16-CV-208 JD

BIOMET, INC., et al.,

    Defendants.

## OPINION AND ORDER

The Court now considers whether sanctions shall issue for certain arguments defense counsel have advanced. Given that defense counsel have asserted multiple arguments predicated on unreasonable interpretations of case law, the Court finds that sanctions are warranted. Accordingly, the Court will impose a monetary fine in the amount of $1,000 against Defendants' lead trial counsel, since he was the one who signed the briefs and bears responsibility for the filings.

### A.    Factual Background

In its prior order, the Court reviewed the extensive factual and procedural history of this case. (DE 404 at 1–4.) The Court now only reviews the facts pertinent to whether sanctions shall issue.

On August 9, 2021, after a six-day jury trial, a verdict was entered in favor of Plaintiffs Charles Hess, Marty Higgins, Robert "Glen" McCormick, Ronald Papa, Al Tornquist, and Frank Shera (collectively, the "Plaintiffs"). (DE 379.) After the verdict was entered, Defendants Biomet Inc. and Zimmer Biomet Holdings Inc. (collectively, the "Defendants") renewed their motion for a judgment as a matter of law. (DE 381.) The Court denied this motion and advised Defendants

that if they intended "to move on their remaining equitable affirmative defenses, they had 14 days to do so." (DE 389 at 18.) In line with this order, the Defendants then filed a motion seeking judgment in their favor on the remaining affirmative defenses, which included waiver, estoppel, laches, unjust enrichment, and acquiescence. (DE 391.) Because the sanctions issue primarily concerns defense counsel's arguments regarding waiver, the Court will review the arguments regarding waiver in some depth.

In their opening brief, defense counsel argued that Plaintiffs waived their right to dispute their long-term commissions. In support of their affirmative defense of waiver, defense counsel cited the case *Pierce v. Goldsberry ("Pierce II")*, 35 Ind. 317, 321 (1871) for the proposition that "waiver may . . . apply where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here, called for a denial." (DE 392 at 4.) Defense counsel went on to argue that each of the Plaintiffs had "actual and constructive knowledge that Biomet was not paying long term commissions on its subsidiaries' products." (*Id.*) Finally, defense counsel argued that because Plaintiffs had "admitted in writing that Biomet had met its obligations" the "Plaintiffs waived the opportunity to claim otherwise" (*Id.* at 11–13.)

In Plaintiffs' response to defense counsel's opening brief, they pointed to clear, black letter Indiana law holding that "waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." (DE 393 at 2.) Plaintiffs explained that defense counsel, in their opening brief, "did not identify any 'duty to speak or act' on the part of [the Plaintiff] Distributors . . . ." (*Id.* at 3.) Proceeding on the assumption that defense counsel were not arguing there was a duty to speak, Plaintiffs only analyzed whether Plaintiffs (i) "knew Biomet was withholding retirement commissions and (ii)

performed affirmative acts that 'unequivocally and decisively' conveyed Distributors' surrender of those retirement commissions." (*Id.* at 4.)

In their reply, defense counsel then, for the first time, argued that Plaintiffs had a duty to speak. Defense counsel explained that Indiana law holds there is a duty to speak where "Plaintiffs had access to all the information" or "even the means of knowledge." (DE 397 at 2, 4.) Defense counsel further claimed that "silence and inaction [is] the ***hallmark[]*** of the defense[] of . . . waiver." (*Id.* at 6.) Counsel also go on to draw an analogy between the instant case, where defendants had the means to "ascertain what the[ir] commissions were" and the case *Hellyer Communications, Inc. v. WRC Properties, Inc*., which defense counsel claims holds that laches applied because "[the tenant] had possession of the space it was leasing at all relevant times and that it was always within [the tenant's] means to measure the space." (*Id.* at 7.)

Defense counsel's new argument concerning duty to speak prompted Plaintiffs to file a surresponse. (DE 399) In this surresponse, Plaintiffs argued that defense counsel had waived their argument concerning "duty to speak" by not raising it in their opening brief and by failing to even cite the black-letter law which holds that "waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." (DE 399 at 2.) In this surresponse, Plaintiffs also explained that multiple cases defense counsel cite in their reply were actually inapplicable. (*Id.* at 8–11.) For example, Plaintiffs explain *Hellyer* was "factually inapposite" because the court had found there was a duty to speak "under the plain terms of the lease." (*Id.*)

Defense counsel then filed a surreply. In this surreply, defense counsel disagreed that they were raising a new argument in their reply. Rather, they asserted that they had *always* claimed that "where a plaintiff has actual knowledge ***or even the means of knowledge***, he has a

duty to speak up." (DE 401 ¶ 3.) Afterwards, they cited to six bullets of their initial brief that were ostensibly "replete with this theme." (*Id.* ¶ 4.) One of these bullets was to a quotation citing *Pierce v. Goldsberry*, five were to bullets which concerned the law of laches, and the final bullet point was to the conclusory statement that "Plaintiffs' willful ignorance and silence until 2016 was an inexcusable failure to speak up." (DE 401 ¶ 4.) Defendants finally explained that they have "provided an example of *Hellyer . . . to illustrate that* [there is an obligation to speak] where a plaintiff is charged with knowledge and stays silent." (*Id.* ¶ 5.)

The Court issued an order which held, among other things, that defense counsel had waived their arguments concerning duty to speak up by not raising it in their opening brief. (DE 404 at 19.) In a separate section, the Court also explained that in making these arguments concerning waiver, defense counsel had advanced multiple "legally unreasonable" arguments which indicated "a failure to do even basic legal research before filing papers with this Court." (*Id.* at 40.) The Court explained that it believed that "[d]efense counsel's failure to argue that there was a duty to speak in their opening brief waived that issue and undermined multiple of their affirmative defenses from the outset." (*Id.*) The Court further explained that the cases defense counsel had cited in support of its "duty to speak" argument (i.e., *Pierce* and *Hellyer*) were being used to demonstrate propositions they did not support. (*Id.*) The Court then ordered counsel to show cause as to why they should not be sanctioned under Rule 11 for making out arguments which "wast[ed] the time of the Court, burden[ed] the opposing party, and "divert[ed] resources from more pressing matters." (*Id.* at 43.)

Defense counsel have now filed their response to the show cause order, making this issue ripe for review.

**B.    Standard of Review**

4

Federal Rule of Civil Procedure 11 serves an important role for civil cases in the federal court's jurisdiction, ensuring that the "powers and machinery [of the federal courts] are engaged only to address claims and defenses that have a reasonable basis in fact and law and that are asserted only for a proper purpose." *N. Illinois Telecom, Inc. v. PNC Bank, N.A.*, 850 F.3d 880, 884 (7th Cir. 2017). When an attorney presents any "pleading, written motion, or other paper" to the court, Rule 11 holds them to have "certifie[d] that to the best of the persons knowledge, information, and belief . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(2)–(3).

A court may impose sanctions under Rule 11 "if a lawsuit is 'not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'" *Cuna Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993). When an attorney fails to make an "objectively reasonable investigation of the facts underlying a claim or the applicable law," Rule 11 sanctions are justified. *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993). In other words, "Rule 11 requires counsel to study the law before representing its contents to a federal court." *Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986). "An empty head but a pure heart is no defense." *Id.* Therefore, when determining if Rule 11 sanctions should issue, the Court must "undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless." *Cuna Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union*, 443 F.3d 556,

560 (7th Cir. 2006). If an attorney's inquiry is "objectively reasonable under the circumstances of the case," then Rule 11 sanctions are not warranted. *Gottlieb*, 990 F.2d at 327.

If the court determines that Rule 11(b) has been violated, then "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c). When a sanction "is imposed on the court's own motion, attorney fees cannot be awarded." *Methode Elecs., Inc. v. Adam Techs., Inc*., 371 F.3d 923, 926 (7th Cir. 2004). However, even when ordered sua sponte, a "fine paid into the court can be an appropriate sanction." *Powers v. Duckworth*, 64 F.3d 665 (7th Cir. 1995); Advisory Committee Notes (1993) ("[A] monetary sanction imposed after a court-initiated show cause order [is] limited to a penalty payable to the court.").

## C.    Discussion

### *(1) Defense Counsel's Continued Reliance on* Pierce II *is Objectively Unreasonable.*

In their briefings, defense counsel repeatedly cite a case, *Pierce v. Goldsberry (Pierce II)*, 35 Ind. 317, 321 (Ind. 1871), for the rule that the waiver occurs "where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here, called for a denial." (DE 392 at 4; DE 397 at 2; DE 401 ¶ 4(a)). Defense counsel cite to *Pierce II* as putting forth the applicable standard regarding waiver in in their opening brief (DE 392 at 4), in their reply brief (DE 397 at 2), and in their surreply (DE 401 ¶ 4(a)).

In its prior order, the Court described how *Pierce II* was concerned with the issue of whether "silence of an opposing party is admissible evidence to show adoption of a statement" and that it "does not concern waiver of a legal right [and] does not discuss a duty to speak up." (DE 404 at 21.) The Court also explained that defense counsels' repeated citations to *Pierce II* "leaves the reader befuddled, asking themselves why Defendants would repeatedly cite a case

which has absolutely nothing to do with the doctrine of waiver." (*Id.* at 20.) Finally, when discussing potential sanctions, the Court noted that "Counsel's repeated reliance on *Pierce* for a proposition it does not support indicates to the Court that they have deliberately misconstrued or ignored Indiana's case law regarding waiver of a legal right." (*Id.* at 41.)

If defense counsel's prior briefing left the Court befuddled, then their current assertions responding to the Court's show cause order leave the Court completely perplexed. Rather than accept that they incorrectly read *Pierce II*, defense counsel continue to assert that *Pierce II* stands for the proposition that waiver and acquiescence "may both apply where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here, called for a denial." (DE 405 at 3–4.) They claim that they were just "interpre[ting] *Pierce* to support the proposition that in an action on a contract, silence can be an admission when the circumstances require a contracting party to speak up." (*Id.* at 3.) They also assert that the "concept expressed over 150 years ago in *Pierce* would likely be recognized as waiver in current Indiana jurisprudence . . . ." (*Id.* at 4.)

As will become clear from the discussion below, defense counsel's position is nonsense. There is a difference between reasonable interpretation and inventing doctrine which does not exist. With its discussion of *Pierce II,* defense counsel have drifted firmly into the latter camp. For example, defense counsel claims that the following quotation from *Pierce II* addresses the substantive requirements for a defense of waiver: "if [Plaintiff] remained silent under such circumstances as made it his duty to speak, then such silence would have been an implied admission of the truth of the statement made by [Defendant]." (DE 405 at 4); *Pierce II*, 35 Ind. at 321. However, this quotation from *Pierce II* does not, in any way, address the requirements for the affirmative defense of waiver. Instead, the quote above relates to the evidentiary doctrine of

when a statement is admissible as adopted by another party. This is not a matter of debate between reasonable minds. It is readily apparent from reading the case.

In order to assist defense counsel in understanding why their reading is unreasonable, the Court's discussion below will review *Pierce II* in substantial detail, analyzing its factual and procedural history, before discussing its holding and rationale. Prior to discussing *Pierce II*, however, the Court discusses another case which further illuminates the unreasonable flaws in defense counsel's assertions: *Pierce v. Goldsberry ("Pierce I")*, 31 Ind. 52 (Ind. 1869). *Pierce I* is not discussed by defense counsel, but it provides informative background as to *Pierce II.* A review of the facts of *Pierce I,* as well as the court's holding in that case, make it clear that the affirmative defense of waiver was *never* an issue in that case. Instead, as *Pierce I* clearly shows and *Pierce II* confirms, the defendant there relied solely on the affirmative defense of discharge of a surety. Finally, after discussing *Pierce I* and *Pierce II*, the Court will elaborate on why it believes defense counsel's assertions regarding *Pierce II* are not only unreasonable, but are being made in bad faith.

> **(a) *Pierce I related to the discharge of sureties, not the affirmative defense of waiver or acquiescence.***

The Court begins with the facts. In *Pierce I*, a Plaintiff, Goldsberry, had brought an action to recover on a note against Defendants Pierce and Loyed. *Pierce v. Goldsberry (Pierce I)*, 31 Ind. 52, 52 (Ind. 1869). Pierce had executed a note as surety for his co-defendant, Loyed. *Id.* The payee on the note was Goldsberry. *Id.* As a defense to Goldsberry's claim, Pierce argued that Loyed, without the knowledge and consent of Pierce, made an oral contract with Goldsberry after the maturity of the note, where Loyed reaffirmed that he would pay the ten percent interest on the said note in exchange for an extension of time to pay off the note, where the extension of time was for a definite period. *Id.*

The Supreme Court of Indiana faced the question of whether the extension of time by Loyed, without the knowledge and consent of Pierce, discharged Pierce as a surety. *Id.* The Supreme Court of Indiana first noted that, as a general rule of contract law, it was well settled that such an extension would, "if valid, discharge the surety." *Id.* at 52. Because of the extra definite period, "it increase[d] [the surety's] hazard, in view of the fact that the principal may become insolvent before the lapse of the additional time given for payment." *Id*. at 52–53. The court went on to further detail the doctrine "as to the discharge of sureties" and explained that such a doctrine went back "as early as the reign of Edward IV, that when the creditor, without the consent of the surety, gave time to the principal debtor, *by agreement*, the surety was discharged[.]" *Id.* at 54. The court further explained that the rule "in England for ages" included no requirement "that such agreement should be supported by a consideration[.]" *Id*. However, by the time the Supreme Court of Indiana was hearing the case in 1869, there was a general consensus that, in order for a discharge to result, the agreement had to be supported by consideration. *Id.*

In *Pierce I*, the Supreme Court of Indiana had to consider whether the agreement by Loyed to pay the interest rate on the loan he already owed in exchange for a further fixed extension to the loan's maturity date was adequate consideration so as to justify the discharge of Pierce's surety. *Id.* The Supreme Court of Indiana held that it was adequate, since the fixed extension of the contract benefitted Goldsberry by allowing interest to accrue for an additional period, while depriving Pierce the ability to pay off the loan early (and potentially limit the amount he owed). *Id.* at 55. The Supreme Court of Indiana then reversed and remanded the case with directions to the lower Court to now consider this affirmative defense. *Id.* at 56.

*Pierce I* bears no resemblance to the case at hand. It has to do with an affirmative defense related to the discharge of sureties: that a new contract made by the principal Loyed discharged the obligation of Pierce as a surety. Such an affirmative defense bears little, if any, relation to the affirmative defense of waiver. For example, a waiver is an "intentional relinquishment" of a known right, which is "made by the person whose rights or remedies are to be affected." *Matter of S.L.*, 599 N.E.2d 227, 229 (Ind. Ct. App. 1992) (citation omitted). The affirmative defense in *Pierce I* was that *someone else* (Loyed) took an action, extending the time to repay, which discharged Pierce's obligation as a surety.[1]

Other cases which cite *Pierce I* have only done so to articulate the law regarding discharge of sureties or to explain the law regarding sureties generally, but none of these cases have expounded in any depth on the law of waiver. *See Post v. Losey*, 111 Ind. 74, 12 N.E. 121, 125 (Ind. 1887) (citing *Pierce I* in support of the position that "the general doctrine . . . is that, in order to release the surety, there must be a new contract between the creditor and the principal debtor, fixing the time of payment at a different date from that fixed in the original contract; that the contract for extension must be based upon a new and sufficient consideration, and that the extension must be to a fixed time, so that the contract may embody the necessary elements of certainty . . . ."); *Menifee v. Clark*, 35 Ind. 304, 307 (Ind. 1871) (citing *Pierce I* for the same proposition); *Jaqua v. Montgomery*, 33 Ind. 36, 45 (Ind. 1870) (same); *Lorimer v. Fairchild*, 68 Kan. 328, 75 P. 124, 126 (Kan. 1904) (same); *McCormick Harvesting Mach. Co. v. Rae*, 9 N.D.

---

[1] The modern rule regarding discharge is somewhat similar to that described in *Pierce I*: "a surety . . . would be discharged from her obligation by a material alteration or change in or departure from the principal obligation without her knowledge or consent." *Reeder v. Ramsey*, 458 N.E.2d 682, 684 (Ind. Ct. App. 1984). It is possible that an individual might waive their defense of discharge. *Id.* But whether an individual waives a defense is a separate question from what is required to prove the defense of discharge. *Pierce I* addresses the defense of discharge, but it does not address the distinct question of what would be required to show that such a defense was waived.

482, 84 N.W. 346, 346 (N.D. 1900) (same); *Miller v. Arnold*, 65 Ind. 488, 491 (Ind. 1879) (citing *Pierce I* for the proposition that "[a]t law the surety could not take any steps to compel the creditor to proceed or collect or secure his claim against the principal").

Secondary sources confirm that this line of cases, starting with *Pierce I*, has to do with the affirmative defense of discharge of surety, not waiver. For example, *Pierce I*'s holding that a fixed extension of time was sufficient consideration to discharge a surety was ultimately overruled by *Abel v. Alexander*, 45 Ind. 523, 531 (Ind. 1874). In a publication entitled "Suretyship — Extension of Time — Discharge of Sureties," the Harvard Law Review disagreed with *Abel*'s holding, finding that the extension of time itself was sufficient consideration, in line with the holding of *Pierce I. See Suretyship - Extension of Time - Discharge of Sureties*, 13 Harv. L. Rev. 63 (1899). The case *Post v. Losey* is cited by more modern sources, none of which opine on the law of waiver. For example, in a section of the Fourth Edition of Williston on Contracts entitled "Discharge by extending principal's time to perform, generally," which is within a chapter entitled "Contracts of Suretyship and Guaranty," the well-known treatise cites *Post* for the general rule that "[a] binding agreement by which the creditor gives the principal an extension of time for performance discharges the surety." 23 Williston on Contracts § 61:16 (4th ed.); *see also* 26 Ind. Law Encyc. Suretyship § 39 (citing *Post* for "[t]he general rule . . . that a surety is discharged by an unauthorized extension of time irrespective of whether or not the surety suffered prejudice in fact").

The above demonstrates that the defense raised by Pierce was not one of waiver. Nor was this simply one defense among many raised by Pierce. As the Supreme Court of Indiana notes in *Pierce II,* "[t]he sole controversy in the case was whether Goldsberry had extended the time of payment, upon a sufficient consideration, and without the knowledge or consent of the appellant,

11

the surety." *Pierce II*, 35 Ind. at 320. In other words, the sole issue regarding the merits of

plaintiff's contract claim was whether Pierce's obligation as surety had been discharged.

Therefore, the first flaw with defense counsel's invocation of *Pierce II* is that the

defendant there was advancing a completely different affirmative defense, related to discharge of

sureties, which does not have any applicability in this setting. But this is not the only reason

defense counsel's reliance on *Pierce II* is misplaced. Even a cursory reading of *Pierce II* should

have put counsel on notice that it was not discussing the affirmative defense of waiver, but rather

was opining on the evidentiary issue of adoption of a statement by silence.

> **(b)** *Pierce II was evidentiary in nature and does not, in any manner, discuss the affirmative defense of waiver.*

After *Pierce I*, the case was remanded and retried. *Pierce v. Goldsberry (Pierce II)*, 35

Ind. 317, 317 (Ind. 1871). At trial, Pierce testified that he had been a surety on the note between

Loyed and Goldsberry. *Id.* at 319. Roughly two years after the maturation of the original note,

Loyed informed him of a new agreement that had been made where Loyed would pay

Goldsberry the same interest rate and get an extension of time for a definite period in order to

pay back the loan. *Id.* Pierce then testified that he had recounted these same facts in front of

Goldsberry and a lawyer. *Id.* Pierce's attorney attempted to ask him what Goldsberry's response

had been, to which Goldsberry objected. *Id.* at 320. The district judge sustained this objection

and did not allow Pierce to testify as to what Goldsberry said in response to those facts, or

whether Goldsberry had objected to those factual statements. *Id.* A jury then found for

Goldsberry. *Id.* at 318.

Pierce appealed and argued that the trial court had erred concerning "the admission of

incompetent and the exclusion of competent evidence." *Id.* The Supreme Court of Indiana held

for Pierce and found that the exclusion of the evidence concerning what Goldsberry had said was

improper. *Id.* at 322. The court started off by noting that "[t]he sole controversy in the case was whether Goldsberry had extended the time of payment, upon a sufficient consideration, and without the knowledge or consent of the appellant, the surety." *Id.* at 320. As mentioned above, this confirmed that the sole issue regarding the merits of the case was whether the surety had been discharged. The court then explained that the response by Goldsberry, whether he admitted, denied, or stayed silent in the face of Pierce's account, was relevant to this defense:

> If [Goldsberry] admitted that the statement of facts made by Pierce was correct, such admission would be evidence against him, though not conclusive; if [Goldsberry] denied the truth of the statement made by Pierce, such denial would be evidence in his favor and would tend to weaken the statement made by Pierce; if he made a statement of facts, such statement would have been admissible, and it would have been for the jury to determine which was true; *or if he remained silent under such circumstances as made it his duty to speak, then such silence would have been an implied admission of the truth of the statement made by Pierce.*

*Id.* at 320–321 (emphasis added). The court opined on the general rule that "[t]he declarations of one party and the replies of the other, in a conversation had between the two, are evidence when provided in a cause[.]" *Id.* at 321 (*quoting Ball v. Clark*, 15 Ind. 370 (Ind. 1860)). The court also explained, in further detail, why even Goldsberry's silence was relevant to the affirmative defense of discharge of surety. The court started by quoting a paragraph from Simon Greenleaf's *A Treatise on the Law of Evidence*:

> Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated."

*Id.* (quoting Simon Greenleaf, *A Treatise on the Law of Evidence* 237–238, § 197). After quoting Greenleaf's evidentiary treatise, the Court then cites to the case *Commonwealth v. Kenney*, 12

13

Met. 235, 236 (Mass. 1847). In *Kenney*, a criminal defendant had been "indicted for stealing money and a bag . . . ." *Id.* At trial, evidence was introduced that "declarations were made" by the victim "in the presence and hearing of the defendant, in regard to the theft, to which the defendant made no reply." *Id.* The court in *Kenny* found that the admission of defendant failing to respond in that circumstance was improper, because under the circumstances the defendant "had certainly no occasion to reply" and the defendant "might well suppose that he had no right to say anything until regularly called upon to answer." *Id.* at 238. The court in *Pierce II* cites *Kenney* in support of the assertion that "[t]o affect a party by evidence that a statement was made in his presence which he did not deny, the circumstances must appear to be such as called on him for a denial, if the statement was untrue." *Pierce II*, 35 Ind. at 321 (citing *Kenney*, 12 Met. at 236.)

After discussing *Kenney,* Greenleaf's Evidentiary Treatise, and several other cases, the Court concluded that "evidence [of what Goldsberry said, or didn't say,] should have gone to the jury[.]" *Id.* at 322. The Court reasoned that "no one [could] doubt that Goldsberry heard and understood what was said by Pierce, or that he was properly and naturally and by the highest considerations called upon and required to speak." *Id*. After making this determination, the court then reversed and remanded the case.[2]

As evident from the above, there was no discussion of a defense of waiver in *Pierce II*. Nor would such a discussion have made any sense: as *Pierce I* showed, the sole affirmative defense raised by Pierce was the discharge of a surety interest. The admission of Goldsberry's silence, as explained by the court in *Pierce II,* was relevant because it related to the question of

---

[2] There was also a brief, one paragraph discussion of whether the court erred in admitting a letter that was purportedly written by Loyed. *Pierce II*, 35 Ind. at 322. The court found the letter inadmissible because the letter was never authenticated. *Id.*

discharge of Pierce's surety: "[t]he sole controversy in the case was whether Goldsberry had extended the time of payment, upon a sufficient consideration, and without the knowledge or consent of [Pierce], the surety." *Id.*  Therefore, after examining the text of the *Pierce II*, the citations used in *Pierce II*, and the procedural history of *Pierce II*, it is clear that defense counsel's interpretation is incorrect.

### (c) The unreasonableness of defense counsel's interpretation.

The above demonstrates that defense counsel's interpretation is unreasonable. It ignores not only the fact that the case it was citing was not discussing, in any manner, the affirmative defense of waiver (as shown by the discussion of *Pierce I*), but also that the language it was quoting clearly concerned the evidentiary issue of adoption of statements (as shown by the discussion of *Pierce II*).

And yet, despite all of the above, defense counsel, in their response to the Court's show cause order, persists in claiming that *Pierce II* articulates the applicable rule regarding waiver. Given such a bold claim, one would expect defense counsel to point to something compelling in support. Instead, defense counsel's arguments amount to throwing multiple, paltry red herrings at the court, hoping one of their arguments will stick.

First, defense counsel assert that the rule articulated in *Pierce II* is the same as that articulated in *Hamlin v. Steward*, 622 N.E2d 535, 538 (Ind. Ct. App. 1993). As defense counsel note, *Hamlin* explicitly addresses waiver, writing that "[t]he existence of waiver may be implied from the acts, omissions or conduct of one of the parties to the contract." *Id.* Defense counsel assert that this sentence is "similar" to the quote from *Pierce II* that "if [Goldsberry] remained silent under such circumstances as made it his duty to speak, then such silence would have been

an implied admission of the truth of the statement made by Pierce." (DE 405 at 3–4.) However, these two quotes are not similar in any relevant sense.

To start, the quotes are drastically different on their face. The rule articulated in *Hamlin* explicitly addresses "waiver." It does this by first explicitly including the word "waiver" and then describing what is necessary to constitute that "waiver." The quote from *Pierce II*, meanwhile, does not explicitly include the word "waiver," any synonym of "waiver," or any definition of "waiver." Rather, it explicitly notes that it is considering under what circumstances silence would be an "implied admission of the truth of the statement . . . . " While the Federal Rules of Evidence were not around at the time of *Pierce II*, the court in *Pierce II* was describing what is now often described as a hearsay exception under both Indiana and Federal law. Under both Indiana law and Federal law, an opposing party statement offered against that party is not hearsay if it is "one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(b); Ind. R. Evid. 801 (d)(b). The quote in *Pierce II* was addressing the well-known principle that when the circumstances are such that one who disagrees would speak up and object (i.e., the individual "remained silent under such circumstances as made it his duty to speak"), and the individual does not speak up, then the silence is relevant to the truth of the other individual's statements (i.e., the "silence would . . . impl[y] admission of the truth of the statement"). The quote is largely consistent with modern day explanations of Federal Rule of Evidence 801(d)(2)(B). *See United States v. Ward*, 377 F.3d 671, 675 (7th Cir. 2004) (finding that defendant's "silence qualifies as an admission because his sister's accusation is the type of statement that a party normally would respond to if innocent");  *Tober v. Graco Children's Prod., Inc.*, 431 F.3d 572, 576 (7th Cir. 2005) (explaining that a "failure to reply to a letter may be introduced as an admission of the statements contained in the letter when the receiver of the

letter remains silent in a situation where a response would seem natural or expected"); *Williams v. Michigan City Police Dep't*, No. S92-488M, 1993 WL 592725, at *1 (N.D. Ind. July 6, 1993) ("Fed. R. Evid. 801(d)(2)(B) requires that the circumstances surrounding the accusation and silence be such that the accused naturally would be expected to deny the accusation if he believed it to be untrue."). After analyzing the language in *Hamlin* and *Pierce II*, it becomes evident that the two quotes are not remotely similar when it comes to describing the current rule regarding the affirmative defense of waiver — which is all that matters for the purposes of this discussion. [3]

In addition to the clear differences in language which distinguish the two quotations, multiple secondary sources in Indiana also cite to *Pierce II* as one of the first authorities discussing the evidentiary rule of adoptive admission prior to the enactment of the Federal Rules of Evidence. *See* 12 Ind. Law Encyc. Evidence § 67 (citing *Pierce II* for the proposition that "the silence of a party is only admissible as being in the nature of an admission when the character or extent of the communications or conversations is shown to be of such a nature as to actually require a reply, and when the statements made are of such a nature as to for a denial"); *see also* Bret Ruber, *Adoptive Admissions and the Duty to Speak: A Proposal for an Appropriate Test for the Admissibility of Silence in the Face of an Accusation*, 36 Cardozo L. Rev. 299, 306 (2014) (citing *Pierce II* when discussing the requirements for adoptive admissions in the nineteenth

---

[3] It is true that the quotes are similar in that they both contain words and that these words are in the English language, but the quotes are not similar as it relates to waiver. As way of an analogy, imagine an individual who has just woken up from a coma and has a severe case of aphasia. Now imagine attempting to explain to that individual what a "tangible object" is. In such a scenario, one could say an "orange" is similar to a "semi-truck." After all, both are "tangible objects." However, now imagine trying to explain what "fruit" is. Now it would be utterly absurd to point to the "orange" and the "semi-truck" and claim they are both "similar." Such a claim entirely forgets that "similarity" between two words hinges on the context of the discussion at hand. Here, defense counsel have forgotten the context of this discussion. Their argument essentially amounts to trying to say an "orange" and a "semi-truck" are "similar" when trying to define the category of "fruit."

century before the enactment of the Federal Rules of Evidence). In fact, the Court is aware of no

case law or secondary sources which cite to *Pierce II* as an authority on waiver.[4]

Furthermore, there are numerous places in *Pierce II* which clearly demonstrate that the

court was referring to the admission of adopted statements. The order is replete with quotations

explaining that the court is discussing an *evidentiary* rule regarding the admissibility of adopted

statements. For example, when quoting Greenleaf's treatise, the Supreme Court of Indiana

writes:

> Greenleaf [in his evidentiary treatise] states the rule thus: *Admissions may also be implied from the acquiescence of the party*.  But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language understood by the party, before any inference can be drawn from his passiveness or silence. . . .

*Pierce II*, 35 Ind. at 321 (emphasis added). On its face, this quote is explaining a rule regarding

the circumstances where an admission may be implied from silence or inaction. The Court notes

that defense counsel, in their brief, claim that the section mentioning "acquiescence"  in

Greenleaf's evidentiary treatise was really opining on elements of the affirmative defense of

---

[4] The court notes that there are numerous criminal cases, not having anything to do with the affirmative defense of waiver of a contractual claim, which cite to *Pierce II. See Kern v. State*, 144 N.E.2d 705, 706 n.1 (Ind. 1957) (cites to *Pierce II* for the hearsay rule regarding adoptive statements); *Fausett v. State*, 39 N.E.2d 728, 733 (Ind. 1942) (same); *Surber v. State*, 99 Ind. 71, 73 (Ind. 1884) (same); *Broyles v. State*, 47 Ind. 251, 253 (Ind. 1874) (same); *State v. Hill*, 36 S.W. 223, 225 (Mo. 1896) (same); *Green v. State*, 36 S.W. 700, 704 (Tenn.  1896) (same); *State v. Mortensen*, 73 P. 562, 568 (Utah 1903) (same); *Conway v. State*, 21 N.E. 285, 286 (Ind. 1889) (same). The fact that cases having to do with criminal charges of murder, robbery, rape, and "bastardy" were citing to *Pierce II*, should have signaled to counsel, in addition to the explicit text of *Pierce II*, that *Pierce II* was not addressing the substantive requirements for the affirmative defense of waiver. There are also numerous civil cases which cite *Pierce II*, but fail to discuss the requirement for the affirmative defense of contractual waiver. *See Springer v. Byram*, 36 N.E. 361, 364 (Ind. 1894) (cites to *Pierce II* for the hearsay rule regarding adoptive statements); *Puett v. Beard*, 86 Ind. 104, 106 (Ind. 1882) (same); *Johnson v. Holliday*, 79 Ind. 151, 156 (Ind. 1881) (same); *Howard v. Howard*, 69 Ind. 592, 601 (Ind. 1880) (same); *Gerulis v. Viens*, 156 A. 378, 379 (Me. 1931) (same); *Masons' Union Life Ins. Ass'n v. Brockman*, 59 N.E. 401, 403 (Ind. Ct. App. 1901) (same). None of these cases claim that *Pierce II* set forth the substantive requirements of the affirmative defense of waiver, and the Court is aware of no such case.

waiver. (DE 405 ("Acquiescence" [in Pierce] and what *Hamlin* called "waiver" do not appear to be meaningfully different.") As can be seen by the text above, this is clearly not what Greenleaf was discussing. Rather, he was discussing when it is permissible to draw inferences from silence or inaction in response to another party's statement or conduct. (i.e., "acquiescence" as used in this context). A quick Google search also dispels the notion that Greenleaf, in his *evidentiary* treatise, was discussing substantive contract defenses in this passage. The first edition of Greenleaf's evidentiary treatise is available for free online. In a footnote to the quotation above, Greenleaf writes the following:

> *To affect a party with the statements of others*, on the grounds of his implied admission of their truth by silent acquiescence, it is not enough that they were made in his presence; for if they were given in evidence, in a judicial proceeding, he is not at liberty to interpose when and how he pleases, though a party; and therefore is not concluded.

Simon Greenleaf, *A Treatise on the Law of Evidence* § 197 n.1 (1st ed. 1842).[5] If Greenleaf had been describing what had to be proved in order to make out the affirmative defense of waiver, it would be unusual that he would claim, in a footnote, that the evidence was going towards "affect[ing] a party with the statements of others, on the grounds of his implied admission of their truth by silent acquiescence[.]"[6] Rather, the footnote demonstrates that Greenleaf's quote was addressing when a party's silence in the face of a statement can be used against that person. Furthermore, the chapter this section of Greenleaf appears in is entitled "Of Admissions" and the

---

[5] A free copy of the treatise is available at: https://www.google.com/books/edition/A_Treatise_on_the_Law_of_Evidence/_fl1AQAAMAAJ?hl=en&gbpv=1&dq=Greenleaf+A+Treatise+on+the+Law+of+Evidence&printsec=frontcover (last viewed 11/10/2022).

[6] The Court also notes that in *Howard v. Howard*, 69 Ind. 592, 600 (1880), the Supreme Court of Indiana again quotes this portion of Greenleaf's evidentiary treatise when determining that the "court erred in allowing the appellees' witnesses to give in evidence to the jury this statement[.]" They also describe it explicitly as a "rule of evidence" that was approved in *Pierce v. Goldsberry*, 35 Ind. 317[.]"

first introductory sentence reads as follows: "Under the head of exceptions to the rule rejecting hearsay evidence, it has been usual to treat of *admissions and confessions* by the party; considering them as declarations against his interest and therefore probably true." *Id.* § 169. Again, it would be quite odd for Greenleaf, in his evidentiary treatise, in a chapter explicitly discussing admissions as an "exception to the rule rejecting hearsay evidence," to then transition into a discussion of the substantive elements of the affirmative defense of waiver.

Other citations should have also alerted counsel to the fact that they were dealing with an evidentiary rule, rather than a rule regarding waiver of a contractual right. For example, the court in *Pierce II*, at some length, quotes from *Kenney*, 12 Met. 235. The quote itself is, again, clearly discussing an evidentiary rule.[7] But beyond that, if counsel had read the case, they would have discovered this is a criminal case dealing with theft, which does not discuss contractual rights or waiver of those rights. The entire opinion in that case is only three paragraphs long and the first paragraph makes it clear that it is not addressing waiver of a contractual right:

> The defendant was indicted for stealing money and a bag . . . [E]vidence was offered to show that declarations were made at the watch house, by [the victim] in the presence and hearing of the defendant, in regard to the theft, to which the defendant made no reply. This evidence was objected to by the defendant, but was admitted by the court; and this is the ground of exception.

---

[7] The court in *Pierce II* quotes *Kenney* as follows: "If a statement is made in the hearing of another, in regard to facts affecting his rights, and he makes a reply, wholly or partially admitting their truth, then the declaration and the reply *are both admissible*; the reply, because it is the act of the party, who will not be presumed to admit anything affecting his own interest or his own rights, unless compelled to it by the force of truth; and the declaration, because it may give meaning and effect to the reply. In some cases where a similar declaration is made in one's hearing, and he makes no reply, it may be a tacit admission of the facts. But this depends on two facts; first, whether he hears and understands the statement and comprehends its bearing; and secondly, whether the truth of the facts embraced in the statement is within his own knowledge or not; whether he is in such a situation that he is at liberty to make any reply; and whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it." *Pierce II*, 35 Ind. at 321–22.

*Id.* at 236. From that paragraph, it is apparent that *Kenney* is a criminal case regarding theft, which considered the admissibility of an adopted statement, but does not set forth the standard regarding waiver of a contractual right.

In their response to the Court's show cause order, defense counsel also cite to the case *Kern v. State*, 144 N.E2d 705, 706 n.1 (Ind. 1957), ostensibly to show that more modern cases have cited *Pierce II*. (DE 405 at 3 (citing *Kern* in support of the proposition that "[w]e interpreted *Pierce* to support the proposition that in an action on a contract, silence can be an admission when the circumstances require a contracting party to speak up").) However, such a citation is bizarre and leaves the Court further convinced that counsel is engaging in arguments that reek of bad faith.

*Kern* was a case in which the Supreme Court of Indiana considered an appeal by a defendant in a criminal case. *Kern*, 144 N.E.2d at 705. This appeal was from a judgment of guilty as to one count of robbery. *Id.* The defendant there and another man had been driven to a house by two female accomplices. *Id.* at 706. The two men then broke into the house, hit the victim over the head with a "tire wrench," and robbed the victim. *Id.* While at the station house, the defendant's accomplices made statements in front of the defendant in which they described their part in the robbery. *Id.* Defendant responded at the police station by saying that they were "lying," which was later admitted into evidence at trial. *Id.* The court found that testimony of the defendant's response was inadmissible. *Id.* This was because the rule in criminal cases was that "if an accused be in custody when such accusations of guilt are made in his presence, he is under no duty to deny them and his silence is not to be taken as an admission against him . . . ." *Id.* The court then, in a footnote, cites *Pierce II* and describes how the rule is different in civil cases:

> In civil causes the rule is, 'if statements are made in the presence and hearing of a person, affecting his rights, and under such circumstances as call for a reply, what

21

he said, or if he failed to say anything may be proven as in the nature of an admission. *Pierce v. Goldsberry*, 35 Ind. 317 . . . .

*Id.* at 706 n.1. After noting that his response was inadmissible hearsay, the court found that it was "introduced without objection" and so could be considered on appeal when determining if a new trial should result. Ultimately, the court found the trial court did not err in denying appellant's motion for a new trial. *Id.* at 707.

The citation to *Kern* by defense counsel indicates that they likely know that *Pierce II* does not stand for the proposition they keep asserting. *Kern* is a criminal case with absolutely no mention of contract or contractual waiver. Instead, the defendant robbed a victim after hitting him over the head with a wrench and then made certain statements at a police station which had been admitted at trial. The court was considering whether those hearsay statements, admitted at trial without objection, warranted a new trial. Since counsel cited this case, they should have also understood that it had nothing to do with waiver and been aware that *Pierce II* was also not discussing the affirmative defense of waiver.

Finally, defense counsel includes the meager argument that *Pierce II* is not merely an "evidentiary ruling" because evidence "is not admissible unless it is relevant, so there would have been no reason for the Indiana Supreme Court to order evidence of Goldsberry's silence to be admitted unless that silence, under the circumstances was relevant to Pierce's liability on the contract." (DE 405 at 4.) This argument misses the point. Counsel is correct that evidence is only admissible if it is relevant. *See* Fed. R. Evid. 402. It is also true that the evidence of Goldsberry's silence was relevant to Pierce's contractual liability. However, defense counsel has never previously asserted that *Pierce II* is only broadly relevant to contractual liability.

Instead, defense counsel have consistently asserted that *Pierce II* sets forth the requirements for the affirmative defense of waiver. Counsel explicitly cite to *Pierce II* in their

opening brief for the rule that waiver "appl[es] where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here called for a denial." (DE 392 at 4.) In their response, Plaintiffs then correctly noted that this was the incorrect standard, explained that under Indiana law "waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act, and then asserted that defendants had failed to identify any "duty to speak or act" in their opening brief. (DE 393 at 2–3.) In their reply, defense counsel, for the first time, raised the argument that Plaintiffs did have a duty to speak up.[8] (DE 397 at 6–8.) Plaintiff's new argument concerning duty prompted Plaintiffs to file a surresponse in which they argued, correctly, that this new argument was waived for failure to include it in defense counsel's opening brief. (DE 399.) In their surreply, defense counsel again cited *Pierce II* as setting forth the standard regarding waiver. (DE 401 ¶ 4(a).) Finally, in their response to the order to show cause, after this court put them on notice that their interpretation of *Pierce II* lacked support, defense counsel persisted with their claim that *Pierce II* stands for the proposition that waiver may apply "where a statement was made in a party's presence which he did not deny, if the circumstances would have, as here, called for a denial." (DE 405 at 4.)

As the above demonstrates, it has never been defense counsel's claim that *Pierce II* is relevant merely because it relates to contractual liability. Rather, it has been defense counsel's position that *Pierce II* is relevant because it lays out the applicable rule regarding the affirmative defense of waiver. The court cannot emphasize this enough: *Pierce II does not, in any manner, lay out the standard that must be met to show the affirmative defense of waiver*.

---

[8] In this reply brief, defense cite *Pierce II* again for the proposition that waiver applies "where a party did not speak out when he should have, where circumstances called for a denial."  (DE 397  at 2.)

It is completely unreasonable to claim that *Pierce II* stands for what defense counsel asserts. As shown above, *Pierce II* is a 150-year-old case that explicitly addresses the evidentiary rule regarding adoption of statements. The case at absolutely no point addresses the affirmative defense of waiver. This commonsense interpretation is readily apparent: it is clear not only through the language of the case, but by the citations included in the case, and is confirmed by the fact that *Pierce II* has been interpreted uniformly by other cases and secondary sources as addressing the evidentiary rule regarding adoption of statements. Defense counsel's continued insistence to the contrary is bewildering.

The Court also finds that defense counsel's insistence to the contrary has resulted in substantial delay to the resolution of this case. As the Court explained in detail in its last order, defense counsel's failure to properly include the proper standard regarding waiver in their opening brief caused them to neglect to address the element of duty to speak (which was likely necessary if they hoped to succeed). (DE 404 at 43.) After Plaintiffs pointed out this failure, defense counsel maintained that they *did*, in fact, argue duty to speak, pointing to *Pierce II*, five quotations from cases addressing laches, and a throwaway, conclusory line in their opening brief. (DE 401 ¶ 4.) Even after the Court called out defense counsel's questionable use of *Pierce II* in its prior order, defense counsel have still persisted in their claim that *Pierce II* lays out the applicable standard of waiver.

The upfront failure to reasonably interpret *Pierce II* likely led to the counsel's omission of an argument regarding duty to speak in their opening brief, which led to them raising this issue for the first time in their reply. Raising this belatedly required Plaintiffs to expend resources writing a surresponse about why such a claim was waived. In addition to the omission prompting further briefing, the Court, as well as Plaintiffs' counsel, have wasted valuable

resources addressing arguments which were largely undermined from the outset due to defense counsel's failure to correctly identify the black letter law regarding waiver. (DE 404 at 41.) Finally, the Court has expended resources in this order addressing an interpretation that is unequivocally wrong. Given defense counsel's repeated invocation of *Pierce II* for a proposition it does not remotely support, the Court finds that defense counsel have been making unreasonable arguments in bad faith for the purpose of dragging out this lawsuit. As explained above, the unreasonable interpretation of *Pierce II* has likely caused delay in the resolution of this case. It has also caused the opposing party, as well as this court, to expend resources addressing multiple arguments based on a flagrant misinterpretation of the law which were doomed to fail at the outset.

Worse yet, defense counsel's misinterpretation of *Pierce II* is not a singular event. Rather, defense counsel made a similar misinterpretation of another case: *Hellyer Commc'ns, Inc. v. WRC Properties, Inc.*, 969 F. Supp. 1150, 1159 (S.D. Ind. 1997).

### *(2) Defense Counsel's Interpretation of* Hellyer *was also Objectively Unreasonable.*

In its prior order, the Court put defense counsel on notice that it believed that defense counsel had also misinterpreted the case law in its discussion of *Hellyer Communications, Inc. v. WRC Properties, Inc.*, 969 F. Supp. 1150, 1159 (S.D. Ind. 1997). In their reply, defense counsel asserted that *Hellyer* supported the rule that there is a duty to speak when "Plaintiffs [have] access to all of the information." (DE 397 at 2.) In support of this, defense counsel then include the following quote taken from *Hellyer*: "Hellyer had a duty to inspect the premises to ensure that they conformed with the Lease and to notify [Landlord] with any problems." (*Id.*)

As the Court explained in its prior order, defense counsel is wrong. (DE 404 at 41–42.) The court in *Hellyer* was clearly writing that the duty to speak came from an explicit term in the

lease. (*Id.*) Furthermore, the quotation that defense counsel includes in support of their standard omits clear portions which identify that the court was discussing how the duty arose from the explicit terms of the lease. The Court explained much of this in its prior order. (*Id.*) However, like with *Pierce II*, the Court again will review *Hellyer* in order to show why defense counsel have reached an unreasonable interpretation.

 In *Hellyer,* the court faced the question of whether laches barred the plaintiff's claim that the defendant had been charging him rent based on the wrong square footage. *Hellyer Commc'ns, Inc.* 969 F. Supp. at 1158. The court first explained that there were three elements necessary for a claim to be barred under the doctrine of laches: "(1) plaintiff's inexcusable delay in asserting his or her rights, (2) plaintiff's implied waiver arising from knowing acquiescence in existing conditions, and (3) prejudice to the defendant due to the delay." *Id.*

The court examined the element of inexcusable delay first. The court began by noting that the plaintiff, once he came in possession of the space leased, had the ability to "measure its space at any time." *Id.* at 1159. This gave the plaintiff constructive knowledge of the square footage of his leased space. *Id.* However, the court then explained that constructive knowledge alone "will not suffice as a predicate for laches." *Id.* Instead, there had to be "means of knowledge *combined* with a duty to exercise those means [in order to have] an adequate basis for finding inexcusable delay." *Id* (emphasis added)*.* The court went on to conduct a thorough analysis of how the plaintiff's duty arose from the explicit terms of the lease:

> Hellyer had a duty to inspect its premises to ensure that they conformed with the Lease and to notify WRC of any problems. *Initial Lease Section 2.03.* Hellyer maintains that *Section 2.03* only pertained to the *Initial Lease* and the tenant improvements made to the leased space, but was not generally in effect as a *term of the Lease*. This argument fails in the face of the *Integration Clause*—the same reason WRC's prior argument about Lease Exhibit A–3 was unavailing: the Amendments specifically provide that "all *provisions of the Lease* not modified or amended hereby shall remain in full force and effect." Exs. 6, 7, 17, 22. *Section*

> *2.03 was not deleted and thus remained in effect, obligating Hellyer to inspect its leased space within thirty days after executing the Lease documents.* In addition, Hellyer's attempt to avoid the waiver provision by claiming that the square footage discrepancy was not a "condition" under the leasehold, is similarly unavailing, given that *Section 2.03, by its very terms, states that, unless Hellyer notified WRC it would be deemed to have found the leased space "satisfactory and in conformity with the provisions of this Lease* in all respects ...." *Ex. 3 (Initial Lease, Section 2.03)*

*Id* (emphasis added*).* It is this passage that counsel only quotes the first line from, even though the rest of the passage, in explicit terms, makes it clear that it is analysis of a *contractual* duty. After this passage, the court in *Hellyer* found that the first element of laches had been satisfied because there was both constructive knowledge and a duty to speak. *Hellyer Commc'ns, Inc.* 969 F. Supp. at 1159. Immediately after finding the first element of laches, the Court found that the second element of laches, acquiescence, had been satisfied: "Hellyer must be deemed to have acquiesced in the conditions as they existed at the 8500 Building, thus satisfying the second laches requirement." *Id.* The court then explains that "the *terms of its Lease* imposed on Hellyer an obligation to verify the lease terms if it wanted to be compensated for any possible discrepancies." *Id.* Finally, the court found that the delay had prejudiced the defendant, resulting in the claim being barred. *Id.*

The Court is at a loss for where in the above analysis defense counsel can find support for the rule that plaintiffs have a general duty to speak when "plaintiffs have access to all of the information," are "charged with knowledge," or when "a plaintiff has . . . even the means of knowledge." If anything, *Hellyer* indicates the exact opposite. If there is *always* a duty to speak up when someone has merely the means of knowledge, then why is the court so concerned with the explicit terms of the lease after it has already found that there the plaintiff had means of knowledge? If defense counsel's rule were correct, there would have simply been no need for the

court in *Hellyer* to examine duty at all. At that point, after determining means of knowledge, the first prong of the laches analysis would have been complete.

Instead, in both its analysis and the rule it articulates, the court in *Hellyer* examines knowledge and duty separately. It first says that constructive knowledge alone "will not suffice as a predicate for laches" and that it is only "means of knowledge *combined* with a duty to exercise those means are an adequate basis for finding inexcusable delay." *Id.* at 1159 (emphasis added). Such a rule accords exactly with the analysis then conducted by the court. First, the court determined that Hellyer had the means of knowledge, since he was in possession of the leased property. Defense counsel appears to think that the court could have stopped here because "means of knowledge" causes an individual to have a "duty to speak up." However, the court in *Hellyer* does not stop there. Rather, in line with the rule the court provides, the court proceeds to explicitly analyze the terms of the lease in order to conclude that *Hellyer* had a duty to speak up. Therefore, in both the explicit rule it puts forth, as well as the analysis it proceeds with, *Hellyer* does not support that an individual has a duty to speak when they have the "means of knowledge" or are simply "charged with knowledge."

In another portion of their response to the court's show cause order, defense counsel claims that they were citing *Hellyer* alongside another string of cases in support of the proposition that individuals have a "duty to speak up when confronted with, or charged with knowledge of a mistake in a contract." (DE 405 at 5.) With this string cite, defense counsel asserts that they were trying to draw "an analogy" between *Hellyer*, the other cases in the string cite, and the facts before the Court. The Court disagrees.

First, defense counsel never asserted that there was a duty to speak up when "confronted with, or charged with knowledge of a mistake in a contract" in any of their briefs. Rather, in their

reply brief, they claimed that waiver occurs "where a party did not speak out when he should have, where the circumstances called for a denial" and that "Indiana law supports that there was a duty to speak, because the Plaintiffs had access to all of the information." (DE 397 at 2.) Elsewhere, they claimed that "[w]here a plaintiff has actual knowledge or even the means of knowledge, he has a duty to speak up." (DE 397 at 6.) In their surreply, they also claim that there is an obligation to speak when one is "charged with knowledge." (DE 401 ¶ 5.) The only cases they cite for these propositions are *Pierce II* and *Hellyer*, not the string cite. As the Court has explained above, neither of these cases support the murky proposition that a plaintiff has a duty to speak when he has "access to all of the information," "means of knowledge," or is "charged with knowledge." In fact, *Hellyer* indicates the exact opposite.

Second, there is no indication that this string cite was being used in support of an analogy. In defense counsel's reply brief, they cite a string of cases in support of the proposition that "[e]quity rewards those who are vigilant about their rights." (DE 397 at 6.) Counsel now asserts that this string cite was intended to support the legal proposition that an individual has a "duty to speak up when confronted with, or charged with, knowledge of a mistake in a contract." (DE 405 at 5.) If counsel was intending to use a string cite to support this proposition, then they hid the ball on this in multiple ways. First, as previously discussed, they fail to even mention such a standard in their briefs, making it highly unlikely that the string cite was in support of it. Second, the string cite was placed directly after the phrase "[e]quity rewards those who are vigilant about their rights." This makes it appear as if the string cite was in support of that proposition. Finally, not a single one of the parentheticals included in that string cite directly

supports the proposition that there is a "duty to speak up when confronted with, or charged with, knowledge of a mistake in contract."[9]

Upon further review of this string cite, the Court believes that, rather than supporting their case by way of analogy, counsel decided to copy a string cite, almost verbatim, from *Hellyer*. The cases in the string cite appear in the exact same order, with almost the exact same language, on page 1159 of *Hellyer*.[10] *See Hellyer Commc'ns, Inc.*, 969 F. Supp. at 1159. Interestingly, though, in *Hellyer*, the court uses the string cite to support the proposition that

---

[9] Defense counsel listed the following quotations in support of the phrase "equity rewards those who are vigilant about their rights." The Court has bulleted them for clarity:

- *Hellyer Commc'ns Inc.,* 969 F. Supp. at 1159 ("Once in possession of the space leased, its reliance upon [landlord's] figures was no longer justifiable.");
- *Perry v. State of Indiana*, 512 N.E.2d 841, 844 (Ind. 1987) (distinguishing the insufficient "notice which is imputed from the mere passage of time in post-conviction proceedings" from the sufficient "[i]nquiry notice which is imputed from objective facts, such as the open and notorious use of land by an adverse claimant");
- *Mishawaka, St. Joseph Loan & Trust Co. v. Neu*, 196 N.E. 85, 90 (Ind. 1935) ("[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself");
- *see also Fulani v. Hogsett, 917 F.2d 1028, 1031* (7th Cir. 1990), cert. denied, 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991) (concluding that laches barred claim challenging state election procedure where plaintiff waited eleven weeks after ballots were public record and two weeks after it had actual knowledge of alleged irregularity);
- *Simon v. Auburn, Bd. of Zoning Appeals*, 519 N.E.2d 205, 214 (Ind. Ct. App.1988) (determining that doctrine of laches applies where plaintiffs "had knowledge or the means of acquiring knowledge of the technical irregularities they now allege").

(DE 397 at 6.)

[10] The following string cite appears in *Hellyer*. The Court has put it in bullets for clarity. The Court has also italicized the portions which appear directly copied:

- *See e.g., Perry v. State of Indiana,* 512 N.E.2d 841, 844 (Ind. 1987) (stating that laches cannot rest on constructive knowledge, and ***distinguishing the insufficient "notice which is imputed from the mere passage of time in post-conviction proceedings" from the sufficient "[i]nquiry notice which is imputed from objective facts, such as the open and notorious use of land by an adverse claimant"***);
- *Mishawaka, St. Joseph Loan & Trust Co. v. Neu,* 209 Ind. 433, 196 N.E. 85, 90 (Ind. 1935) (***"[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself"***) (quoting *Cordova v. Hood,* 84 U.S. 1, 17 Wall. 1, 21 L.Ed. 587 (1872));
- *see also Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir.1990), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991) (***concluding that laches barred claim challenging state election procedure where*** nature of claim requires expeditious prosecution and before filing claim, ***plaintiff waited eleven weeks after ballots were public record and two weeks after it had actual knowledge of alleged irregularity***);
- *Simon v. Auburn, Bd. of Zoning Appeals,* 519 N.E.2d 205, 214 (Ind. App.1988) (***determining that doctrine of laches applies where plaintiffs "had knowledge or the means of acquiring knowledge of the technical irregularities they now allege"***)

"[a]lthough constructive knowledge will not suffice as a predicate for laches, the means of knowledge combined with a duty to exercise those means are an adequate basis for finding inexcusable delay." *Id.* In other words, defense counsel have copied, nearly verbatim, a string cite that does not support what they are now claiming. Furthermore, defense counsel's naked claim that these cases support them by way of analogy does not make it so: in their reply brief, they include no independent analysis explaining why these cases help show there is a duty to speak up when "confronted with, or charged with knowledge of a mistake in a contract." (DE 397 at 6.)

Even if defense counsel included a discussion of the so-called duty to speak when "confronted with, or charged with knowledge of a mistake in a contract," the cases cited in that string cite don't appear, on their face, to support such a standard. For example, defense counsel cites to *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). In *Fulani*, the Seventh Circuit considered whether a claim that Indiana electoral officials had been denied equal protection of the laws when state officials allowed both the Democratic and Republican presidential candidates on the ballot after the Indiana Secretary of State failed to certify their electoral candidates by the date set forth under Indiana law. *Id.* at 1029. However, the plaintiffs waited until only three weeks before the election to file their claim. *Id.* at 1030. The court noted that "in the context of elections, [laches] means that any claim against a state electoral procedure must be expressed expeditiously." *Id.* The Seventh Circuit ultimately held that the claim was barred by laches given the eleven weeks they waited in pressing their claim and that they only raised it three weeks before "the election, [which would have made it] extremely difficult, if not impossible, for Indiana to provide another set of ballots." *Id.* at 1031. It is unclear why defense counsel believes this case, discussing the unique application of laches when it comes to claims

affecting elections, supports the rule that there is "a duty to speak up when confronted with, or charged with, knowledge of a mistake in a contract." (DE 405 at 5.) After all, the case does not mention contracts and has to do with laches in the unique context of elections.

Other cases cited in this long string cite also do not, on their face, have to do with a duty to speak up when "confronted with, or charged with knowledge of a mistake in contract." *See Perry v. State*, 512 N.E.2d 841, 844 (Ind. 1987) (considering laches in the context of a prisoner seeking post-conviction relief and finding that both constructive knowledge and "inquiry notice alone [are] not sufficient to support a finding of unreasonable delay under circumstances permitting diligence"); *Mishawaka, St. Joseph Loan & Trust Co. v. Neu*, 196 N.E. 85, 90 (Ind. 1935) (considering a claim seeking specific-performance of real estate and noting that "[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself"); *Simon v. City of Auburn, Ind., Bd. of Zoning Appeals*, 519 N.E.2d 205, 215 (Ind. Ct. App. 1988) (explaining that the first element of laches was met because "persons are charged with knowledge of the law . . . .") The Court notes that even if an analogy could be drawn from these cases to the instant one, defense counsel never developed one in any meaningful manner throughout their briefs.

Finally, defense counsel, in their response to the show cause order, now claims that their "intent was not to argue that Indiana law establishes an independent duty to speak based on mere access to information[,]" but rather "under the 'circumstances calling for a response' framework discussed above,[11] our intent was to draw a factual analogy between what ought to be a tenant's

---

[11] The only section prior to defense counsel addressing *Hellyer* was the section addressing *Pierce II*. Therefore, it appears that defense counsel here means the framework discussed in *Pierce II*. Of course, that framework, as explained above, has nothing to do with the affirmative defense of waiver.

familiarity with the space she occupies and what ought to be a commission-earner's familiarity with the commissions he is owed." (DE 405 at 6.) The Court again disagrees.

First, the Court finds that it was, in fact, their intent to argue that Indiana law establishes an independent duty to speak based on "mere access to information" given the explicit words to that effect in their brief: "Indiana law supports that there was a duty to speak because the Plaintiffs had access to all of the information." (DE 397 at 2.) Elsewhere in their reply, they put forth a similarly flawed standard: "Where a plaintiff has actual knowledge *or even the means of* knowledge, he has a duty to speak up." (*Id.* at 6.) The Court emphasizes that the bold italics are not the Court's addition, they are defense counsels' own stylization. In fact, again, in their surreply, defense counsel assert that "its position had always been that "where a plaintiff has actual knowledge *or even the means of knowledge*, he has a duty to speak up." (DE 401 ¶ 3.) For defense counsel to claim now that they were not arguing that there was a duty to speak based on "mere access to information" is inconsistent with the explicit, bolded, italicized words they used throughout their briefs. The Court is not willing to ignore the clear meaning of defense counsel's words in favor of a weakly supported after-the-fact justification.

Second, when defense counsel claims they were simply referencing *Hellyer* and the string cite in support of the "circumstances calling for a response" framework, they appear to be referencing the framework derived from *Pierce II*. As the Court explained above, this reliance on *Pierce II* is misplaced considering that was a case addressing whether adopted statements could be admitted into evidence.

Accordingly, the Court finds that counsel's initial interpretation of *Hellyer* was objectively unreasonable. The Court also finds that defense counsel's justification for why they used *Hellyer*, which relies on *Pierce II* and an irrelevant string cite, further demonstrates bad

faith. Like with *Pierce II*, defense counsel repeatedly relied on *Hellyer* to support their argument concerning duty to speak and that there was a duty where a plaintiff had "even the means of knowledge." (DE 397 at 6; DE 401 ¶ 3) Counsel did this even though they should have been aware *Hellyer* stood for the exact opposite. This approach, which attempted to belatedly address duty after it had been waived by their failure to address it in their opening brief, prompted plaintiffs to file a surresponse. It also required the Court to address meritless, unsupported arguments which were waived by virtue of defense counsel's failure to correctly cite the black letter law in their initial brief.

### (3)  The Court's Sanctions are Based on the Above.

The Court initially ordered defense to show cause on two other matters: (1) a quotation that omitted the ending, which the Court found to be slightly misleading; and (2) an argument that prejudgment interest was not warranted which appeared to ignore the distinction between liability and damages. (DE 404 at 41–43.) While the Court still believes that these two arguments are ultimately unpersuasive, the Court does not believe that they are sanctionable. Unlike defense counsel's interpretation of *Pierce II* and *Hellyer*, these arguments, while only lightly supported, do not appear as unfounded. Accordingly, the Court only sanctions defense counsel for the reasons previously discussed.

### (4)  Monetary Sanction is Warranted.

The Court finds that defense counsel have been advancing objectively unreasonable, frivolous, and misleading arguments. As the Court explained above, there is no reasonable basis to interpret *Pierce II* as setting the modern-day standard of waiver. It was not a case that set forth the elements of waiver in 1870, and it is surely not a case setting forth the elements of waiver in 2022. And yet, defense counsel have stubbornly relied on *Pierce II*. They did so in their opening

34

brief, where they failed to address whether plaintiffs had a duty to speak. They then did so again in their reply brief, their surreply, and their response to this Court's order to show cause.

Defense counsel similarly rely on *Hellyer.* As explained above, *Hellyer* is not a case which held that Plaintiffs have a general duty to speak when "Plaintiffs have access to all of the information" or a duty to speak up when "a plaintiff has . . . even the means of knowledge." In fact, it indicates the opposite. And yet, in their reply brief, they claim that *Hellyer* supports the proposition that a plaintiff has a duty to speak where they have "access to all of the information" and elsewhere claim that a plaintiff has a duty to speak where they have the "means of knowledge" or are "charged with knowledge."

The Court finds that these unreasonable arguments deserve sanctions. They are the type of "utterly implausible" arguments which are "characterized by abuse." *Lerch v. Boyer*, 929 F. Supp. 319, 324 (N.D. Ind. 1996). The black letter law regarding waiver in Indiana is not obscure, but rather widely available. *Hastetter v. Fetter Properties, LLC*, 873 N.E.2d 679, 684 (Ind. Ct. App. 2007) ("Waiver is an intentional relinquishment of a known right, and silence, inactivity, or acquiescence is not waiver unless the party against whom waiver is claimed had a duty to act or speak."); *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) ("[W]aiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak."); *Grenchik v. State ex rel. Pavlo*, 373 N.E.2d 189, 193 (Ind. 1978) ("Mere silence or acquiescence (or, in this case, inactivity) is not a waiver unless there was a duty to speak"); *Union Fed. Sav. Bank v. INB Banking Co. Sw.*, 582 N.E.2d 426, 432 (Ind. Ct. App. 1991) ("Silence may constitute waiver, but only when there is a duty to speak or to otherwise take action."). Rather than citing to any one of these cases, defense counsel chose to rely on a case from 1870, which does not address what is necessary to make out the defense of

waiver. They even went so far as to claim that "silence and inaction are the hallmarks of . . . waiver." (DE 397 at 6.) While the Court recognizes that counsel should have some latitude to come up with creative arguments, they have never advanced the argument that *Pierce II* somehow developed into the current law of waiver, acknowledged its limited holding, or analogized the legal issues presented there to the instant case. Instead, they have repeatedly claimed that *Pierce II* provides the substantive standard for what is required to show waiver. Such a claim is flatly wrong.  This disregard for Indiana law is not solely confined to *Pierce II*. As explained above, defense counsel similarly ignored a case's clear holding in *Hellyer*.

In sum: defense counsel have put forth baseless arguments in front of the Court, based on unreasonable interpretations of case law, which have delayed resolution of this case. The baseless filings contesting whether duty to speak was waived, relying on *Pierce II*, are precisely the type of filings Rule 11 was meant to deter. *Goldfinger v. J. Commc's Inc.*, No. 15-C-12, 2015 WL 13034986, at *4 (E.D. Wis. Aug. 4, 2015) (Rule 11 is meant to deter baseless filings in district court). Defense counsel's theories regarding waiver, duty to speak, and whether their duty to speak argument was forfeited were undermined by unreasonable interpretations of case law and demonstrate that defense counsel either purposefully put incorrect interpretations of case law in front of this Court, or failed to conduct a reasonable investigation of the law regarding waiver before filing their briefs. *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 823 (7th Cir. 2001) ("Rule 11 authorizes a district court to impose sanctions on lawyers or parties (or both) for submissions that are filed for an improper purpose or without reasonable investigation of the facts and law necessary to support their claims.").

"The court may impose a penalty as light as a censure and as heavy as is justified—a fine that may exceed the amount of fees incurred by the opposing party." *Frantz v. U.S. Powerlifting*

*Fed'n*, 836 F.2d 1063, 1066 (7th Cir. 1987). The Seventh Circuit has previously approved of

sanctions in the amount of $1,000 where an attorney made unreasonable and frivolous

arguments. *Burda v. M. Ecker Co*., 2 F.3d 769, 776 (7th Cir. 1993) (finding a $1,000 sanction

was justifiable where the attorneys ignored dispositive federal statutes and case law). Similar to

*Burda*, defense counsel here utilized *Pierce II* and *Hellyer* to make an unreasonable argument

concerning whether they had raised a duty to speak in their opening brief and when a duty to

speak is present under Indiana law. Such an argument wasted the time of the opposing party

because they had to file a surresponse, but it also wasted the time of this Court. Accordingly, the

Court believes a monetary sanction of $1,000 is proper. The sanction shall be imposed against

the attorney who signed the briefs containing the sanctionable arguments: Joshua Fleming. *See*

Fed. R. Civ. P. 11 advisory committee note to 1993 amendment ("The sanction should be

imposed on the persons . . . who have violated the rule or who may be determined to be

responsible for the violation. The person signing, filing, submitting, or advocating a document

has a nondelegable responsibility to the court, and in most situations is the person to be

sanctioned for a violation.").

The Court also notes that this sanction is less than those in other cases involving more

serious conduct. *Fries v. Helsper*, 146 F.3d 452, 459 (7th Cir. 1998) (ordering sanctions in the

amount of $5,779.64 where the plaintiff "entangled multiple defendants in duplicitous litigation

based on unfounded allegations [and] impugned the integrity of a state court judge as well as the

reputation of a federal district court judge with total disregard for the truth"); *Schmude v.

Sheahan*, 312 F. Supp. 2d 1047, 1097 (N.D. Ill. 2004) (ordering that a sanction of a fine in the

amount of $5,000 was justified where the attorneys obtained awards of attorneys' fees in the

Circuit Court of Cook County even though the case had been removed to federal court, and

proceeded with doing so even after a motion to remand was denied and after being reminded that further litigation in state court would be in contravention of the federal court's jurisdiction)

**D.     Conclusion**

The Court finds that Mr. Fleming's baseless arguments warrant sanctions under Federal Rule of Civil Procedure 11. Therefore, a fine in the amount of $1,000 is assessed against attorney Joshua Fleming. Mr. Fleming is to pay this monetary sanction to the clerk of court within fourteen days.

SO ORDERED.

ENTERED: November 30, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court